# Exhibit D



**AMERICAN ARBITRATION ASSOCIATION®**

**EMPLOYMENT ARBITRATION RULES**
**DEMAND FOR ARBITRATION**

*Please visit our website at www.adr.org if you would like to file this case online. AAA Customer Service can be reached at 800-778-7879.*

**Mediation:** If you would like the AAA to contact the other parties and attempt to arrange mediation, please check this box ☐.

### Parties (Claimant)

| | |
|---|---|
| Name of Claimant: Sidney L. Staton III, et al. | Representative's Name (if known): Jennie Lee Anderson |
| Address:<br>5277 Amelia Drive | Firm (if applicable): Andrus Anderson LLP |
| | Representative's Address:<br>155 Montgomery Street |

| City: San Jose | State: CA | Zip Code: 951 | City: San Francisco | State: CA | Zip Code: 9410 |
|---|---|---|---|---|---|
| Phone No.: 650-833-8799 | Fax No.: | | Phone No.: 415-986-1400 | Fax No.: 415-986-1474 | |

| Email Address: sidneystaton@gmail.com | Email Address: jennie.anderson@andrusanderson.com |
|---|---|

### Parties (Respondent)

| | |
|---|---|
| Name of Respondent: HP Inc., et al. | Representative's Name (if known): Richard W. Black |
| Address:<br>1501 Page Mill Road | Firm (if applicable): Littler Mendelson P.C. |
| | Representative's Address:<br>3344 Peachtree Road |

| City: Palo Alto | State: CA | Zip Code: 9430 | City: Atlanta | State: GA | Zip Code: 3032 |
|---|---|---|---|---|---|
| Phone No.: 650-857-1501 | Fax No.: | | Phone No.: 404-233-0330 | Fax No.: 404-233-2361 | |

| Email Address: | Email Address: rblack@littler.com |
|---|---|

Claim: What was/is the employee/worker's annual wage range?   ☐ Less than $100,000   ☐ $100,000-$250,000   ☐ Over $250,000
*Note: This question is required by California law.*

| Amount of Claim: | Claim involves: ☑ Statutorily Protected Rights   ☐ Non-Statutorily Protected Rights |
|---|---|

In detail, please describe the nature of each claim. You may attach additional pages if necessary:

Please see attached.

Other Relief Sought:   ☐ Attorneys Fees   ☐ Interest   ☐ Arbitration Costs   ☐ Punitive/ Exemplary   ☑ Other  Declaratory

Please describe the qualifications for arbitrator(s) to hear this dispute:

Experience with class and/or collective actions, as well as complex litigation.

| Hearing: Estimated time needed for hearings overall: | hours or 1 | days |
|---|---|---|

| Hearing Locale:  Northern District of California | ☑ Requested by Claimant   ☐ Locale provision included in the contract |
|---|---|

Filing Fee requirement or $300 (max amount per AAA)
Filing by Company:   ☐ $2,200 single arbitrator   ☐ $2,800 three arbitrator panel

Notice: To begin proceedings, please send a copy of this Demand and the Arbitration Agreement, along with the filing fee as provided in the Rules, to: American Arbitration Association, Case Filing Services, 1101 Laurel Oak Road, Suite 100, Voorhees, NJ 08043. Send the original Demand to the Respondent.

| Signature (may be signed by a representative): | Date:<br>11-30-17 |
|---|---|

Pursuant to Section 1284.3 of the California Code of Civil Procedure, consumers with a gross monthly income of less than 300% of the federal poverty guidelines are entitled to a waiver of arbitration fees and costs, exclusive of arbitrator fees. This law applies to all consumer agreements subject to the California Arbitration Act, and to all consumer arbitrations conducted in California. Only those disputes arising out of employer plans are included in the consumer definition. If you believe that you meet these requirements, you must submit to the AAA a declaration under oath regarding your monthly income and the number of persons in your household. Please contact the AAA's Western Case Management Center at 1-800-778-7879. If you have any questions regarding the waiver of administrative fees, AAA Case Filing Services can be reached at 877-495-4185.

JENNIE LEE ANDERSON
jennie@andrusanderson.com
LELAND H. BELEW
leland.belew@andrusanderson.com
ANDRUS ANDERSON LLP
155 Montgomery Street, Suite 900
San Francisco, CA  94104
Phone: (415) 986-1400
Fax:    (415) 986-1474

DOUGLAS P. DEHLER
doug.dehler@wilaw.com
PAUL W. ZIMMER
paul.zimmer@wilaw.com
O'NEIL, CANNON, HOLLMAN, DEJONG & LAING S.C.
111 East Wisconsin Avenue, Suite 1400
Milwaukee, WI  53202
Phone: (414) 276-5000
Fax:    (414) 276-6581

*Attorneys for the Claimants*

## AMERICAN ARBITRATION ASSOCIATION

| | |
|---|---|
| SIDNEY L. STATON III, ED KAPLAN, KAREN BECKS, DANETTE HARDIN, KENT MEAGHER, CAMILLE HEDRICK, TINA BRADLEY, DAVID COBLEIGH, MICHAEL BAKER, LATISHA REYNOLDS, JULIO SEDA, DELORES ANDERSON, JOSEPHINE STEFANI, SAVERINO GENITO, and GERALDINE SHORT, for and on behalf of themselves and other persons similarly situated, | |
| Claimants, | **ARBITRATION DEMAND** <br><br> **CLASS ACTION** |
| vs. | |
| HP INC. and HEWLETT PACKARD ENTERPRISE COMPANY, | |
| Respondents. | |

1

## Introduction

1. This arbitration was ordered by the Honorable Edward J. Davila, District Judge for the United States District Court for the Northern District of California, in *Forsyth, et al. v. HP Inc., et al.*, Case no. 5:16-cv-04775-EJD (hereinafter "Lawsuit") on September 20, 2017. A copy of the September 20, 2017 Order (hereinafter "Order") compelling the Claimants to arbitration is attached hereto as *Exhibit A*.

## Parties

2. The Claimants are 15 of 49 Plaintiffs who brought, or opted into, the Lawsuit, which was filed as a collective action under the Age Discrimination in Employment Act, 29 U.S.C. § 621, et seq. ("ADEA"), on August 8, 2016. A copy of an Amended Complaint filed in the Lawsuit is attached hereto as *Exhibit B*.  Specifically, the Claimants are:

- Sidney L. Staton, III, from San Jose, CA;
- Karen Becks, from Washington, D.C.;
- Ed Kaplan, from Buffalo Grove, IL;
- Kent Meagher, from Phoenix, AZ;
- Geraldine Short, from Woodbridge, VA;
- Delores Anderson, from Washington, D.C.;
- Tina Bradley, from Cumming, GA;
- Latisha Reynolds, from Indianapolis, IN;
- Saverino Genito, from Nashua, NH;
- Josephine Stefani, from Washington Township, MI;
- Michael Baker, from Pittsboro, NC;
- Julio Seda, Jr., from Tinton Falls, NJ;
- Camille Hedrick, Allen, TX;
- Danette Hardin, from Carrollton, TX; and
- David Cobleigh, from Camas, WA.

2

3.      The Respondents are Hewlett Packard Enterprise Company ("HPE"), located at 3000 Hanover St., Palo Alto, California 94304, and HP Inc. ("HPI"), located at 1501 Page Mill Road, Palo Alto, CA 94304, who were named as the two Defendants in the Lawsuit. *See Ex. B.* Both HPE and HPI are successors to the liabilities of their predecessor, Hewlett Packard Company ("HPC"). Effective November 1, 2015, HPC split into HPI and HPE, with both companies retaining responsibility for certain liabilities of the old HPC pursuant to a Separation and Distribution Agreement dated October 31, 2015, which was entered into by and between HPC, HPE and HPI.

### Issue to Be Decided

4.      This arbitration is based entirely on District Judge Davila's Order compelling arbitration. Consistent with that Order, this arbitration involves a single issue. Specifically, the issue to be decided is whether certain release provisions contained in a standard form Waiver and General Release Agreement (hereinafter "RA") signed by the Claimants are valid and enforceable. The RAs containing the pertinent release provisions were signed by each of the 15 Claimants after their employment was terminated under a workforce reduction or restructuring plan implemented by HPC beginning in May 2012 ("WFR"). The WFR was continued by the Respondents after HPC split into HPI and HPE effective November 1, 2015. A copy of a standard form RA used by the Respondents in the WFR, like the one signed by each of the Claimants, is attached hereto as *Exhibit C.*

5.      In the Lawsuit, the Claimants allege that the release provisions contained in the RA are invalid and unenforceable because HPC and the Respondents failed to comply with the requirements of the Older Workers Benefit Protection Act ("OWBPA"), 29 U.S.C. § 626(f), when they terminated the Claimants' employment.

3

6.     As District Judge Davila made clear in the Order, the single question for this arbitration is "whether the release provision contained in the [RA] is enforceable" in light of the Claimants' assertions that the Respondents violated the OWBPA. *See Ex. A*, p. 4 (quoting Respondents' reply brief in support of their motion to compel arbitration).

<u>**The Limited Scope of the Arbitration**</u>

7.     The Claimants filed the Lawsuit as a collective action under the ADEA, and Plaintiffs also assert class allegations under Fed. R. Civ. P. 23 for California state law claims. *See Ex. B*, ¶¶ 131-155. After being served with the Lawsuit, the Respondents moved to compel the Claimants to arbitrate based on standard form language contained in Section 13 the RA. *See Ex. C*, § 13 (containing arbitration language)

8.     The Claimants opposed the Respondents' motion to compel arbitration, arguing in part that the entire RA (including its arbitration provisions) was void and unenforceable based on the OWBPA and by its own terms. Specifically, the RA contains a class action waiver ("CAW"). *Ex. C*, ¶ 5.7. When the Respondents drafted the RA, they included a non-severability provision stating that if the CAW was found invalid, the entire RA would be rendered invalid. *Id.*, at ¶¶ 5.7, 17. Furthermore, the Respondents drafted the RA to make it clear that the validity of the CAW could be decided only ***by a court of competent jurisdiction***, and ***not*** an arbitrator. *Id.*, at ¶ 5.7.

9.     In opposition to the Respondents' motion to compel arbitration, the Claimants argued that District Judge Davila ***first*** should decide whether the CAW was valid, as answering that question will dictate whether the entirety of the RA (including its arbitration provisions) is valid and enforceable given the RA's non-severability provision. The Claimants argued that this

4

approach was consistent with the CAW's non-severability language, as well as the RA's clear requirement that the CAW's validity be decided only by a court, and not an arbitrator.

10.     In their reply brief in support of their motion to compel arbitration, the Respondents opposed the Claimant's arguments, proposing that District Judge Davila *first* compel the Claimants to arbitration for a decision on "whether the release provision contained in the [RA] is enforceable." *See Ex. A*, p. 4 (quoting the Respondents' reply brief in support of their motion to compel arbitration). The Respondents argued that this would be most efficient because, if the release provisions in the RA are enforceable, then the Claimants could no longer pursue any claims against the Respondents.

11.     In essence, the motion to compel arbitration boiled down to a question of whether the validity of the CAW should be decided by the District Court *first* (as the Claimants argued), or whether the validity of the release provision in the RA should be decided by an arbitrator *first* (as the Respondents argued).

12.     Ultimately, the District Court entered an Order that required an arbitrator to decide the validity of the RA's release provisions first, followed by the District Court deciding the validity of the CAW. Specifically, the Order states in relevant part as follows:

> The Court agrees with Defendants that, under the terms of the RA, "*an arbitrator* must first decide *whether the release provision contained in the agreement is enforceable*." Arb. Reply 4. Then, if *the arbitrator* determines that the release provision is enforceable, Plaintiffs' claims will be barred and the collective action issue will be moot. *Id.* Otherwise, *the Court* will then determine whether Plaintiffs' claims may proceed on a class or collective basis. *Id.*

*Ex. A*, p. 4 (emphasis added).

5

### The Applicable AAA Rules

13.    This matter is governed by the AAA's Supplementary Rules for Class Arbitrations ("Supplementary Rules"), which supplement the AAA's other arbitration rules.

14.    The Supplementary Rules "shall [] apply whenever a court refers a matter pleaded as a class action to the AAA for administration." Supplementary Rule 1(a). Here, the Lawsuit was pleaded both as an ADEA collective (also known as "opt-in class action") and a Rule 23 class action with regard to California state law claims. *See Ex. B*, ¶¶ 131-155. As a result, the Lawsuit was pled as a class action and this arbitration is governed by the AAA's Supplementary Rules.

15.    The Supplementary Rules also state that those rules "shall apply to any dispute arising out of an agreement that provides for arbitration pursuant to any of the rules of the American Arbitration Association ('AAA') where a party submits a dispute to arbitration on behalf of or against a class or purported class…" Supplementary Rule 1(a). Here, the parties' dispute arises out of the RA, which purports to require the parties to arbitrate with the AAA. As set forth above, the Lawsuit was filed as a collective and class action, seeking (among other relief) a judicial order that the release language in the standard form RA is invalid and unenforceable under the OWBPA. For this additional reason, the Supplementary Rules apply to this arbitration, along with other applicable AAA rules.

### Requested Hearing Location

16.    The Claimants request that the hearing of this matter take place in the Northern District of California.

17.    AAA's location in the Northern District of California is the proper hearing location for this arbitration.  The underlying Lawsuit is pending in the Northern District of

California, and the Court has specifically retained jurisdiction over the case pending a

determination by the arbitrator on the limited issue of whether the release provision contained in

the agreement is enforceable. Furthermore, Defendants are headquartered here, the documents at

issue were created in this district and a Claimant resides in this district.

### Factual Background

18.     In the Lawsuit, the Claimants allege they were unlawfully terminated in violation

of the ADEA and California state laws. Although the merits of these claims are not before the

arbitrator, to provide context, the following is a brief summary of some of the factual

background concerning the Claimants' allegations.

19.     In the Lawsuit, the Claimants allege that the WFR's objective was to make HPC

younger, as shown in part by the public statements of the company's senior management. *See

Ex. B,* ¶¶ 32-36. For example, in October 2013, HPC's CEO Meg Whitman stated during a

Securities Analyst Meeting that HPC's goal was to "*recalibrate and reshape*" its "*labor

pyramid*" by replacing existing workers with "*a whole host of young people.*" *Id.*, at ¶ 33.

20.     In September 2015, just two months before HPC split into HPI and HPE effective

November 1, 2015, Ms. Whitman spoke again at a Securities Analyst Meeting about the need to

"fundamentally recreate" HPC's workforce, reiterating that HPC's "labor pyramid" needed to be

changed into a "quite flat [labor] triangle"—another reference to replacing the older workers

with new, younger employees. *Ex. B,* ¶ 34.

21.     Then, in November 2015, just weeks after the corporate split, Ms. Whitman stated

publicly again, this time in a CNBC television interview, that the organization's goal continued

to be getting younger, boasting that the post-split organization was developing "a labor pyramid

with *lots of young people* coming in right out of college and graduate school and early in their

careers." *Ex. B*, ¶ 35. Ms. Whitman went on to say that this was "an important part of the future of the company." *Id.*

22.     A preliminary statistical analysis of available data concerning the ages of those terminated under the WFR shows that older employees (age 40 and above) were more likely to be terminated than younger ones, with a statistical confidence level exceeding 99%. *Ex. B*, ¶¶ 71-76.

### An Objective Legal Standard Applies

23.     Throughout the time that HPC, HPE and HPI were implementing the WFR, they used nearly identical WFR documents, including a standard form RA that was presented to all former employees after termination. Thus, the release provisions at issue here are substantively identical for all 15 Claimants and other putative class members who signed RAs.

24.     Included in a standard packet of WFR materials used by the Respondents was also a document titled "Attachment A." The alleged purpose of the Attachment A was to comply with the OWBPA, which required, *inter alia*, that the Respondents disclose the job titles and ages of all employees in the pertinent "decisional unit," identifying those who were terminated under the WFR and those who were not.

25.     The RAs, however, did not comply with the OWBPA because they were not written so that *a reasonable employee* could understand them. In addition, the Attachment A forms failed to comply with OWBPA's disclosure requirements for "decisional units."

26.     The test for whether the RA's release language is enforceable is an *objective* one, which the arbitrator can decide across the board for all 15 Claimants and putative class members. Under the OWBPA, no waiver of "any right or claim" under the ADEA is valid "unless the waiver is knowing and voluntary." 29 U.S.C. § 626(f)(1). A waiver is knowing and voluntary

8

only if it is "written in a manner calculated to be understood by . . . *the average individual*" and if it provides certain age-related data "in writing in a manner calculated to be understood by *the average individual*." § 626(f)(1)(A), (H) (emphasis added). Because these are objective standards, the arbitrator will need to decide what an "average individual," not each Claimant, would have understood. *See Romero v. Allstate Ins. Co.*, 1 F. Supp. 3d 319, 390 (E.D. Pa. 2014), *opinion clarified on denial of reconsideration* (Apr. 7, 2014) (noting that the "OWBPA's understandability requirement is couched in objective terms."); *Ribble v. Kimberly-Clark Corp.*, No. 09-C-643, 2010 WL 4627929, at *1 (E.D. Wis. Nov. 9, 2010) (noting understandability "is an *objective inquiry*.") (emphasis in original).

27.    In this arbitration, the Claimants will present evidence that the Respondents' standard WFRs documents (specifically, the RAs and Attachment As) did not satisfy the OWBPA's *objective* standards. Further, the Claimants will show that the RAs' release provisions were not written in a clear manner, as required under the OWBPA. 29 U.S.C. § 626(f)(1)(A). Rather, they were written in a manner that was unreasonable and confusing, contrary to the OWBPA's requirements. *Id.* Further, the Claimants will show that the Attachment As did not meet the requirements of the OWBPA with regard to how "decisional units" must be identified. Given that the RAs and Attachment As did not meet the requirements of the OWBPA, the release provisions in the RAs are unenforceable as a matter of law. 29 U.S.C. § 626(f)(1)(H)(i).

28.    The evidence presented in this arbitration will consist primarily of the standard form documents (including the RAs and the Attachment As) that the Respondents presented to the Claimants in connection with the WFR, which have already produced in the underlying litigation, along with sworn testimony of one or more of the Claimants and possibly limited expert testimony. A determination of whether the Respondents complied with the requirements

of the OWBPA will be straight-forward. To the degree any additional discovery is needed to resolve this narrow issue, it will be extremely limited and should be concluded promptly.

## The Court's Order Sets the Parameters for the Arbitration

29.     Under the AAA's rules, when an arbitration is initiated based on a court order compelling arbitration, the scope and nature of the arbitration are governed by the court's order. *See* Supplementary Rule 1(c) ("Whenever a court has, by order, addressed and resolved any matter that would otherwise be decided by an arbitrator under these Supplementary Rules, the arbitrator shall follow the order of the court."); Supplemental Rule 12(b) ("It is the policy of the AAA to comply with any order of a court directed to the parties to an arbitration or with respect to the conduct of an arbitration.").

30.     Here, the Order states in relevant part as follows:

> The Court agrees with Defendants that, under the terms of the RA, "*an arbitrator* must first decide *whether the release provision contained in the agreement is enforceable*." Arb. Reply 4. Then, if *the arbitrator* determines that the release provision is enforceable, Plaintiffs' claims will be barred and the collective action issue will be moot. *Id.* Otherwise, *the Court* will then determine whether Plaintiffs' claims may proceed on a class or collective basis. *Id.*

*Ex. A*, p. 4 (emphasis added). In its Conclusion, the Order also states: "The parties shall file a joint status report with the Court within thirty days of the resolution of arbitration proceedings." *Id.*, at p. 5.

31.     As the Order makes clear, the arbitration compelled by the District Court involves only "whether the release provision contained in the [RA] is enforceable." *Ex. A*, p. 5. Further, if that issue is resolved in the Respondents' favor, then Judge Davila has said that the Claimants' legal claims against the Respondents "will be barred." *Id.* On the other hand, if the release provisions in the RA are found unenforceable (as the Claimants argue), then "the Court" will

10

*next* determine "whether [the Claimants'] claims may proceed on a class or collective basis." *Id.* Under the RA, the question of the validity of the CAW is specifically reserved for a court of competent jurisdiction, and cannot be decided by an arbitrator.

32.     Ultimately, if this case is sent back to the District Court and District Judge Davila decides that the CAW is valid, then the Claimants presumably will be compelled back to arbitration with the AAA, this time to resolve the merits of their ADEA claims. However, at this stage, the single issue presented by this arbitration is "whether the release provision contained in the [RA] is enforceable." *Ex. A*, p. 4. The merits of the Claimants' ADEA claims and their other legal claims against the Respondents are not the subject of this arbitration.

33.     To be clear, there are absent Plaintiffs and class members in the Lawsuit who will not be participating in this arbitration because they did *not* sign an RA. It is undisputed that any Plaintiffs in the Lawsuit who did not sign an RA cannot be compelled to arbitration. Nevertheless, the District Court's Order stayed (the Claimants believe inadvertently) the Lawsuit as to such Plaintiffs even though they clearly need not arbitrate their claims. The District Court granted Plaintiffs' leave to file a motion for reconsideration on that portion of the Order. That motion for reconsideration is now fully briefed and currently pending before District Judge Davila. Depending on the outcome of that motion, an appeal or writ of mandate to the Ninth Circuit Court of Appeals may be necessary.

**The Issue Presented Here Should Be Decided in One Arbitration, Not 15 Arbitrations**

34.     The Order makes it clear that District Judge Davila expected that the single issue to be arbitrated would be decided by one arbitrator, specifically referring to "an arbitrator" and "the arbitrator" in the Order. *See Ex. A*, p. 4.

11

35.     Consistent with the Order, this arbitration is hereby submitted to the AAA so that "an arbitrator" can decide the validity of the release language of the RA, as ordered by District Judge Davila. As the Order contemplates, if the Claimants prevail in this arbitration, this matter will be referred back to Judge Davila for a decision on whether the CAW is valid, an issue that the RA specifically says can be decided only by a court, and not an arbitrator. If the Respondents prevail, then the District Court's Order seems to conclude that the Claimants' claims are barred.

36.     Before initiating this arbitration, the Claimants tried to initiate a discussion with the Respondents to reach agreement on "an arbitrator," consistent with the Order and the terms of the RA. *See Ex. C*, § 13 (parties should endeavor to select arbitrator "by mutual agreement"). The Respondents would not engage in those discussions, insisting that the 15 Claimants each needed to file their own individual arbitrations in various states around the country. Because the parties could not come to a mutual agreement, under the terms of the RA, "the arbitration shall be held through the American Arbitration Association." *Id.*

37.     The Respondents contend that the Court ordered 15 separate arbitrations, presumably so that 15 different arbitrators could each decide "whether the release provision contained in the [RA] is enforceable." *Ex. A*, p. 4. However, the Respondents' position is inconsistent with the plain language of the Order, which says that "an arbitrator" will decide this issue, and that the decision of "the arbitrator" will dictate future proceedings. *Id.* The District Court did not order 15 different arbitrations before 15 different arbitrators.

38.     The Respondents' argument that 15 different arbitrations are required is based entirely on District Judge's use of the plural "arbitration proceedings" in the Conclusion of the Order. *See Exhibit D* (letter from Respondents' counsel), p. 2. Specifically, in that part of the Order, the District Court ordered the parties to file a joint status report "within thirty days of the

resolution of arbitration proceedings." Of course, the use of the phrase "arbitration proceedings" is consistent with a single arbitration. Just as there are "court proceedings" in a single lawsuit, there are "arbitration proceedings" in a single arbitration.

39.   Because this arbitration is based on the Court's Order, the arbitrator need not make a Clause Construction Award.

### Remedy Sought

WHEREFORE, the Claimants request an arbitration award declaring that the release provisions in the Respondents' standard form RAs are not valid and enforceable with respect to the claims alleged in the Lawsuit because those RAs fail to meet the objective "knowing and voluntary" requirements of the OWBPA.

DATE: November 30, 2017

ANDRUS ANDERSON LLP

By: _____ /s/ Jennie Lee Anderson _____
        Jennie Lee Anderson

Jennie Lee Anderson (SBN 203586)
jennie@andrusanderson.com
Leland H. Belew (SBN 293096)
leland.belew@andrusanderson.com
ANDRUS ANDERSON LLP
155 Montgomery Street, Suite 900
San Francisco, CA 94104
Phone:   (415) 986-1400
Fax:       (415) 986-1474

DOUGLAS P. DEHLER
doug.dehler@wilaw.com
PAUL W. ZIMMER
paul.zimmer@wilaw.com
O'NEIL, CANNON, HOLLMAN,
 DEJONG & LAING S.C.
111 East Wisconsin Avenue, Suite 1400
Milwaukee, WI 53202
Phone:   (414) 276-5000
Fax:       (414) 276-6581

*Attorneys for the Claimants*

13

# EXHIBIT A

1

2

3

4

5

6

7

8

9

10

United States District Court
Northern District of California

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| DONNA J. FORSYTH, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>HP INC., et al.,<br><br>Defendants. | Case No.  5:16-cv-04775-EJD<br><br>**ORDER GRANTING DEFENDANTS'<br>MOTIONS TO COMPEL<br>ARBITRATION AND DENYING<br>DEFENDANTS' MOTION TO DISMISS**<br><br>Re: Dkt. No. 74, 75, 99–108 |

Plaintiffs bring a variety of federal and state employment claims against Defendants.

Defendants have filed a motion to dismiss and several motions to compel arbitration. Defendants'

motions to compel arbitration will be granted and their motion to dismiss will be denied without

prejudice.

## I.   BACKGROUND

Plaintiffs are former employees of Hewlett Packard ("HP").[1] Plaintiffs allege that HP discriminated against them on the basis of their age by terminating their employment under "workforce reduction plans." First Am. Compl. ("FAC") ¶¶ 1–15, Dkt. No. 60. Plaintiffs bring claims under the Age Discrimination in Employment Act, 29 U.S.C. § 621 et seq., as well as a variety of state-law claims. Id. ¶¶ 156–88.

Defendants have moved to dismiss. Defs.' Mot. to Dismiss ("MTD"), Dkt. No. 74. Defendants have also moved to compel arbitration with respect to named Plaintiffs Staton, Becks, and Kaplan (Dkt. No. 75) and thirteen opt-in Plaintiffs (Dkt. Nos. 99–108).[2]

## II.   LEGAL STANDARD

Under the Federal Arbitration Act ("FAA"), written arbitration agreements "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the avoidance of any contract." 9 U.S.C. § 2 (2012). The FAA "leaves no place for the exercise of discretion by a district court, but instead mandates that district courts shall direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed." Chiron Corp. v. Ortho Diagnostic Sys., Inc., 207 F.3d 1126, 1130 (9th Cir. 2000) (citing Dean Witter Reynolds Inc. v. Byrd, 470 U.S. 213, 218 (1985)). A district court's role is limited to determining (1) whether the parties agreed to arbitrate and, if so, (2) whether the claims at issue are within the scope of that agreement. Id. If the party seeking arbitration meets these two requirements, the court must compel arbitration. 9 U.S.C. § 4; Chiron, 207 F.3d at 1130.

If a contract contains an arbitration clause, the clause is presumed to be valid. AT&T

---

[1] In 2012, Hewlett Packard Company was reorganized into two entities: HP Inc. and Hewlett Packard Enterprise Company. Dkt. No. 99 at 1, 3.

[2] Defendants have filed eleven separate motions to compel arbitration (Dkt. Nos. 75, 99–108). Because all parties agree that these motions are "virtually identical" (Dkt. No. 109 at 1; Dkt. No. 113 at 1 n.2), the Court will decide them together. For convenience, the Court cites the motion to compel arbitration ("Arb. Mot") at Dkt. No. 99, the opposition brief ("Arb. Opp'n") at Dkt. No. 109, and the reply brief ("Arb. Reply") at Dkt. No. 113.

Case No.: 5:16-cv-04775-EJD
ORDER GRANTING DEFENDANTS' MOTIONS TO COMPEL ARBITRATION AND DENYING DEFENDANTS' MOTION TO DISMISS

2

United States District Court
Northern District of California

Techs., Inc. v. Commc'ns Workers of Am., 475 U.S. 643, 650 (1986). "[A]ny doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." Three Valleys Mun. Water Dist. v. E.F. Hutton & Co., 925 F.2d 1136, 1139 (9th Cir. 1991). The party opposing arbitration has the burden of showing that an arbitration clause is invalid or otherwise unenforceable. Engalla v. Permanente Med. Grp., Inc., 15 Cal. 4th 951, 972 (1997).

Nonetheless, "arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." AT&T, 475 U.S. at 648 (quoting Steelworkers v. Warrior & Gulf Navigation Co., 363 U.S. 574, 582 (1960)). General contract law principles govern the interpretation and enforcement of arbitration agreements. First Options of Chicago v. Kaplan, 514 U.S. 938, 944 (1995).

## III.   DISCUSSION

Upon termination of their employment with HP, each Plaintiff signed a release Agreement ("RA") in exchange for severance benefits. Arb. Mot. 3; Arb. Opp'n 3.[3] The RA contains an arbitration clause that states that the parties agree to arbitrate all claims arising out of the employee's "employment or separation, or related to the validity, enforceability, interpretation, performance or breach of this Agreement." Arb. Mot. 4. The RA also states that the question of whether the RA is enforceable is delegated to the arbitrator:

> The parties further agree that this Agreement is intended to be strictly construed to provide for arbitration as the sole and exclusive means for resolution of all disputes hereunder to the fullest extent permitted by law, and its validity and enforceability determined, in accordance with the Federal Arbitration Act. The parties expressly waive any entitlement to have such controversies decided by a court or a jury.

Id.

Plaintiffs allege that the RA is unenforceable. See FAC ¶¶ 78–84. Defendants argue that this threshold question must be decided by the arbitrator, not by this Court. See Arb. Mot. 9–10;

---

[3] The agreements each Plaintiff signed are "substantively identical." Arb. Opp'n 3.

Case No.: 5:16-cv-04775-EJD
ORDER GRANTING DEFENDANTS' MOTIONS TO COMPEL ARBITRATION AND DENYING DEFENDANTS' MOTION TO DISMISS
3

United States District Court
Northern District of California

United States District Court
Northern District of California

1   see also id. at 4 (quoting language from the agreement indicating that the agreement's "validity

2   and enforceability" are to be determined "in accordance with the Federal Arbitration Act");

3   Buckeye Check Cashing, Inc. v. Cardegna, 546 U.S. 440, 448–49 (2006) ("a challenge to the

4   validity of the contract as a whole, and not specifically to the arbitration clause, must go to the

5   arbitrator"); Nitro-Lift Technologies, L.L.C. v. Howard, 133 S. Ct. 500, 503 (2012) ("[W]hen

6   parties commit to arbitrate contractual disputes, it is a mainstay of the [FAA's] substantive law

7   that attacks on the validity of the contract, as distinct from attacks on the validity of the arbitration

8   clause itself, are to be resolved 'by the arbitrator in the first instance, not by a federal or state

9   court.' ").

10           Plaintiffs do not contest that an arbitrator, not a court, should determine the enforceability

11   and validity of the release. Instead, Plaintiffs contend that the Court should first "consider the

12   validity of the Class Action Waiver [contained in the RA], and find it invalid" for failure to

13   comply with the Older Workers Benefit Protection Act, Pub. L. 101-433, 104 Stat. 978 (1990),

14   amending 29 U.S.C. 621, et seq. Arb. Opp'n 1–2. The RA indicates that challenges to the

15   enforceability of the Class Action Waiver "may be determined only by a court . . . and not by an

16   arbitrator." Id. at 4. Plaintiffs argue that the Class Action Waiver is not severable from the RA as a

17   whole. Id. at 11. As a result, Plaintiffs argue that their challenge to the validity of the Class Action

18   Waiver (and by extension, to the validity of the RA as a whole) must be decided by this Court, not

19   by an arbitrator. Id. at 2.

20           The Court agrees with Defendants that, under the terms of the RA, "an arbitrator must first

21   decide whether the release provision contained in the agreement is enforceable." Arb. Reply 4.

22   Then, if the arbitrator determines that the release provision is enforceable, Plaintiffs' claims will

23   be barred and the collective action issue will be moot. Id. Otherwise, the Court will then determine

24   whether Plaintiffs claims may proceed on a class or collective basis. Id. Accordingly, Defendants'

25   motions to compel arbitration will be granted and this case will be stayed.

26

27   Case No.: 5:16-cv-04775-EJD

28   ORDER GRANTING DEFENDANTS' MOTIONS TO COMPEL ARBITRATION AND
     DENYING DEFENDANTS' MOTION TO DISMISS
     4

IV.     **CONCLUSION**

Defendants' motions to compel arbitration are GRANTED. Defendants' motion to dismiss is denied without prejudice. The Clerk shall administratively close this file.

The parties shall file a joint status report with the Court within thirty days of the resolution of arbitration proceedings.

**IT IS SO ORDERED.**

Dated: September 20, 2017

EDWARD J. DAVILA
United States District Judge

United States District Court
Northern District of California

Case No.: 5:16-cv-04775-EJD
ORDER GRANTING DEFENDANTS' MOTIONS TO COMPEL ARBITRATION AND
DENYING DEFENDANTS' MOTION TO DISMISS
5

# EXHIBIT B

JENNIE LEE ANDERSON (SBN 203586)
jennie@andrusanderson.com
LELAND H. BELEW (SBN 293096)
leland.belew@andrusanderson.com
ANDRUS ANDERSON LLP
155 Montgomery Street, Suite 900
San Francisco, CA 94104
Phone: (415) 986-1400
Fax:    (415) 986-1474

DOUGLAS P. DEHLER (admitted *pro hac vice*)
doug.dehler@wilaw.com
PAUL W. ZIMMER (admitted *pro hac vice*)
paul.zimmer@wilaw.com
O'NEIL, CANNON, HOLLMAN, DEJONG & LAING S.C.
111 East Wisconsin Avenue, Suite 1400
Milwaukee, WI 53202
Phone: (414) 276-5000
Fax:    (414) 276-6581

Attorneys for Plaintiffs and the Proposed Classes

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| DONNA J. FORSYTH, SIDNEY L. STATON III, ARUN VATTURI, DAN WEILAND, SHAFIQ RAHMAN, ED KAPLAN, KAREN BECKS, AND ALBERT R. DEVERE for and on behalf of themselves and other persons similarly situated,<br><br>　　　　　　　Plaintiffs,<br><br>　　vs.<br><br>HP INC. and HEWLETT PACKARD ENTERPRISE COMPANY,<br><br>　　　　　　　Defendants. | Case No. 5:16-cv-04775<br><br>**CLASS ACTION**<br><br>**FIRST AMENDED COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiffs Donna J. Forsyth, Sidney L. Staton III, Arun Vatturi, Dan Weiland, Shafiq Rahman, Ed Kaplan, Karen Becks, and Albert R. DeVere ("Plaintiffs"), on behalf of themselves and other persons similarly situated, as and for their Complaint against HP Inc. and Hewlett Packard Enterprise Company, allege and state as follows:

## INTRODUCTION

1.     Defendants HP, Inc. ("HPI") and Hewlett Packard Enterprise Company ("HPE"), along with their predecessor, Hewlett-Packard Company (collectively, the "HP Entities"), through coordinated employment policies and practices, have unlawfully discriminated against Plaintiffs and other similarly situated employees because of their age.

2.     In 2012, under the direction of Ms. Meg Whitman, who was then its President and Chief Executive Officer (CEO), Hewlett-Packard Company began implementing a company-wide initiative to replace thousands of existing, older workers with new, younger employees (hereinafter, referred to as the "Workforce Restructuring Initiative" or "Initiative"). When rolling out this Initiative, Ms. Whitman said the goal was to restructure Hewlett-Packard Company's workforce over a period of approximately five years, between 2012 and 2017.

3.     In October 2013, Ms. Whitman admitted publicly during a Securities Analyst Meeting that the Initiative's overarching goal was to "recalibrate and reshape" the workforce by "replacing" existing workers with "a whole host of young people."

4.     In November 2015, Hewlett-Packard Company split into two companies, HPI and HPE. Since the split, Ms. Whitman has been the Chair of the Board of Directors for HPI and the CEO for HPE.

5.     Under Ms. Whitman's direction, both HPI and HPE have continued to implement the Initiative in concert with one another, shedding thousands of additional employees since November 2015, and making plans to terminate the employment of thousands more in 2017 (and possibly beyond).

6.     Ms. Whitman has repeatedly admitted that her goal has been to make the entire Hewlett-Packard organization younger. In pursuit of this goal, the three HP Entities have now shed thousands of older workers since 2012, while at the same time aggressively recruiting

1

1   younger employees to replace them.

2       7.      The split of Hewlett-Packard Company into HPI and HPE was Ms. Whitman's

3   brain-child, as was the entire Workforce Restructuring Initiative. Ms. Whitman not only

4   implemented and controlled the Initiative at the pre-split Hewlett-Packard Company, she also

5   continues to exert control and substantial influence over the implementation of the Initiative at the

6   post-split entities, HPI and HPE.

7       8.      The HP Entities may contend that the Workforce Restructuring Initiative was

8   always meant to be age-neutral. However, the Initiative and the programs and plans implemented

9   under it have had a clear and substantially adverse impact on older employees.

10      9.      At all relevant times, HPI and HPE have colluded, conspired and aided and abetted

11  one another to carry out the Workforce Restructuring Initiative in furtherance of Ms. Whitman's

12  goal to "recalibrate" the age of the HP Entities' workforces. At worst, the HP Entities

13  intentionally designed and carried out the Initiative to discriminate willfully against older workers

14  in an effort to get younger. At best, the Initiative was comprised of facially neutral policies that

15  disproportionately and adversely impacted the HP Entities' older workers.

16      10.     Since the Initiative was implemented in 2012, it has involved a coordinated two-

17  prong strategy: (1) pushing current, older workers out of the company, while (2) at the same time

18  hiring a large number of new, younger employees to replace them. As just one means of

19  executing the first prong of this strategy, Hewlett-Packard Company, under Ms. Whitman's

20  direction, implemented the "2012 Workforce Reduction Plan," which was subsequently adopted

21  by both HPI and HPE (hereinafter, the pre- and post-split Workforce Reduction Plans are referred

22  to collectively as the "WFR Plans").

23      11.     While the WFR Plans' titles suggest that the primary goal is a "workforce

24  reduction," as Ms. Whitman herself admits, the true goal of the entire Workforce Restructuring

25  Initiative has been to restructure, recalibrate and reshape the HP Entities' workforces to make

26  them younger. Indeed, in the nearly five years since they began to implement the Initiative and

27  the WFR Plans in 2012, the HP Entities have added thousands of new employees to replace those

28  who were terminated under the WFR Plans.

2

12.     As many in the technology industry know, Hewlett-Packard is generally regarded as the oldest company in Silicon Valley whose employees have a higher average age when compared to companies such as Facebook or Google. When she took over in 2012, Ms. Whitman perceived the age of Hewlett-Packard Company's workforce as a problem that needed solving, rather than an asset to be harnessed. With this mindset, Ms. Whitman began the Initiative to make Hewlett-Packard Company younger, and that Initiative has been ongoing since then.

13.     The Plaintiffs, along with thousands of other similarly situated former employees of the HP Entities, are among those who were discarded as part of the Initiative because they were considered too old.

14.     The Initiative violated federal laws and California state laws prohibiting age discrimination in employment. The Initiative was designed and implemented to discriminate intentionally against employees based on age. In addition, the WFR Plans and other employment programs that were used to implement the Initiative's goals have had a substantially adverse impact on employees aged 40 or older.

15.     For these reasons, as well as those set forth in greater detail below, Plaintiffs bring this action on behalf of themselves and others similarly situated to recover damages and seek other relief available under the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621, *et seq.*, as well as under the California Fair Employment and Housing Act ("FEHA"), Government Code §§ 12900-12996, and other California state laws.

## THE PARTIES

16.     Plaintiff Donna Forsyth is a resident of the State of Washington. She worked at the Hewlett Packard Enterprise Company (and previously Hewlett-Packard Company) until she was laid off in May 2016, when she was 62 years old.

17.     Plaintiff Sidney Staton is a resident of the State of California. He worked at Hewlett-Packard Company until he was laid off in April 2015, when he was 54 years old.

18.     Plaintiff Arun Vatturi is a resident of the State of California. He worked at HP, Inc. (and previously Hewlett-Packard Company) until he was laid off in January 2016, when he was 52 years old.

3

19.     Plaintiff Dan Weiland is a resident of the State of Texas. He worked at Hewlett-Packard Company until he was laid off in July 2015, when he was 63 years old.

20.     Plaintiff Shafiq Rahman is a resident of the State of Texas. He worked at Hewlett Packard Enterprise Company (and previously Hewlett-Packard Company) until he was laid off in July 2016, when he was 65 years old.

21.     Plaintiff Ed Kaplan is a resident of the State of Illinois. He worked at Hewlett Packard Enterprise Company (and previously Hewlett-Packard Company) until he was laid off in July 2016, when he was 63 years old.

22.     Plaintiff Karen Becks is a resident of the District of Columbia. She worked at Hewlett Packard Enterprise Company (and previously Hewlett-Packard Company) until she was laid off in June 2016, when she was 51 years old.

23.     Plaintiff Albert R. DeVere is a resident of the State of Virginia. He worked at Hewlett Packard Enterprise Company (and previously Hewlett-Packard Company) until he was laid off in July 2016, when he was 52 years old.

24.     Defendant HP Inc. is a corporation organized under the laws of the State of California with its headquarters and principal place of business located at 1501 Page Mill Road, Palo Alto, California.

25.     Defendant Hewlett Packard Enterprise Company is a corporation organized under the laws of the State of Delaware with its headquarters and principal place of business located at 3000 Hanover Street, Palo Alto, California.

26.     Non-party Hewlett-Packard Company in November 2015 split into the two Defendants in this action, HPE and HPI. These new entities have expressly and/or impliedly assumed liability for the wrongful acts of Hewlett-Packard Company and the wrongful acts of Hewlett-Packard Company are imputed to the Defendants. Furthermore, Defendants have continued Hewlett-Packard Company's illegal age discrimination. As a matter of law, Defendants are legally responsible for the age discrimination of their predecessor, Hewlett-Packard Company.

27.     At all times relevant, both Defendants aided and abetted, incited, compelled, coerced and/or conspired with each other in connection with the acts complained of herein. Each

4

1  Defendant knowingly and substantially assisted and encouraged the other in the discriminatory

2  conduct alleged. Through Ms. Whitman's common leadership and control over the management

3  of both entities, Defendants agreed to continue the discriminatory policies after Hewlett-Packard

4  Company split into two companies and they have acted in furtherance of that conspiracy by

5  pursuing virtually identical discriminatory policies and practices. At all times relevant,

6  Defendants acted as a joint or single employer and/or the agents of one another while carrying out

7  this illegal age discrimination.

8  **JURISDICTION AND VENUE**

9       28.     This Court has subject matter jurisdiction over this action pursuant to the ADEA,

10  29 U.S.C. § 621, *et seq*.

11      29.     This Court has supplemental jurisdiction over the California state law claims

12  alleged herein pursuant to 28 U.S.C. § 1367(a).

13      30.     This Court has personal jurisdiction over the two Defendants because they are

14  headquartered and do substantial business in the State of California.

15      31.     Venue is proper in the Northern District of California, San Jose Division, pursuant

16  to 28 U.S.C. §§ 1391(b)(1) and (2) because a substantial part of the events giving rise to

17  Plaintiffs' claims arose in this District, and because both Defendants are headquartered here.

18  **FACTUAL ALLEGATIONS**

19  ***The HP Entities' Publicly-Stated Goal to Get Younger***

20      32.     Throughout the time that the HP Entities have been carrying out the Workforce

21  Restructuring Initiative, Ms. Whitman held senior leadership positions at all three companies. She

22  was the CEO of pre-split Hewlett-Packard Company, and is currently the Chair of HPI's Board of

23  Directors and the CEO of HPE. Throughout this time, Ms. Whitman has publicly made it known

24  that her overarching goal is to make the HP Entities younger.

25      33.     Ms. Whitman candidly admitted this objective when discussing the need to change

26  Hewlett-Packard Company's "labor diamond" into a "labor pyramid" or a "quite flat triangle"

27  with large numbers of young people at its base. Specifically, during an October 2013 Securities

28  Analyst Meeting, Ms. Whitman said:

5

[A]s we think about our overall labor pyramid at Hewlett-Packard, we need to return to a labor pyramid that really looks like a triangle where you have a lot of early career people who bring a lot of knowledge who you're training to move up through your organization, and then people fall out either from a performance perspective or whatever.

And over the years, our labor pyramid doesn't look—has become not a triangle. It's become a bit more of a diamond. And *we are working very hard to recalibrate and reshape our labor pyramid so that it looks like the more classical pyramid* that you should have in any company and particularly in ES. If you don't have *a whole host of young* people who are learning how to do delivery or learning how to do these kinds of things, you will be in [for] real challenges.

. . . .

Now, that's not something that changes like that. Changing the same shape of your labor pyramid takes a couple of years, but we are on it, and *we're amping up our early career hiring, our college hiring*. And we put in place an informal rule to some extent which is, listen, when you are *replacing* someone, really think about the new style of IT skills. (emphasis added.)

34.    Two years later, at another Securities Analyst Meeting held in September 2015 (just before the anticipated November 2015 split and formation of HPI and HPE), Ms. Whitman reiterated her position that the HP Entities needed to create a "labor pyramid" that was "quite flat," stating:

We have to fundamentally recreate the labor pyramid. Many of you heard me say our labor pyramid in Enterprise Services looks like a diamond and it needs to look like a triangle and quite frankly it needs to look like a quite flat triangle to be competitive.

35.    In November 2015, more than three years after implementing the Initiative and the 2012 WFR Plan, and just as Ms. Whitman was preparing to take on senior leadership positions at both HPI and HPE, Ms. Whitman again declared publicly during an interview on CNBC that the goal was for the HP Entities to get younger:

Interviewer:    You did announce significant job cuts about a month or so ago. . . . Is that going to be it for HP?

Ms. Whitman: That should be it. That will allow us to right-size our Enterprise Services business . . . to make sure that we've got a labor pyramid with *lots of young people* coming in right out of college and graduate school and early in their careers. That's an important part of the future of the company. . . . (emphasis added).

6

36.     Notably, Ms. Whitman answered the CNBC interviewer's question about *job cuts* by saying that the HP Entities would be doing a lot of additional *hiring* of "young" people. This demonstrates the true purpose of the Initiative: to reduce the *age* of the HP Entities' workforce, not its size.

37.     When carrying out the Initiative, the HP Entities' senior management (acting under the direction of Ms. Whitman) provided managers throughout the country with two simultaneous orders: (1) terminate a specific number of employees, called "slates," pursuant to a WFR Plan; and (2) hire a specific number of requisitions ("reqs") to replace them, focusing on new, younger hires. The issuance of these "slates" and "reqs" followed a distinct pattern: an upper-level manager would order a subordinate manager to lay off a designated number of experienced, older, tenured "LT" (meaning "long-term" or "long-tailed") employees, while simultaneously providing that manager a similar number of new "reqs" authorizing the hiring of recent "graduate" or "early career" employees to replace those just fired.

38.     The HP Entities used uniform, near-verbatim paperwork when terminating Plaintiffs and other class members, who all received the same vaguely worded, boilerplate reasons for being terminated, regardless of which of the HP Entities they worked for. Those notices generically state: "Employees were selected for the reduction in force because the job they were performing will no longer continue, their skill set was not applicable to the Company's or organization's operations going forward, and/or other employees were viewed as better qualified because of past performance and competency evaluation, which may include skills, abilities, knowledge and experience." This broadly worded, proffered justification for firing these employees was merely a pretext for policies of overt age discrimination.

39.     Even when a terminated employee's specific job title or position was eliminated, consistent with Ms. Whitman's statements about the Initiative generally, those positions were not truly eliminated, but were simply staffed with new, younger hires.

### The HP Entities' Other Efforts to Eliminate Older Workers

40.     In addition to terminating employees under the WFR Plans, the HP Entities used other tactics to push current, older workers out—thereby further fulfilling the first prong of the

7

1   Initiative. For example, in 2012 and 2014, Hewlett-Packard Company implemented early and

2   phased retirement programs under which employees having a combined number of years in terms

3   of age and tenure were strongly encouraged to "voluntarily" phase out their employment.

4          41.     In 2016, HPI initiated nearly the same phased retirement program that the former

5   Hewlett-Packard Company had, and HPE has also implemented similar retirement policies to

6   strongly encourage older employees to leave the company.

7          42.     For example, Hewlett-Packard Company proposed that Plaintiff Dan Weiland take

8   early phased retirement in September 2014. However, Mr. Weiland declined because he was not

9   ready to retire and wanted to continue working. Nevertheless, Mr. Weiland's supervisor tried to

10  persuade him to participate in the program, even though it offered no significant benefits to

11  Mr. Weiland. It was simply a way for Hewlett-Packard Company to apply pressure on

12  Mr. Weiland to leave the company "voluntarily."

13         43.     The retirement programs have put older employees in a dilemma that works to the

14  HP Entities' advantage. During meetings with older employees where the various phased

15  retirement programs are explained and promoted by management, the elephant in the room is

16  looming: each person is thinking, like Mr. Weiland did, "If I turn down this retirement program,

17  am I just going to be laid off anyway?"

18         44.     In Mr. Weiland's case, and in thousands of others, that question was answered just

19  how Mr. Weiland feared. Shortly after he turned down the 2014 phased retirement program,

20  Mr. Weiland's employment was simply terminated under Hewlett-Packard Company's WFR

21  Plan. As time went on, older employees at each of the HP Entities received the message: they

22  were in serious jeopardy of losing their jobs.

23         45.     Hewlett-Packard Company also employed a bait-and-switch strategy with its

24  employees regarding work-at-home policies. Specifically, just before implementing the 2012

25  WFR Plan, Hewlett-Packard Company adopted new employment policies that strongly

26  encouraged employees to work remotely from home. But then, shortly after it initiated its 2012

27  WFR Plan, Hewlett-Packard Company (acting at Ms. Whitman's direction) reversed course and

28  suddenly required all employees to appear regularly at physical office locations. Not only was this

8

a complete reversal of the prior policy (which was only recently implemented), in many cases, the offices where these employees previously worked had been closed. Thus, many employees found themselves needing to make hour-plus long commutes to new offices that often did not even have room for them. This policy change disproportionately impacted older employees and amplified the ongoing hostility toward older workers.

46.     Pursuant to their Workforce Restructuring Initiative, the HP Entities also implemented bans on hiring employees who were terminated pursuant to WFR Plans implemented by any of the HP Entities. In other words, the HP Entities agreed to effectively blacklist employees who were terminated under any of the WFR Plans. This ensured that the current, older workers would not be re-hired by any of the HP Entities.

47.     This blacklisting policy was implemented even though the HP Entities claimed to have a "60 Day Preferential Rehire Period" during which those terminated under a WFR Plan were encouraged to apply for new positions within either HPE or HPI (and Hewlett-Packard Company before the split). These employees were told they would receive preferential hiring status for 60 days following their termination. However, although apparently meant to be facially neutral, in practice, the 60 day Preferential Rehire Period was a farce for older employees.

48.     For example, after Mr. Rahman was terminated, HPE created a new job opening for a nearly identical position in Colorado Springs, Colorado. Mr. Rahman was appropriately qualified for that position and applied for it during his 60 Day Preferential Rehire Period, but HPE refused to hire him because he was laid off under a WFR Plan. All three HP Entities engaged in this policy of blacklisting their own and each other's former employees in order to prevent them from being rehired.

//
//
//
//
//
//

9

*HP's Internal Policies to Hire Young Employees*

49.     While pushing out older workers as part of the first prong of the Initiative, the HP Entities also hired (and continue to hire) thousands of new, younger workers as part of the Initiative's second prong.

50.     In other words, since the so-called workforce "reduction" efforts began in 2012, the HP Entities have continued to hire aggressively. The primary difference is that, since 2012, HP has hired a disproportionately large number of new, younger employees (under the age of 40) to replace older employees (aged 40 and older) who were terminated.

51.     Thus, the HP Entities were not actually engaging in a workforce "reduction." Rather, as Ms. Whitman admitted publicly, the Initiative has always been an effort to "recalibrate" (most modestly stated) or "fundamentally recreate" (most accurately stated) the HP Entities' workforces with a "whole host of young people." Regardless of which words are used, the HP Entities are engaging in illegal age discrimination.

52.     The discriminatory intent is also shown by internal directives provided to hiring managers by senior management and the human resources departments at the HP Entities. For example, in August 2013, the Hewlett-Packard Company's human resources department distributed written guidelines stating that its "[n]ew corporate requisition policy requires 75% of all External hire requisitions be 'Graduate' or 'Early Career'" employees. A similar policy of promoting "graduate" and "early career" hires continued at both HPE and HPI after the split.

53.     The use of the words "graduate" and "early career" in this August 2013 document (and others like it) provide additional evidence of the intent to discriminate against older workers in hiring decisions.

54.     As Hewlett-Packard Company defined the term for purposes of the August 2013 directive, a "graduate" hire was someone who either was about to graduate or had graduated within the previous 12 months. Similarly, an "early career" hire was somebody who had completed his or her degree and had *up to* five years of experience related to the job for which they were applying.

55.     Furthermore, across Hewlett-Packard Company, hiring managers were advised in

10

writing to "look for and create opportunities to enhance [their] labor structure" through "Early Career hiring."

56.     Human resources employees at Hewlett-Packard Company were also told to "[h]elp convert or repurpose" the hiring managers' "current requisitions, as appropriate, to Early Career requisitions."

57.     Hewlett-Packard Company's human resources department knew, however, that focusing on hiring younger employees might raise some concerns with its older "long term" employees. Thus, in an internal memorandum issued in 2013, management demonstrated that they knew there was a need to disguise the discriminatory hiring policies and, specifically, to "*[a]ddress [the] issue of long term employees being perceive[d] as bypassed by the next gen[eration]."* (emphasis added).

58.     Despite knowing that it was improper, the HP Entities continued to use online job openings that contained blatantly discriminatory statements such as:

- This position is for a recent college graduate. To qualify, you must have graduated with your Bachelor's or Master's degree within the last 12 months.

- In order to be considered for this role, you must have graduated within 12 months of the start date. . . [W]e can only consider graduates who have graduated between August 2014 and September 2015.

- Must have graduated within 12 months of July, 2016.

- This position is for a recent college graduate. To qualify you must have received your last degree within the past 12 months.

- The candidate must be a recent graduate.

- We are looking for recent college graduate and early career candidates. . . .

- The successful candidate must be near degree completion (Dec 2015 or prior) or have graduated within the past 12 months.

- Must be a recent graduate (2015) or graduating by January 2016.

- Must have completed degree within the past 12 months.

- We are looking for a future, or recent (within 12 months) College Graduate. . . .

- This position is for a recent university graduate.

- First Level University degree awarded within the past 12 months.

11

FIRST AMENDED COMPLAINT

- Recent (graduation date between July 2014 and September 2015 only) college graduate. . . .

- We are seeking candidates who have recently graduated. . . . Only applicants who have graduated within the past year (July 2014 - August 2015) will be considered for this role, and this will be verified during the background check.

- Recent college graduates preferred.

### The HP Entities' Age Discrimination Is Willful

59.     The Workforce Restructuring Initiative was designed by Ms. Whitman to achieve one discriminatory goal: to make the Hewlett-Packard organization younger. The HP Entities knew that their practice of firing old and hiring young was discriminatory but pursued those practices regardless, making their age discrimination willful.

60.     At one point, in 2014, Hewlett-Packard Company even acknowledged that it "need[ed] to remove references to maximums or limits on years of experience in [its] posting[s], job titles, classifications of jobs and policies as it relates to our Early Career definition to mitigate any potential risk and litigation regarding discrimination of protected classes against our employment practices."

61.     Notably, Hewlett-Packard Company did not suggest it should rethink or reconsider its discriminatory employment practices, but decided it should simply avoid using certain words in its job postings and advertisements to "mitigate" against the potential litigation risk.

62.     As seen in cases involving other types of illegal employment discrimination (e.g., race or gender discrimination), stereotypical statements were made at Hewlett-Packard Company about large groups of employees based entirely on their age. For example, internal Hewlett-Packard Company documentation dated July 2015 stated that anyone born between 1930 and 1946 could be considered a "Traditionalist" who moves "slow and steady" and seeks "part time work." As for "Baby Boomers" (born between 1946 and 1964), they were considered to be "rule breakers," implying that they were undesirable. Conversely, when it came to "Millennials," Hewlett-Packard Company made it clear that hiring new employees from this generation was highly desirable. Indeed, Hewlett-Packard Company specifically adopted strategies for "integrat[ing] millennials into the workforce" and "educat[ing] managers and others on millennial

12

1   characteristics." These attitudes toward different age groups continued at both HPI and HPE after

2   Hewlett-Packard Company split.

3        63.    Referring to entire segments of employees as "slow and steady" or "rule breakers"

4   based on the year in which they were born is not only callous, but is at the heart of the very type

5   of discrimination that the ADEA and similar California laws were intended to prohibit.

6   Furthermore, promoting such stereotypes only further exacerbates unjustified bias against large

7   parts of the HP Entities' workforce based solely on age.

8        64.    Plaintiff Dan Weiland observed this first-hand during a team meeting involving his

9   then-supervisor, Mark Wade, who described a phone call with Hewlett-Packard Company's

10  human resources team as follows:

11             The theme on the EER call was, you know, college, college,
   college. Everything was about *refreshing HP's golden workforce*.
12             That was kind of the theme. I think they woke up and said, "man,
   *everybody running around this place is old*." (emphasis added).
13

14       65.    As these comments demonstrate, the HP Entities were effective in communicating

15  to their lower level managers that the Initiative was designed to "refresh" its "golden workforce"

16  with younger employees. In these ways, the HP Entities' upper management directed its lower

17  level managers, both directly and indirectly, to select older workers to be terminated under the

18  WFR Plans.

19                 ***Facial Neutrality of the Workforce Restructuring Initiative***

20       66.    As Ms. Whitman's public statements and the other allegations set forth herein

21  demonstrate, the intent behind the Workforce Restructuring Initiative was (and still is) to

22  discriminate willfully against older workers to make the HP Entities younger. However, to hide

23  their discriminatory goals, the Defendants may claim that the Initiative and the policies

24  implemented in connection with that Initiative were age-neutral.

25       67.    However, even if facially neutral, the HP Entities' policies had a substantial

26  discriminatory impact on employees aged 40 and over. For instance, the mandate that 75% of all

27  new hires be "graduate" or "early career" hires does not, on its face, mention age. Hypothetically,

28  an older worker could be a recent college graduate, or starting a new career, such that the worker

might meet the definitions of an "early career" or "graduate" employee. However, in practice, the overwhelming majority of the HP Entities' early career and recent graduate hires under the Initiative were younger workers in their 20's or 30's.

68.     In addition, while the HP Entities' upper management and human resources departments arguably may have communicated facially neutral criteria to lower level managers about who they should select to be terminated under the WFR Plans (i.e., instructions to fire more tenured employees or those who work remotely), the HP Entities' upper management and human resources departments made the final decisions regarding which individuals to terminate under the WFR Plans. Indeed, although lower level managers would initially be asked to select individuals for termination, the HP Entities' upper management and human resources departments always could (and did) override those selections consistent with the discriminatory intentions of the Initiative.

69.     For example, when Plaintiff DeVere—himself a lower level manager—was asked to select two employees from his team to be terminated under the WFR Plan, he selected two who he felt had the worst performance: specifically, two younger, early career or graduate recent hires. But, Mr. DeVere's boss, a director named Mark Moreno, told Mr. DeVere he should not be laying off recent graduates or early career hires. Nonetheless, Mr. DeVere submitted his selections to HPE's human resources department, which promptly vetoed his selections.

70.     Instead, two older team members from Mr. DeVere's team were fired. In addition, two other workers over the age of 40 were terminated at about the same time—specifically, both Mr. DeVere *and* Mr. Moreno.

### Statistical Evidence Showing Discrimination

71.     In implementing the Workforce Restructuring Initiative, regardless of any facially neutral criteria the HP Entities allegedly used, the end result was that older workers were disproportionately selected to be laid off under the WFR Plans. Indeed, based on available data regarding layoffs under the WFR Plans, the HP Entities clearly conformed to Ms. Whitman's publicly-stated goal of trying to make the companies younger. Older workers were statistically more likely to be laid off under the WFR Plans than younger ones.

FIRST AMENDED COMPLAINT

72.     When the HP Entities fired or laid off employees under the WFR Plans, they also routinely failed to comply with the Older Workers Benefit Protection Act ("OWBPA"), 29 U.S.C. § 626(f). The HP Entities provided "Attachment A" forms to terminated employees, ostensibly to comply with the requirements of the OWBPA. However, these forms did not comply with the requirements of the OWBPA and were drafted in a manner that underrepresented the discriminatory impact of the Initiative.

73.     The Attachment A forms did not provide the data required by the OWBPA because, *inter alia*, they did not include the job titles and ages of all employees in the pertinent "decisional unit" impacted by the HP Entities' layoffs. Indeed, they did not even define the employee's "decisional unit." Rather than provide the required data for the relevant "decisional unit," the HP Entities regularly provided Attachment A forms that improperly focused on a small group of employees that the HP Entities deceptively suggested were part of the appropriate decisional unit, when in fact they were not.

74.     A preliminary statistical analysis of Attachment A forms provided to former employees shows that older employees were significantly more likely to be terminated than younger employees, reaching a statistical confidence level of three standard deviations; in other words, the statistical level of confidence in this disparity exceeds 99%.

75.     The disparity exists even though the Attachment A forms that the HP Entities prepared and distributed to former employees did not fully portray the negative impact of their employment policies on older employees. Indeed, the HP Entities improperly crafted their Attachment A forms to understate the true impact of the employment terminations on older employees.

76.     If, instead, the Attachment A forms were accurate and properly identified all of the younger employees who were hired or retained pursuant to the Initiative, as well as the additional older workers who were terminated pursuant to the Initiative, then the known statistical disparity between the impact on older employees versus younger ones would be even greater.

//

15

*The HP Entities' Waiver and General Release Agreement is Unenforceable*

77.   After they were terminated, Mr. Staton, Ms. Becks, Mr. Kaplan and others similarly situated executed a Waiver and General Release Agreement ("Release Agreement") provided to them. The Release Agreements and other WFR documentation are virtually identical across the HP Entities because they are all implementing the same, unified policy. Indeed, terminated employees are directed to submit their signed Release Agreement to the same building for both HPI and HPE as they were for Hewlett-Packard Company.

78.   The Release Agreement purported to waive age discrimination claims and other ADEA rights. However, like thousands of similarly situated employees who signed verbatim or near-verbatim Release Agreements, those signed by Mr. Staton, Ms. Becks and Mr. Kaplan were not "knowing and voluntary" for purposes of the OWBPA.

79.   Specifically, the Release Agreement is, among other things, internally inconsistent, confusing, misleading, and unclear, and it contains provisions that violate the ADEA and applicable regulations. Therefore, the Release Agreements signed by Mr. Staton, Ms. Becks, Mr. Kaplan, and similarly situated individuals were not written in a manner calculated to be understood by the average individual eligible for the WFR Plans.

80.   Additionally, for the reasons explained above, the Attachment A forms supplied to Mr. Staton, Ms. Becks, Mr. Kaplan, and others similarly situated did not inform them of the job titles and ages of all individuals eligible or selected for the applicable WFR Plan as well as those not eligible and not selected for the same in a manner calculated to be understood by the average individual eligible to participate in the WFR Plans.

81.   Moreover, the HP Entities also presented Mr. Staton, Ms. Becks, Mr. Kaplan, and others similarly situated with a Severance Payment Estimate Statement ("Statement") which, in conjunction with the Release Agreement, misled the average employee regarding the amount of consideration he or she would receive for signing the Release Agreement. The Statement misleadingly includes the employee's benefits under the Worker Adjustment and Retraining Notification Act, 29 U.S.C. § 2101, *et seq.* ("WARN") within the severance payment calculation, and the Release Agreement confusingly implies that the WARN payment is part of the

16

1  consideration for waiving ADEA rights and claims.

2       82.    Also, any alleged waiver of any ADEA right or claim contained in the Release

3  Agreement signed by any former employee is not legally valid under the OWBPA for the reasons

4  described above.

5       83.    The Release Agreement also contains a provision that purports to waive the rights

6  held by Mr. Staton, Ms. Becks, Mr. Kaplan, and others similarly situated to bring or participate in

7  a collective action under the ADEA (the "Class Action Waiver"). However, the Class Action

8  Waiver is unenforceable because, *inter alia*, it was not entered into knowingly and voluntarily

9  under the OWBPA, for the reasons just described. As such, the Class Action Waivers signed by

10  Mr. Staton, Ms. Becks, Mr. Kaplan, and others similarly situated, are unenforceable and void. As

11  set forth in the Release Agreement, the validity of the Class Action Waiver must be resolved in

12  court, not in arbitration.

13       84.    Further, while most provisions of the Release Agreement are severable if they are

14  deemed wholly or partially unenforceable, the Class Action Waiver is explicitly ***not*** severable

15  from the rest of the Release Agreement. Accordingly, because the Class Action Waiver is

16  unenforceable and void in this case (for the reasons discussed above), the ***entire*** Release

17  Agreement—including its arbitration provision—is void and unenforceable. As such, Mr. Staton,

18  Ms. Becks, Mr. Kaplan, and all similarly situated individuals who signed a Release Agreement

19  are not bound by the arbitration provision contained in the Release Agreement, and they may

20  proceed with this collective action.

21                      ***The Named Plaintiffs' Background***

22                       Donna Forsyth

23       85.    Plaintiff Donna Forsyth was hired by Hewlett-Packard Company on or about July

24  12, 1999. Her most recent position was a Manager on the Capabilities Team in the Global

25  Corporate Services organization. When her employment was terminated, Ms. Forsyth was

26  working for Hewlett Packard Enterprise Company in Bellevue, Washington.

27       86.    Ms. Forsyth performed her job duties in a satisfactory and competent manner. She

28  always met or exceeded her employer's expectations.

17

87.     Ms. Forsyth was involved with and knowledgeable about Hewlett-Packard Company's and HPE's graduate and early career hiring efforts. She has first-hand knowledge of the aggressive efforts used to hire younger "millennial" employees to replace the many thousands of employees terminated under the WFR Plans.

88.     In May 2016, HPE notified Ms. Forsyth, then 62 years old, that she was being terminated pursuant to a WFR Plan. Her last day of work at HPE was May 27, 2016.

89.     Upon information and belief, and consistent with the HP Entities' internal policies and practices as alleged in this Complaint, when Ms. Forsyth's employment was terminated, she was replaced with a "graduate" or "early career" hire who is significantly under the age of 40, or with someone else who is younger than her.

90.     Ms. Forsyth filed a charge of discrimination with the Equal Employment Opportunity Commission (EEOC) that raised class-wide claims for relief on July 8, 2016. More than 60 days have passed since she filed that charge. She received a Notice of Right to Sue from the EEOC dated August 2, 2016. This lawsuit was filed within 90 days after receiving her Notice of Right to Sue. Ms. Forsyth has exhausted her administrative remedies.

<u>Sidney Staton</u>

91.     Plaintiff Sidney Staton was hired by Hewlett-Packard Company in February 2014. His most recent position was a Sales Enablement Specialist in the Enterprise Services organization. When his employment was terminated, Mr. Staton was working for Hewlett-Packard Company near Sacramento, California.

92.     Mr. Staton performed his job duties in a satisfactory and competent manner. He always met or exceeded his employer's expectations.

93.     About six months prior to being laid off, Mr. Staton was handpicked to join another group within Hewlett-Packard Company performing slightly different work. However, his then-manager insisted that Mr. Staton remain in his current group because he was an important part of his then-team. But then, after being forced to forego the new opportunity presented to him, Hewlett-Packard Company shifted the duties of Mr. Staton's team to a group of new hires in their 20's and suddenly Mr. Staton was no longer considered important to that team.

18

94.     In April 2015, Hewlett-Packard Company notified Mr. Staton, then 54 years old, that he was being terminated pursuant to a WFR Plan. His last day of work was in April 2015.

95.     Upon information and belief, and consistent with the HP Entities' internal policies and practices as alleged in this Complaint, when Mr. Staton's employment was terminated, he was replaced with a "graduate" or "early career" hire who is significantly under the age of 40, or with someone else who is younger than him.

96.     Although Mr. Staton did not file a charge of discrimination with the EEOC, his claims are preserved by the filing of Mr. Weiland's charge of discrimination.

<u>Arun Vatturi</u>

97.     Plaintiff Arun Vatturi was hired by Hewlett-Packard Company in 2001. His most recent position at the company was a Master Black Belt of PC Quality. When his employment was terminated, Mr. Vatturi worked for HPI in its Palo Alto, California offices.

98.     Mr. Vatturi performed his job duties in a satisfactory and competent manner. He always met or exceeded his employer's expectations.

99.     Mr. Vatturi's job was essentially to work on internal systems to improve procedures and save money. In one instance alone, Mr. Vatturi saved Hewlett-Packard Company and HPI more than $70 million through the implementation of his ideas. He was one of the 0.5% of employees at Hewlett-Packard Company who received the company's top performance review rating of "significantly exceeds expectations" in its forced ranking system.

100.    Shortly before terminating Mr. Vatturi, and despite his stellar performance reviews, HPI moved him to a low-level data collection position working with two young independent contractors located in India.

101.    In January 2016, HPI notified Mr. Vatturi, then 52 years old, that he was being terminated pursuant to a WFR Plan. His last day of work was January 22, 2016.

102.    Upon information and belief, and consistent with the HP Entities' internal policies and practices as alleged in this Complaint, when Mr. Vatturi's employment was terminated, he was replaced with a "graduate" or "early career" hire who is significantly under the age of 40, or with someone else who is younger than him.

19

103.    Mr. Vatturi filed a charge of discrimination with the EEOC on July 5, 2016. In that EEOC charge, Mr. Vatturi raised class-wide claims for relief. He received a Notice of Right to Sue dated August 2, 2016. In addition, Mr. Vatturi filed the same charge of discrimination with the California Department of Fair Employment and Housing on July 5, 2016 and received a Notice of Right to Sue from that state agency dated July 6, 2016. More than 60 days have passed since Mr. Vatturi filed his discrimination charge. This lawsuit was brought within 90 days of receiving his Notice of Right to Sue. Mr. Vatturi has exhausted his federal and state administrative remedies.

<u>Dan Weiland</u>

104.    Plaintiff Dan Weiland was hired by Hewlett-Packard Company as an independent contractor in 2010. In February 2012, he was hired by Hewlett-Packard Company as a full-time employee. His most recent position at the company was Project/Program Manager and Acting Group Chief of Staff in the Test Operations & Technologies organization. When his employment was terminated, Mr. Weiland worked for Hewlett-Packard Corporation in its Houston, Texas offices.

105.    Mr. Weiland performed his job duties in a satisfactory and competent manner. He always met or exceeded his employer's expectations.

106.    In his last performance review before being laid off, Hewlett-Packard Company praised Mr. Weiland as a "solid contributor" who brought a "positive, 'can do' attitude" with him every day. Hewlett-Packard Company also said Mr. Weiland was "[a] pleasure to work with, well grounded, [had] outstanding dependability, and work ethic." In 2014, Mr. Weiland received the "Making a Difference" award.

107.    On or about September 9, 2014, Hewlett-Packard Company notified Mr. Weiland that he was eligible to participate in the 2014 Phased Retirement program. His then-manager, Bland Quattlebaum, had several conversations with Mr. Weiland to try to persuade him to participate in the retirement program, which Mr. Weiland declined. Mr. Weiland wanted to continue working.

108.    In July 2015, Hewlett-Packard Company notified Mr. Weiland, then 63 years old,

20

1   that he was being terminated as part of a WFR Plan. His last day of work was July 24, 2015.

2   109.   Upon information and belief, and consistent with the HP Entities' internal policies

3   and practices as alleged in this Complaint, when Mr. Weiland's employment was terminated, he

4   was replaced with a "graduate" or "early career" hire who is significantly under the age of 40, or

5   with someone else who is younger than him.

6   110.   Mr. Weiland filed a charge of discrimination with the EEOC on October 5, 2015,

7   raising class-wide claims for relief against Hewlett-Packard Company. Shortly after Hewlett-

8   Packard Company split into HPE and HPI, Mr. Weiland notified the EEOC that he was charging

9   both HPE and HPI with discrimination. He received a Notice of Right to Sue dated August 11,

10   2016. More than 60 days have passed since this filing of his discrimination charge. This lawsuit

11   was filed within 90 days of receiving his Notice of Right to Sue. Mr. Weiland has exhausted his

12   administrative remedies.

13                                  Shafiq Rahman

14   111.   Plaintiff Shafiq Rahman began working at Compaq in April 1997, which was

15   acquired by Hewlett-Packard Company in 2002. At the time of his termination, on July 29, 2016,

16   Mr. Rahman was a Senior Engineer developing computer servers for HPE.

17   112.   Throughout the nearly twenty years of his employment, Mr. Rahman performed

18   his job duties in a satisfactory and competent manner, and consistently received positive reviews.

19   Indeed, during a mid-year review that took place shortly before his termination, Mr. Rahman was

20   told his performance was good and he should consider himself "safe" from termination.

21   113.   Nevertheless, soon thereafter, on July 18, 2016, when Mr. Rahman was 65 years

22   old, he was informed he was being terminated under a WFR Plan. His last day of work was

23   July 29, 2016.

24   114.   Upon information and belief, and consistent with the HP Entities' internal policies

25   and practices as alleged in this Complaint, when Mr. Rahman's employment was terminated, he

26   was replaced with a "graduate" or "early career" hire who is under the age of 40, or with someone

27   else who is younger than him.

28   115.   Mr. Rahman filed a charge of discrimination with the EEOC on September 29,

21

FIRST AMENDED COMPLAINT

1   2016 that raised class-wide claims for relief. More than 60 days have passed since the charge was

2   filed. He has exhausted his administrative remedies.

3                                              Ed Kaplan

4          116.    Plaintiff Ed Kaplan was hired by the Hewlett-Packard Company in 1984. At the

5   time of his termination in 2016, Mr. Kaplan was a Quality Consultant for HPE.

6          117.    During his more than 30 years with Hewlett-Packard Company and HPE,

7   Mr. Kaplan received only one less than average performance review, which was in 2009.

8   However, he was not placed on a performance plan as a result of this review. Otherwise, he

9   consistently performed his job duties in a satisfactory and competent manner, and always met or

10  exceeded his employer's expectations.

11         118.    Mr. Kaplan's last day of work was July 8, 2016, when he was 63 years old.

12         119.    Upon information and belief, and consistent with the HP Entities' internal policies

13  and practices as alleged in this Complaint, when Mr. Kaplan's employment was terminated, he

14  was replaced with a "graduate" or "early career" hire who is under the age of 40, or with someone

15  else who is younger than him.

16         120.    Mr. Kaplan filed a charge of discrimination with the EEOC on October 5, 2016

17  that raised class-wide claims for relief. More than 60 days have passed since the charge was filed.

18  He has exhausted his administrative remedies.

19                                            Karen Becks

20         121.    Plaintiff Karen Becks was hired by the Hewlett-Packard Company in February,

21  2004 (although she had also been performing contract work for Hewlett-Packard Company since

22  December, 2001). When terminated in 2016, Ms. Becks was an employee of HPE.

23         122.    Ms. Becks consistently performed her job duties in a satisfactory and competent

24  manner, and she never received a negative performance review during her time with Hewlett-

25  Packard Company or HPE. Indeed, her 2015 performance evaluation described Ms. Becks as

26  "achiev[ing] expectations" and noted that she "maintained her performance and increased her

27  skills" even after recently moving into a new role.

28  //

                                                   22

123.    However, on June 24, 2016, when Ms. Becks was 51 years old, she was terminated under a WFR Plan.

124.    Upon information and belief, and consistent with the HP Entities' internal policies and practices as alleged in this Complaint, when Ms. Becks' employment was terminated, she was replaced with a "graduate" or "early career" hire who is under the age of 40, or with someone else who is younger than her.

125.    Ms. Becks filed a charge of discrimination with the EEOC on October 6, 2016 that raised class-wide claims for relief. More than 60 days have passed since the charge was filed. Ms. Becks has exhausted her administrative remedies.

<u>Albert R. DeVere</u>

126.    Plaintiff Albert R. DeVere began working for the Hewlett-Packard Company in September 2010. When he was terminated in 2016, Mr. DeVere was a Manager of Solutions Architects for HPE.

127.    Mr. DeVere consistently performed his job duties in a satisfactory and competent manner and always met or exceeded his employer's expectations. He never received any negative performance reviews during his time at Hewlett-Packard Company and HPE.

128.    On July 1, 2016, when Mr. DeVere was 52 years old, he was terminated under a WFR Plan.

129.    Upon information and belief, and consistent with the HP Entities' internal policies and practices as alleged in this Complaint, when Mr. DeVere's employment was terminated, he was replaced with a "graduate" or "early career" hire who was under the age of 40, or with someone else who is younger than him.

130.    Mr. DeVere filed a charge of discrimination with the EEOC on October 5, 2016 that raised class-wide claims for relief. More than 60 days have passed since the charge was filed. Mr. DeVere has exhausted his administrative remedies.

//

//

//

23

FIRST AMENDED COMPLAINT

*Class Allegations*

131.   Plaintiffs are representatives of the following class for purposes of the ADEA:

The "Nationwide Class"

All individuals aged 40 and older who had their employment terminated by an HP Entity pursuant to a WFR Plan on or after December 9, 2014 for individuals terminated in deferral states; and on or after April 8, 2015 for individuals terminated in non-deferral states.

132.   Plaintiffs and the members of the Nationwide Class were all: (a) aged 40 years or more at the time of termination, (b) terminated pursuant to Defendants' Workforce Restructuring Initiative and common WFR Plans, and (c) terminated because of their age pursuant to common discriminatory employment policies, practices and procedures.

133.   The HP Entities' discriminatory practices and policies are centralized. As explained above, the HP Entities instituted company-wide policies of firing older employees (who were aged 40 years or older) and hiring a disproportionately large number of significantly younger employees (who were under the age of 40). This policy was carried out through the HP Entities' upper management and human resources departments, as alleged in greater detail above. The HP Entities' highest levels of management implemented the discriminatory policies and practices described herein, and they were uniformly carried out through all levels of the HP Entities.

134.   Common questions of law and fact among Plaintiffs and the members of the Nationwide Class include, but are not limited to:

(a) whether the HP Entities unlawfully terminated members of the Nationwide Class in violation of the ADEA;

(b) whether the HP Entities engaged in a pattern and practice of age discrimination when selecting members of the Nationwide Class for termination pursuant to the WFR Plans;

(c) whether the HP Entities through their WFR Plans willfully and intentionally discriminated against members of the Nationwide Class because of their age;

(d) whether the HP Entities' common employment policies and practices adversely

24

FIRST AMENDED COMPLAINT

impacted members of the Nationwide Class; and

(e) whether the HP Entities' purported reasons for laying off members of the Nationwide Class pursuant to the WFR Plans have been pretextual.

135.     Counts for violations of the ADEA may be brought and maintained as an "opt-in" collective action pursuant to 29 U.S.C. § 216(b), for all claims asserted by Plaintiffs, because their claims are similar to the claims of the members of the Nationwide Class.

136.     Plaintiffs and the members of the Nationwide Class are similarly situated because, among other things, (a) they all worked for the HP Entities and are all aged 40 and older, (b) they are all residents of the United States, (c) they were all subjected to the same company-wide policy of age discrimination, (d) they were all subjected to the same company-wide policies that adversely impacted them because of their age, (e) they were all terminated pursuant to the Initiative and the WFR Plans because of their age, and (f) they were all given the same boilerplate reason for having their employment terminated.

137.     Individual variations among Plaintiffs and members of the Nationwide Class, such as location, education, or job responsibilities, do not undermine the common issues at stake here. Plaintiffs allege a single scheme of age discrimination initiated at the very top of the HP Entities and carried out through the entire structure of the companies. Regardless of where an individual worked in the United States or to which manager the individual reported, each member of the Nationwide Class faced the same discrimination and discriminatory policies.

138.     Plaintiffs Arun Vatturi and Sidney Staton also seek to represent the following class for purposes of their California state law claims pursuant to Rule 23 of the Federal Rules of Civil Procedure:

The "California Class"

All individuals aged 40 and older who had their employment terminated by an HP Entity in California pursuant to a WFR Plan on or after August 18, 2012.

139.     The California Class consists of hundreds, if not thousands, of former employees who were notified of their termination when they were aged 40 and older, making joinder of all members of the class impracticable.

25

FIRST AMENDED COMPLAINT

140.     The common questions of law and fact among Plaintiffs Staton and Vatturi and the members of the California Class include, but are not limited to:

(a) whether the HP Entities' conduct violated the California Fair Employment and Housing Act;

(b) whether the HP Entities' conduct was unlawful, unfair or fraudulent in violation of California's Unfair Competition Law;

(c) whether the HP Entities' conduct constitutes an unlawful employment practice in violation of public policy;

(d) whether the HP Entities engaged in a pattern and practice of age discrimination when selecting individuals for termination pursuant to the Initiative and the WFR Plans;

(e) whether the HP Entities based their processes for selecting employees for termination on reasonable factors other than age that were a business necessity;

(f) whether the HP Entities through the WFR Plans willfully and intentionally discriminated against the California Class because of their age,

(g) whether the HP Entities' discrimination had a disparate impact on members of the California Class; and

(h) whether the HP Entities' purported reasons for laying off members of the California Class pursuant to the WFR Plans have been pretextual.

141.     Plaintiffs Staton's and Vatturi's claims and the relief sought for their claims are typical of the claims and relief sought for the California Class. Like the members of the California Class, Staton and Vatturi are aged 40 or older and worked for one or more of the HP Entities in California until they were terminated pursuant to the WFR Plans. Staton and Vatturi were, therefore, subjected to the same discriminatory policies and practices as the other members of the California Class. The relief necessary to remedy Staton's and Vatturi's claims is the same relief necessary to remedy the claims of the members of the California Class in this case.

142.     Plaintiffs Staton and Vatturi will adequately represent the interests of the members of the California Class. Staton's and Vatturi's interests are co-extensive with those of the

26

1   California Class. They seek to remedy the HP Entities' discriminatory employment policies,

2   procedures and practices and will fairly and vigorously pursue claims on behalf of the California

3   Class. Staton and Vatturi are willing and able to represent the California Class fairly and

4   vigorously as they pursue their individual claims in this action.

5        143.   Plaintiffs Staton and Vatturi have retained counsel who are qualified, experienced,

6   and able to conduct this litigation and to meet the time and fiscal demands required to litigate an

7   employment discrimination class action of this size and complexity. The combined interests,

8   experience, and resources of Staton's and Vatturi's counsel to litigate completely the individual

9   and class claims at issue in this case satisfy the adequacy of representation requirement.

10        144.   The HP Entities have acted or refused to act on grounds that apply generally to all

11   members of the California Class, so that final injunctive relief or corresponding declaratory relief

12   is appropriate respecting the California Class as a whole pursuant to Rule 23(b)(2).

13        145.   The HP Entities have failed to create adequate incentives for their managerial and

14   supervisory personnel to comply with laws regarding the employment policies, practices, and

15   procedures described herein.

16        146.   The HP Entities have acted on grounds generally applicable to Plaintiffs Staton

17   and Vatturi and the California Class by adopting and implementing systemic policies, practices,

18   and procedures that are discriminatory. Disparate impact and systemic age discrimination have

19   been the HP Entities' standard operating procedures rather than sporadic occurrences.

20        147.   In addition, the HP Entities have, in a discriminatory way, refused to act on

21   grounds generally applicable to the California Class by terminating class members pursuant to a

22   WFR Plan based on their age.

23        148.   The HP Entities' systemic discriminatory acts and refusals to act make it

24   appropriate to grant the requested final injunctive and declaratory relief with respect to the

25   California Class.

26        149.   All requirements of Rule 23(b)(3) are satisfied here.

27        150.   The common issues of fact and law affecting the claims of Plaintiffs Staton and

28   Vatturi and the members of the California Class predominate over any issues affecting only

1   individual claims. The answers to the common questions listed above will be the same for

2   Plaintiffs Staton and Vatturi and all members of the California Class and will resolve all core

3   issues in the case, once, on common evidence and on a class-wide basis.

4          151.    Prosecution of these claims on a class-wide basis is the most efficient and

5   economical means of resolving the questions of law and fact common to the claims of Plaintiffs

6   Staton and Vatturi and the members of the California Class.

7          152.    Plaintiffs Staton and Vatturi and the members of the California Class were injured

8   by the same discriminatory policies and practices, and these injuries are redressable through

9   systemic relief and class-wide remedies.

10         153.    In order to achieve such class-wide relief, Plaintiffs Staton and Vatturi will

11  establish the existence of systemic age discrimination as the premise for the relief they seek.

12  Without class certification, the same evidence and issues would be subject to re-litigation in a

13  multitude of individual lawsuits with an attendant risk of inconsistent adjudications and

14  conflicting obligations. Certification of the California Class is the most efficient and judicious

15  means of presenting the evidence and arguments necessary to resolve such questions for Plaintiffs

16  Staton and Vatturi, the California Class, and the HP Entities.

17         154.    The cost of proving the disparate treatment and impact of the HP Entities' policies,

18  procedures and practices makes it impracticable for Plaintiffs Staton and Vatturi and members of

19  the California Class to prosecute their claims individually.

20         155.    Class-wide liability and the relief sought herein present common issues capable of

21  class-wide resolution, which would advance the interests of the parties in an efficient manner

22  such that the requirements of Rule 23(c)(4) are also satisfied here.

23                 **COUNT 1 –AGE DISCRIMINATION UNDER THE ADEA**
                   **(On behalf of all Plaintiffs and the Nationwide Class)**
24

25         156.    Plaintiffs hereby incorporate each paragraph above as though fully set forth here.

26         157.    This is a representative action under 29 U.S.C. §§ 626(b) and (c) and 29 U.S.C.

27  § 216(b) filed by the above-named Plaintiffs individually and on behalf of similarly situated

28  persons who opt into this action by filing an appropriate notice.

28

158.   As more fully set forth elsewhere in this Complaint, the HP Entities engaged in an unlawful pattern or practice of age discrimination that adversely affected Plaintiffs and the members of the Nationwide Class in violation of 29 U.S.C. § 621, *et seq.*

159.   Plaintiffs and the members of the Nationwide Class were 40 years of age or older at the time of they were terminated.

160.   The HP Entities terminated Plaintiffs and the members of the Nationwide Class because of their age, and would not have terminated Plaintiffs or the members of the Nationwide Class but for their age.

161.   The unlawful pattern or practice of age discrimination by the HP Entities alleged herein constitutes a willful violation of the ADEA. Plaintiffs' charges of discrimination filed with the EEOC asserted claims on behalf of both the Plaintiffs themselves and others similarly situated, and adequately placed the HP Entities on notice that a collective action was forthcoming.

162.   Plaintiffs and others similarly situated were adversely affected by the pattern or practice of unlawful, willful age discrimination by the HP Entities as elsewhere described herein. Plaintiffs and all similarly situated individuals have suffered actual damages in an amount to be determined at trial.

163.   This is also a representative action under 29 U.S.C. §§ 626(b) and (c) and 29 U.S.C. § 216(b) filed by the above-named Plaintiffs individually and on behalf of similarly situated persons who opt into this action by filing an appropriate notice, and an individual action under the ADEA.

164.   The HP Entities used WFR Plans that had a significantly adverse or disproportionate impact on Plaintiffs and the members of the Nationwide Class and caused Plaintiffs and the members of the Nationwide Class to be terminated. The HP Entities' policies and practices have had a disparate impact on Plaintiffs and the members of the Nationwide Class and were not based upon a reasonable factor other than age.

165.   As set forth more fully above, the HP Entities have utilized practices, policies and procedures that have disparately impacted former employees of the HP Entities, resulting in an unlawful pattern or practice of age discrimination in violation of the ADEA, 29 U.S.C. § 621 *et*

29

*seq.* There was no legitimate, non-discriminatory reason for its action, and any reasons the HP Entities may advance are pretextual. The HP entities at all times relevant acted as a joint or single employer and/or the agent of the other.

166.    The above-named Plaintiffs and others similarly situated were disparately impacted by the HP Entities' practices, policies and procedures, in violation of the ADEA.

167.    As a direct and proximate result of the aforesaid age discrimination by the HP Entities, each of the Plaintiffs and all others similarly situated have suffered damages in an amount to be determined at trial.

## COUNT 2 – AGE DISCRIMINATION UNDER THE FEHA
### (On behalf of Plaintiff Arun Vatturi and the California Class only)

168.    Plaintiff hereby incorporates each paragraph above as though fully set forth here.

169.    This is a representative action under the California Fair Employment and Housing Act, Cal. Gov't Code § 12900, *et seq.* ("FEHA"). The FEHA prohibits employers from discriminating on the basis of age. Cal. Gov. Code § 12940(a). Plaintiff Vatturi brings his FEHA claim on behalf of himself and a class of similarly situated individuals.

170.    The HP Entities have engaged in a pattern and practice of discriminating against individuals aged 40 and older by knowingly and intentionally firing a disproportionately large number of workers aged 40 and older while simultaneously hiring a disproportionately large number of workers under the age of 40.

171.    As a direct and proximate result of the HP Entities' intentional discrimination, Plaintiff Vatturi and a class of similarly situated individuals has had his employment terminated.

172.    The HP Entities have used employment policies and practices related to hiring and firing that have had a disparate impact on the basis of age (discriminating against workers who are aged 40 and older) that are not job-related for the positions at issue, not consistent with business necessity, and are not necessitated by a reasonable factor other than age.

173.    The HP Entities' conduct has been intentional, deliberate, willful, malicious, reckless, and conducted in callous disregard of the rights of Plaintiff Vatturi and the California Class members, entitling them to punitive damages.

30

174.     The HP Entities' policies, procedures, and practices have produced a disparate impact on Plaintiff Vatturi and the California Class members with respect to the terms and conditions of their employment.

175.     The HP Entities' actions constitute unlawful discrimination in violation of the FEHA.

176.     HPI and HPE at all times relevant aided and abetted, incited, compelled, coerced and/or conspired with each other to carry out the discriminatory Workforce Restructuring Initiative. At all times relevant, each Defendant knew that the other was engaging in unlawful discrimination and provided substantial assistance or encouragement to the other in the discriminatory acts described herein. The Initiative was designed to reduce the number of older workers drastically between 2012 and 2017 to make the HP Entities younger. After Hewlett-Packard Company split into HPI and HPE, Defendants agreed to continue to implement the Initiative and took overt acts to continue the Initiative in furtherance of the discriminatory policies.

177.     Pursuant to California Civil Code Section 12940(i), it is unlawful "for any person to aid, abet, incite, compel or coerce" discrimination forbidden by the act.

178.     As a direct and proximate result of the aforesaid age discrimination by the HP Entities, Plaintiff Vatturi and all similarly situated individuals have suffered damages in an amount to be determined at trial.

**COUNT 3 – AGE DISCRIMINATION IN VIOLATION OF PUBLIC POLICY**
**(On behalf of Plaintiffs Sidney Staton and Arun Vatturi and the California Class only)**

179.     Plaintiffs Staton and Vatturi hereby incorporate each paragraph above as though fully set forth here.

180.     The HP Entities discriminated against Plaintiffs Staton and Vatturi and the California Class members by terminating their employment on the basis of their age.

181.     The HP Entities' discrimination constitutes an unlawful employment practice in violation of California public policy.

182.     As a proximate result of the HP Entities' discriminatory conduct, Plaintiffs Staton

31

and Vatturi and the California Class members have been injured in their health, strength, and activity, all of which have caused and continue to cause them to suffer mentally and emotionally.

183.    As a further proximate result of the conduct alleged herein, Plaintiffs Staton and Vatturi and the California Class members have lost earnings, lost employment opportunities, and will lose job benefits in an amount yet to be ascertained.

184.    The HP Entities discriminated on the basis of age with fraud, oppression, and malice. Plaintiffs Staton and Vatturi and the California Class members are therefore entitled to exemplary and punitive damages in an amount to be determined at trial.

**COUNT 4 – UNFAIR COMPETITION**
**CALIFORNIA BUSINESS AND PROFESSIONS CODE §17200, *ET SEQ***
**(On behalf of Plaintiffs Sidney Staton and Arun Vatturi and the California Class only)**

185.    Plaintiffs Staton and Vatturi hereby incorporate each paragraph above as though fully set forth here.

186.    Each of the Defendants is a "person" as defined under California Business & Professions Code § 17021.

187.    The HP Entities' discrimination against its older employees, as alleged herein, constitutes unlawful and/or unfair and/or fraudulent activity prohibited by the California Business & Professions Code § 17200. As a result of their unlawful and/or unfair and/or fraudulent acts, the HP Entities reaped and continue to reap unfair benefits at the expense of Plaintiffs Staton and Vatturi and the California Class members. The HP Entities should be enjoined from these activities.

188.    Accordingly, Plaintiffs Staton and Vatturi and the California Class members are entitled to restitution with interest and other equitable relief.

**JURY DEMAND**

189.    Plaintiffs hereby demand a trial by jury.

//

//

//

32

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs request that the Court make orders and enter judgment in their favor and against Defendants as follows:

1.      Making such orders as are necessary and appropriate to certify this case for treatment as a collective action under the ADEA;

2.      Making such orders as are necessary and appropriate to certify the California claims for class relief;

3.      Designating the above-named Plaintiffs as representatives of the Nationwide Class;

4.      Designating Plaintiffs Sidney Staton and Arun Vatturi as representatives of the California Class;

5.      Designating the undersigned as class counsel;

6.      Granting injunctive relief ordering Defendants to stop discriminating against their older workers based on age;

7.      Awarding each of the Plaintiffs and all members of the Nationwide Class and California Class damages in an amount to be determined at trial, including but not limited to back pay and benefits, together with interest thereon;

8.      Restoring each of the Plaintiffs and all members of the Nationwide Class and California Class to positions comparable to those from which they were terminated or, in lieu of reinstatement, awarding each Plaintiff and all members of the Nationwide Class and California Class front pay and benefits for the period remaining until that person's expected retirement age;

9.      Awarding each Plaintiff and all members of the Nationwide Class liquidated damages pursuant to the ADEA in an amount equal to that person's back pay and benefits award, together with interest thereon;

10.     Awarding Plaintiffs Sidney Staton and Arun Vatturi and all members of the California Class compensatory damages, restitution, and punitive damages pursuant to their state law claims;

11.     Awarding Plaintiffs and all members of the Nationwide Class and the California

33

1   Class their attorneys' fees and costs pursuant to the ADEA and California state law;

2          12.     Awarding prejudgment interest, costs and disbursements; and

3          13.     Awarding such other and further relief, including but not limited to declaratory or

4   injunctive relief, as the Court and/or jury deems equitable, appropriate, and just.

5

6   DATE: December 19, 2016                    ANDRUS ANDERSON LLP

7                                              By:  ___/s/ Jennie Lee Anderson_____
                                                        Jennie Lee Anderson

8                                              Jennie Lee Anderson (SBN 203586)
9                                              jennie@andrusanderson.com
                                               Leland H. Belew (SBN 293096)
10                                             leland.belew@andrusanderson.com
                                               ANDRUS ANDERSON LLP
11                                             155 Montgomery Street, Suite 900
                                               San Francisco, CA 94104
12                                             Phone:   (415) 986-1400
                                               Fax:     (415) 986-1474
13
                                               DOUGLAS P. DEHLER *pro hac vice*
14                                             doug.dehler@wilaw.com
                                               PAUL W. ZIMMER *pro hac vice*
15                                             paul.zimmer@wilaw.com
                                               O'NEIL, CANNON, HOLLMAN,
16                                                DEJONG & LAING S.C.
                                               111 East Wisconsin Avenue, Suite 1400
17                                             Milwaukee, WI 53202
                                               Phone:   (414) 276-5000
18                                             Fax:     (414) 276-6581

19                                             BRUSE LOYD
                                               bruse@jgl-law.com
20                                             JONES, GILLASPIA & LOYD LLP
                                               4400 Post Oak Parkway, Suite 2360
21                                             Houston, TX 77027
                                               Phone:   (713) 225-9000
22                                             Fax:     (713) 225-6126

23                                             BRIAN H. MAHANY
                                               brian@mahanylaw.com
24                                             MAHANY LAW
                                               8112 W. Bluemound Road, Suite 101
25                                             Milwaukee, WI 53213
                                               Phone:   (414) 258-2375
26                                             Fax:     (414) 258-2521

27                                             *Attorneys for Plaintiffs and the Proposed*
                                               *Classes*
28

                                        34

FIRST AMENDED COMPLAINT

# EXHIBIT C



**INSTRUCTIONS FOR WAIVER AND GENERAL RELEASE AGREEMENT**
**(For Use with the HP Workforce Reduction Plan in the US)**

To be eligible for the Cash Severance Payment provided for in the HP Workforce Reduction Plan (the "Plan"), you must complete and sign the attached Waiver and General Release Agreement ("Release Agreement") and send it by U.S. mail or overnight courier to the HP HR Operations Organization. You should review the document carefully and are advised to review it with an attorney.

The Cash Severance Payment will be processed once you sign and return the unaltered Waiver and General Agreement and after the seven-day revocation period has lapsed, approximately 60 to 90 days after your termination.

**Please do not sign or return this form until on or after your termination date.**

1. Please confirm that your name, employee number and termination date at the top of the Release Agreement are correct.

2. Review the Release Agreement and, if you intend to accept the terms of the Release Agreement, sign and enter the date on the last page.

3. If you are age 40 or over, the Age Discrimination in Employment Act (ADEA) notice referenced in Paragraph 12 is attached. If you are under age 40, there will not be an ADEA notice.

4. You have 60 calendar days after your termination date to submit this form to the HP HR Operations Organization. Do not sign or submit your Release Agreement until after your termination date.

5. **Do not amend or alter the Release Agreement**. Release Agreements containing any altered or amended terms and conditions will be rejected.

6. Please confirm that you have signed your name and entered the date on the last page of the Release Agreement. Mail the Release Agreement pages 1-6. An incomplete form may be returned to you, which will delay processing of the Cash Severance Payment. Please make a copy of this Release Agreement and keep it for your records before submitting the original. You will not receive a signed copy back from HP.

**Submit the Release Agreement to:**
Hewlett-Packard HR Operations Organization
5400 Legacy
H1-6F-61
Plano, TX 75024
ATTN: Workforce Management Programs

*Note: The signed Release Agreement must be received by the HR Operations Organization by 5:00 p.m. Pacific Time no later than 60 calendar days after your termination date. You will not receive a confirmation that HP has received your Release Agreement. If a confirmation is important to you, then we recommend that you mail it certified with return receipt requested or by overnight courier so that you have a tracking number to refer to. HR Operations Organization and Payroll will not respond to phone calls to confirm your Release Agreement was received.*

**WAIVER AND GENERAL RELEASE AGREEMENT**
**(For Use with HP Workforce Reduction Plan)**



Employee Name:
Employee Number:

This Waiver and General Release Agreement ("Agreement") is entered into between Hewlett-Packard Company (including its subsidiaries, affiliated companies, successors and assigns) ("HP" or the "Company") and _____ ("Employee"). This Agreement is being entered into in the context of Employee's termination of employment with the Company and the receipt of certain severance benefits subject to the terms and conditions set forth herein.

The terms of the Agreement are:

1. It is acknowledged that Employee's employment by HP or any of its subsidiaries terminated on Employee's designated termination date: _____.

2. Both Employee and HP are entering into this Agreement as a way of concluding the employment relationship between them and settling voluntarily any dispute or potential dispute that Employee has or might have with HP, whether known or unknown at this time. This Agreement is not, and should not be construed, as an allegation or admission on the part of either Employee or HP that either has acted unlawfully or violated any state or federal law or regulation.

3. In return for Employee's agreeing to the release set forth in this Agreement, HP agrees to provide Employee the Cash Severance Payment and other benefits associated with the Hewlett-Packard Company Workforce Reduction Plan (the "Plan") by direct deposit or check.  As provided in the Plan, the payment will be issued as soon as practicable following the Effective Date of this Agreement (as defined below). All payments and other benefits under this Agreement are subject to applicable employment and income taxes and other required withholdings. The parties recognize that this payment exceeds any amounts to which Employee would otherwise be entitled under existing HP policies or practices or otherwise.

4. The exercise of any stock options and any rights relating to any HP equity shall continue to be subject to the terms and conditions of the applicable equity plan(s) and agreements pursuant to which such equity was issued, including any modification to the treatment of such stock options in the event of termination under a workforce reduction plan provided by the HP Board of Directors (or its delegate), from time to time. Regardless of whether those plans, agreements or actions of the HP Board (or its delegate) provide Employee with the opportunity to exercise options following termination of employment, Employee shall be solely responsible for tracking applicable option expiration dates.

5. In return for the Cash Severance Payment and other benefits associated with the Plan, Employee, for himself or herself, and his or her spouse, heirs, executors, representatives and assigns, forever releases, discharges, and agrees to hold harmless HP and its direct and indirect subsidiaries and affiliated companies and their respective shareholders, directors, officers, managers, agents, employees, attorneys, representatives, and assigns from any and all claims, actions and causes of action arising at any time through the Effective Date of this Agreement. Such potential claims **include but are not limited to**:

    5.1. Any claims relating to employment discrimination or harassment based on race, color, sex, age, national origin, religion, disability, pregnancy, sexual orientation, or otherwise, whether or not arising under Title VII of the Civil Rights Act of 1964, as amended, the Civil Rights Act of 1991, the Age Discrimination in Employment Act (ADEA), the Rehabilitation Act of 1973, the Americans With Disabilities Act, the Older Workers Benefit Protection Act, the California Fair Employment and Housing Act, any amendments to the foregoing, or any other federal, state, local or foreign law, statute, regulation or order relating to employment discrimination or terms and conditions of employment;

    5.2. Any claims relating to pay (including but not limited to any claims for overtime pay under state or local law), benefits or leaves of absence, whether or not arising under the Family and Medical Leave Act, the

Employee Retirement Income Security Act, the Worker Adjustment and Retraining Notification Act or any similar laws enacted in any jurisdiction;

5.3. Any "wrongful termination" claims, and any other claims relating to employment or termination of employment by HP, whether or not based upon any oral, written, express or implied employment contract or agreement; any implied covenant of good faith and fair dealing; any alleged violation of public policy; compliance (or lack of compliance) with any HP policy, procedure, practice, or guideline; or any federal, state, local or foreign law, statute, regulation or order, whether or not relating to labor or employment;

5.4. Any claims alleging wrongful acts resulting in physical injury, emotional distress, and damage to reputation or any other damage;

5.5. Any claim for attorneys' fees, interest, or costs; and

5.6. Any claims relating to any other matter or event occurring prior to the execution of this Agreement whether or not brought before any judicial, administrative or other tribunal.

5.7. Employee further agrees he or she will not bring or participate in any class, collective, or representative action against HP which asserts, in whole or in part, any claim(s) which arose through the date Employee signs this agreement, whether or not such claims are specifically covered by this Agreement ("Class Action Waiver").  Notwithstanding any other clause contained in this Agreement, the preceding sentence shall not be severable from this Agreement in any case in which the dispute to be litigated or arbitrated is brought as a class, collective or representative action.  Although an Employee will not be retaliated against, disciplined or threatened with discipline as a result of his or her exercising his or her rights under Section 7 of the National Labor Relations Act by the filing of or participation in a class, collective or representative action in any forum, the Company may lawfully seek enforcement of this Agreement and the Class Action Waiver under the applicable law and seek dismissal of such class, collective or representative actions or claims.  Notwithstanding any other clause contained in this Agreement, any claim that all or part of the Class Action Waiver is unenforceable, unconscionable, void or voidable may be determined only by a court of competent jurisdiction and not by an arbitrator.  The Class Action Waiver shall be severable in any case in which the dispute is filed as an individual action and severance is necessary to ensure that the individual action proceeds.

6. The claims released pursuant to this Agreement include all claims against individual employees or agents of HP or its subsidiaries whether acting within the scope of their duties, individually or in any other capacity. This Agreement does not, and shall not be construed as an attempt to, waive or release any claim or right that cannot lawfully be waived or released by private agreement between Employee and HP. Employee promises never to file a lawsuit, demand, action or otherwise assert any claims that are released by this Agreement (other than a claim filed solely for the purpose of challenging the validity of the waiver of claims under the Age Discrimination in Employment Act). If Employee breaks the promises he or she makes in this Agreement, Employee agrees he or she will repay to HP the Cash Severance Payment and other benefits associated with the Plan.

7. In entering into this Agreement, the parties intend it to be a full and final settlement of all matters, whether or not disputed at present that could have arisen between them. Employee understands and expressly agrees that this Agreement extends to all claims of every nature and kind whatsoever, known or unknown, suspected or unsuspected; and accordingly Employee waives all rights under Section 1542 of the California Civil Code and/or any similar statute or law of any other jurisdiction.

Such section reads as follows:

**Section 1542: A general release does not extend to claims which the creditor does not know or suspect to exist in his or her favor at the time of executing the release, which if known by him or her must have materially affected his or her settlement with the debtor.**

8. Employee and HP fully understand that if the facts with respect to this Agreement are later found to be

different from the facts now believed to be true, Employee and HP expressly accept and assume the risk of such possible differences of fact, and agree that this Agreement shall be and remain effective notwithstanding such differences. Employee agrees that the consideration set forth above fully compensates him or her for this risk, and that Employee will have no legal recourse against HP in the event of such differences.

9. Employee represents that he/she does not have in his/her possession any specifications, drawings, sketches, notes, reports, proposals, computer disks, sales reports, customer lists, marketing or business plans, or copies of them, or other documents or materials, tools, equipment or other property belonging to HP. Employee acknowledges that during the course of employment with HP, he/she has had access to and acquired knowledge of trade secrets and confidential and proprietary business information relating to HP and/or third parties such as suppliers and customers. Employee agrees to maintain all such information in strict confidence and to abide by the terms of any confidentiality and/or proprietary information agreement that he/she has entered into with HP. Nothing in this Agreement is intended to limit any remedy of HP under applicable law in connection with protection of its intellectual property.

10. Employee agrees that he/she will not make or publish, either orally or in writing, any disparaging statement regarding HP or in any way impede or interfere with HP's customer relationships including, without limitation, any statements made by Employee in any online forum, blog or social media site. Nothing in this Agreement shall be construed to prevent Employee from providing truthful testimony if mandated by subpoena or court order to do so, or from cooperating fully with any request from or investigation by a government agency.

11. Employee agrees to fully cooperate with and assist HP at its expense in the prosecution or defense of any patent applications and in resolving any and all claims, disputes, investigations, lawsuits, or other legal proceedings related to issues that arose or occurred during the course of Employee's employment with HP.

12. For employees age 40 and over, the Older Workers Benefit Protection Act requires that HP provide Employee with the job titles and ages of all employees covered by this severance program within Employee's decisional or organizational unit, and the ages and job titles of all individuals in the same decisional or organizational unit who were not selected for the program. This information is set forth in the ADEA notice delivered with this Agreement. Employee acknowledges receipt of this information.

12.1. Employee acknowledges that he or she has had at least 45 calendar days to consider this Agreement before the date he/she is obligated to sign it.

12.2. Employee agrees that he/she is aware of the contents and significance of all the provisions of this Agreement and that he/she has decided to enter into it voluntarily.

12.3. Employee may revoke this Agreement within seven calendar days after this Agreement is signed. Employee and HP agree that this Agreement shall not become effective or enforceable until this seven-day revocation period has ended.

12.4. Employee acknowledges that he/she has been advised in writing to have this Agreement reviewed by counsel prior to signing it, and that he/she has had an opportunity to consult with counsel, if he/she chooses to do so.

12.5. Employee understands that rights or claims under the Age Discrimination in Employment Act of 1967 (29 USC § 621 et seq.) that may arise after the date this Agreement is signed are not waived; and

12.6. Employee understands that nothing in this Agreement shall be construed to prohibit Employee from filing a charge or complaint, including a challenge to the validity of this Agreement, with the EEOC, NLRB, or any other comparable federal, state or local agency charged with the investigation and enforcement of any employment laws or participating in any investigation or proceeding conducted by the EEOC, NLRB or other comparable federal, state or local agency, although by signing this Agreement, Employee agrees and understands that Employee is waiving Employee's right to individual relief based on claims asserted in

such a charge or complaint.

13. The parties agree to arbitrate any and all disputes or claims arising out of or Employee's employment or separation, or related to the validity, enforceability, interpretation, performance or breach of this Agreement, whether sounding in tort, contract, statutory violation or otherwise, or involving the construction or application or any of the terms, provisions, or conditions of this Agreement before a neutral arbitrator and/or arbitration sponsoring organization, selected by mutual agreement, in or near the city in which Employee was last employed by the Company.  If the parties are unable to mutually agree upon an arbitrator, the arbitration shall be held through the American Arbitration Association ("AAA").  Any arbitration may be initiated by a written demand to the other party within the statute(s) of limitation provided by law for such claim(s).  The arbitrator's written decision, except as provided herein, shall be final, binding, and conclusive.  In making the award, the arbitrator shall have no power to add to, delete from, or modify the terms of this Agreement, or to construe implied terms or covenants herein, the parties being in agreement that no such implied terms or covenants are intended.  In reaching the arbitrator's decision, the arbitrator shall adhere to relevant law and applicable legal precedent, and shall have no power to vary therefrom.  At the time of issuing the arbitrator's award, the arbitrator shall make specific findings of fact, and set forth such facts in support of the arbitrator's decision, as well as the reasons and basis for the arbitrator's opinion.  Should the arbitrator exceed the jurisdiction or authority herein conferred, any party aggrieved thereby may file a petition to vacate, amend or correct the award so rendered in a court of competent jurisdiction.  The parties further agree that this Agreement is intended to be strictly construed to provide for arbitration as the sole and exclusive means for resolution of all disputes hereunder to the fullest extent permitted by law, and its validity and enforceability determined, in accordance with the Federal Arbitration Act.  The parties expressly waive any entitlement to have such controversies decided by a court or a jury. The requirement to arbitrate does not apply to claims for workers compensation benefits, state disability insurance, unemployment insurance benefits or benefits under any ERISA-covered benefit plan sponsored by the Company.  The Company and Employee may pursue temporary and/or preliminary injunctive relief in a court of competent jurisdiction for tortious interference with prospective employment and/or the protection of confidential information and/or trade secrets, prevention of unfair competition, or enforcement of post-employment contractual restrictions related to same; provided, however, that all issues of final relief shall continue to be decided through arbitration, and the pursuit of the temporary and/or preliminary injunctive relief described herein shall not constitute a waiver of the parties' agreement to arbitrate by any party.  Disputes that may not be subject to pre-dispute arbitration as provided by the Dodd-Frank Wall Street Reform and Consumer Protection Act are excluded from mandatory arbitration under this Agreement.  This Agreement also shall not be construed to require the arbitration of any claims against a defense contractor that may not be the subject of a mandatory arbitration agreement as provided by any Department of Defense Appropriations Act and their implementing regulations.

14. After submission of the written claim for arbitration, the parties shall submit the matter to non-binding mediation before a mutually selected neutral mediator.  The Company shall pay the reasonable fees of the mediator and the expenses associated with the mediation.  The International Institute for Conflict Resolution Prevention and Resolution (CPR) or some comparable independent mediation service shall be used to provide the mediator and the rules under which the mediation will be conducted.  In the event the claim is not resolved through the mediation process, the claim shall be submitted to binding arbitration, as provided herein.

15. Employee understands and agrees that he or she has no right to be employed or retained by HP as an employee or contingent worker at any time in the future, and Employee shall not at any time institute or join in any claim or action against HP for failure to employ or retain him or her. HP may in its sole discretion consider engaging Employee as an employee or contingent worker in accordance with its policies regarding such matters, as in effect at the time such engagement is considered. Any engagement of Employee as an employee or contingent worker in violation of such policies shall be voidable at any time, at HP's option.

16. This Agreement shall be binding upon Employee and HP and upon their heirs, administrators, representatives, executors and assigns. Employee expressly warrants that he/she has not transferred to any person or entity any rights, causes of action or claims released in this Agreement and that he/she has

not commenced, maintained, prosecuted or participated in any action, suit, charge, grievance, complaint or proceeding of any kind against the Released Parties, in any court or before any administrative or investigative body or agency (including but not limited to the Equal Employment Opportunity Commission or equivalent state or local agency).

17. This Agreement shall be interpreted in accordance with the plain meaning of its terms and not strictly for or against either HP or Employee. Should any provision of this Agreement be determined by any court to be wholly or partially invalid or unenforceable, the validity and enforceability of the remaining provisions shall not be affected, and the unenforceable or invalid provision shall be deemed not to be a part of this Agreement (except as provided above regarding the class and collective action waiver).

18. Both employee and HP understand and agree that, except for matters relating to arbitration, intellectual property, trade secrets, confidential or proprietary information, this Agreement represents the entire agreement and understanding between them concerning Employee's employment with and separation from HP, and supersedes and replaces all prior and contemporaneous agreements and understandings concerning Employee's relationship with HP and compensation by HP. Employee shall continue to be bound by any agreements previously made with HP or any entity HP is successor to relating to arbitration, intellectual property, trade secrets and confidential or proprietary information. This Agreement may only be amended in a writing signed by Employee and a Senior Vice President of HP.

19. This Agreement may be executed in counterparts or by facsimile, and each counterpart, facsimile or photocopy shall have the same force and effect as an original and shall constitute an effective, binding agreement on the part of each of the undersigned.

20. Employee may accept this Agreement by fully executing it and returning it no earlier than Employee's termination date and no later than 60 days following Employee's termination date. After executing this Agreement, Employee shall have seven days to revoke this Agreement by indicating his/her desire to do so in writing, addressed to HP, Attention: Workforce Management Programs, 5400 Legacy, Mail Stop: H1-6F-61, Plano, Texas 75024. The Effective Date of this Agreement shall be the eighth day following Employee's signing of the Agreement. If Employee does not accept this Agreement within the time period described above, or if Employee revokes this Agreement during the seven-day revocation period, this Agreement shall be null and void and HP shall have no obligation to make any payments or provide any benefits under the Plan.

21. Any disputes and/or claims between the parties shall be governed by federal law and/or the laws of the state of the Employee's work location on the Separation Date, as reflected in the Company directory. The Arbitrator is without jurisdiction to apply any different substantive law. The arbitration shall take place in or near the city of the Employee's work location on the Separation Date, as reflected in the Company directory.

**IN SIGNING THIS AGREEMENT, EMPLOYEE FURTHER STATES THAT HE OR SHE HAS BEEN ADVISED IN WRITING TO HAVE AN ATTORNEY REVIEW THIS AGREEMENT AND HAS HAD THE OPPORTUNITY TO CONSULT WITH AN ATTORNEY OF HIS OR HER CHOICE, THAT HE OR SHE HAS CAREFULLY READ THIS AGREEMENT, THAT HE OR SHE HAS HAD AMPLE TIME TO CONSIDER ITS CONSEQUENCES, THAT HE OR SHE FULLY UNDERSTANDS ITS FINAL AND BINDING EFFECT, THAT THE ONLY PROMISES MADE TO INDUCE HIM OR HER TO SIGN THIS AGREEMENT ARE THOSE STATED ABOVE, AND THAT HE OR SHE IS SIGNING THIS AGREEMENT VOLUNTARILY.**

Employee Signature: _____

Printed Name: _____

Employee Number: _____

Mailing Address: _____

Employee Email: _____

*(We will email you in case there is an issue with this Release Form)*

Employee Telephone: _____

Date: _____(Please note: This date can be no earlier than your termination date).

Hewlett-Packard Company

Date Received

Rev 5.1.2014

# EXHIBIT D


Employment & Labor Law Solutions Worldwide

**Littler Mendelson, P.C.**
100 Congress Avenue
Suite 1400
Austin, TX  78701

Darren G. Gibson
512.982.7259 direct
512.982.7250 main
512.692.2810 fax
dgibson@littler.com

October 4, 2017

<u>VIA EMAIL</u>

Jennie Lee Anderson, Esq.                    Douglas P. Dehler, Esq.
Andrus Anderson LLP                          O'Neil, Cannon, Hollman, DeJong & Laing S.C.
155 Montgomery Street, Suite 900             111 E. Wisconsin Ave., Suite 1400
San Francisco, CA  94104                     Milwaukee, WI 53202

Re:     *Forsyth v. HP Inc., et al.*; USDC, ND Cal., Case No. 16-cv-04775-EJD

Dear Counsel:

This letter is in response to Ms. Anderson's letter, dated September 29, 2017, and her subsequent email dated October 3, 2017, regarding the Court's order granting Defendants' motions to compel arbitration pertaining to sixteen (16) named and opt-in Plaintiffs compelled to arbitration ("Arbitration Plaintiffs").   In that letter and the subsequent email, Ms. Anderson indicated that the Arbitration Plaintiffs were working to compile a list of proposed arbitrators, and she requested that Defendants provide a list of proposed arbitrators by October 6, 2017. Moreover, in both the letter and email, Ms. Anderson made clear that she envisions a single arbitration in which a lone arbitrator would "hear the question of whether the release provision in the Agreement is enforceable".  Both the request that Defendants propose arbitrators at this time, and the suggestion that a single arbitration is appropriate to evaluate the enforceability of the waiver and release executed by each Arbitration Plaintiff at issue, misapprehend and contradict the plain, express terms of the Waiver and General Release Agreement ("Release Agreement") signed by each.

I.      **The Terms of the Release Agreement Require That An Individual Initiate Arbitration By Making A Written Demand, Followed By Mandatory Mediation**

Sections 13 and 14 of each Release Agreement include the terms governing the arbitrations.  First, an arbitration governed by a Release Agreement must be initiated by

Jennie Lee Anderson, Esq. and Douglas P. Dehler, Esq.
October 4, 2017
Page 2

a written demand from the individual Arbitration Plaintiff.[1]  None of the 16 Arbitration Plaintiffs have made a written demand for arbitration in accordance with their individual Release Agreement.  Thus, no single arbitration proceeding has been initiated and it is inappropriate to exchange the names of potential arbitrators at this time.

Second, even if any of the Arbitration Plaintiffs had made a written request for arbitration, each's Release Agreement requires that they and the respondent mediate the dispute before submitting the claim to binding arbitration.[2]  It is only if the mandatory mediation is unsuccessful that an individual arbitration claimant may proceed to binding arbitration before a neutral arbitrator selected by a mutual agreement (or through the American Arbitration Association, if the parties cannot agree), with the arbitration being conducted in or near the city in which the Arbitration Plaintiff was last employed by the respondent.[3]

## II.   The Plaintiffs' Challenges to the Releases Require Individual Arbitration.

Moreover, contrary to Ms. Anderson's suggestion that the Court's Order required that a single arbitrator would "hear the question of whether the release provision in the Agreement is enforceable", the Court ordered no such thing.   Rather, the Court observed first that "[u]pon termination of their employment with HP, each Plaintiff signed a [Release Agreement] in exchange for severance benefits" and then held that "The Court agrees with Defendants that, under the terms of the RA, "an arbitrator must first decide whether the release provision contained in the agreement is enforceable." Dkt. No. 132 at 3-4.  Additionally, the Court closed its Order by expressly noting that "[t]he parties shall file a joint status report with the Court within thirty days of the resolution of arbitration *proceedings.*" *Id.* at 5.  Thus, the Court's Order plainly compelled each of the 16 Arbitration Plaintiffs to individual arbitrations to address the enforceability of the waiver and release on their own individualized facts.

Such a ruling is, indeed, the only one that makes sense given the claims asserted by the 16 individuals.  That is, the 16 individuals alleged that the releases contained in

---

[1] Section 13 of the Release Agreement states, "Any arbitration may be initiated by a written demand to the other party within the statute(s) of limitation provided by law for such claim(s)."

[2] Section 14 of Release Agreement states, "After submission of the written claim for arbitration, the parties shall submit the matter to non-binding mediation before a mutually selected neutral mediator."

[3] Section 13 states that the arbitration is to be conducted "before a neutral arbitrator and/or arbitration sponsoring organization, selected by mutual agreement, in or near the city in which Employee was last employed by the Company. If the parties are unable to mutually agree upon an arbitrator, the arbitration shall be held through the American Arbitration Association ("AAA")."

Jennie Lee Anderson, Esq. and Douglas P. Dehler, Esq.
October 4, 2017
Page 3

Release Agreements were not "knowing and voluntary" for three reasons: (1) the release was allegedly not written in a manner that the employee could reasonably understand its provisions; (2) each individual Attachment A allegedly failed to provide the proper list of other employees in the "decisional unit" considered for selection; and (3) each individual's severance payment estimate statement allegedly "misled the average employee regarding the amount of consideration he or she would receive for signing the Release Agreement." (FAC ¶¶ 73, 79-81.)   Each of these arguments requires an individual assessment.

In sum, once an Arbitration Plaintiff initiates arbitration by making a written demand for arbitration under Section 13 of their respective Release Agreement, we will gladly exchange the names of potential mediators who are located in or near the city where the Arbitration Plaintiff was last employed by the arbitration respondent and participate in the individual mediation.  Until that process is completed, the exchange of names of potential arbitrators is inappropriate.

Sincerely,

Darren G. Gibson

cc:   Leland H. Belew, Esq.
      Paul W. Zimmer, Esq.
      Lisa A. Schreter, Esq.
      Richard W. Black, Esq.
      Donald W. Myers, Esq.
      James A. Frederick, Esq.
      Shannon R. Creasy, Esq.