JENNIE LEE ANDERSON (SBN 203586)
jennie@andrusanderson.com
LELAND H. BELEW (SBN 293096)
leland.belew@andrusanderson.com
ANDRUS ANDERSON LLP
155 Montgomery Street, Suite 900
San Francisco, CA 94104
Phone: (415) 986-1400
Fax:    (415) 986-1474

DOUGLAS P. DEHLER (admitted *pro hac vice*)
doug.dehler@wilaw.com
PAUL W. ZIMMER (admitted *pro hac vice*)
paul.zimmer@wilaw.com
O'NEIL, CANNON, HOLLMAN, DEJONG & LAING S.C.
111 East Wisconsin Avenue, Suite 1400
Milwaukee, WI 53202
Phone: (414) 276-5000
Fax:    (414) 276-6581

Attorneys for Plaintiffs and the Proposed Classes

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| DONNA J. FORSYTH, ARUN VATTURI, DAN WEILAND, SHAFIQ RAHMAN, ALBERT R. DEVERE, AND KEVIN ALVISO, for and on behalf of themselves and other persons similarly situated, <br><br> Plaintiffs, <br><br> vs. <br><br> HP INC. and HEWLETT PACKARD ENTERPRISE COMPANY, <br><br> Defendants. | Case No. 5:16-cv-04775 <br><br> **CLASS ACTION** <br><br> **THIRD AMENDED COMPLAINT** <br><br> **JURY TRIAL DEMANDED** |

Plaintiffs Donna J. Forsyth, Arun Vatturi, Dan Weiland, Shafiq Rahman, Albert R. DeVere, and Kevin Alviso ("Plaintiffs"), on behalf of themselves and other persons similarly situated, submit this Third Amended Complaint against HP Inc. and Hewlett Packard Enterprise Company pursuant to the agreement of the parties.[1]   As and for their claims against HP Inc. and Hewlett Packard Enterprise Company, Plaintiffs allege and state as follows:

## INTRODUCTION

1.      Defendants HP, Inc. ("HPI") and Hewlett Packard Enterprise Company ("HPE"), along with their predecessor, Hewlett-Packard Company (collectively, the "HP Entities"), through coordinated employment policies and practices, have unlawfully discriminated against Plaintiffs and other similarly situated employees because of their age.

2.      In 2012, under the direction of Ms. Meg Whitman, who was then its President and Chief Executive Officer (CEO), Hewlett-Packard Company began implementing a company-wide initiative to replace thousands of existing, older workers with new, younger employees (hereinafter, referred to as the "Workforce Restructuring Initiative" or "Initiative"). When rolling out this Initiative, Ms. Whitman said the goal was to restructure Hewlett-Packard Company's workforce over a period of approximately five years, between 2012 and 2017.

3.      In October 2013, Ms. Whitman admitted publicly during a Securities Analyst Meeting that the Initiative's overarching goal was to "recalibrate and reshape" the workforce by "replacing" existing workers with "a whole host of young people."

4.      In November 2015, Hewlett-Packard Company split into two companies, HPI and HPE. Since the split, Ms. Whitman served as the Chair of the Board of Directors for HPI until July 26, 2017. Since the split, she also served as the CEO for HPE until February 1, 2018 and she served on the board of HPE until February 1, 2019.

//

//

//

---

[1] Defendants have agreed not to oppose Plaintiffs' motion for leave to file the Third Amended Complaint, but Defendants have reserved all defenses, objections, and counterclaims they may assert, or motions they may file, in response to the Third Amended Complaint.  Further, Defendants' agreement not to oppose Plaintiffs' motion for leave to file the Third Amended Complaint does not constitute an admission of any allegation contained in the Third Amended Complaint.

THIRD AMENDED COMPLAINT

5.      During Ms. Whitman's tenure, both HPI and HPE continued to implement the Initiative in concert with one another, shedding thousands of additional employees since November 2015, and making plans to terminate the employment of thousands more in 2017 (and possibly beyond).

6.      Ms. Whitman repeatedly admitted that her goal was to make the entire Hewlett-Packard organization younger. In pursuit of this goal, the three HP Entities have now shed thousands of older workers since 2012, while at the same time aggressively recruiting younger employees to replace them.

7.      The split of Hewlett-Packard Company into HPI and HPE was Ms. Whitman's brain-child, as was the entire Workforce Restructuring Initiative. Ms. Whitman not only implemented and controlled the Initiative at the pre-split Hewlett-Packard Company, she also continued to exert control and substantial influence over the implementation of the Initiative at the post-split entities, HPI and HPE.

8.      The HP Entities may contend that the Workforce Restructuring Initiative was always meant to be age-neutral. However, the Initiative and the programs and plans implemented under it have had a clear and substantially adverse impact on older employees.

9.      At all relevant times, HPI and HPE have colluded, conspired and aided and abetted one another to carry out the Workforce Restructuring Initiative in furtherance of Ms. Whitman's goal to "recalibrate" the age of the HP Entities' workforces. At worst, the HP Entities intentionally designed and carried out the Initiative to discriminate willfully against older workers in an effort to get younger. At best, the Initiative was comprised of facially neutral policies that disproportionately and adversely impacted the HP Entities' older workers.

10.      Since the Initiative was implemented in 2012, it has involved a coordinated two-prong strategy: (1) pushing current, older workers out of the company, while (2) at the same time hiring a large number of new, younger employees to replace them. As just one means of executing the first prong of this strategy, Hewlett-Packard Company, under Ms. Whitman's direction, implemented the "2012 Workforce Reduction Plan," which was subsequently adopted by both HPI and HPE (hereinafter, the pre- and post-split Workforce Reduction Plans are referred to collectively

1    as the "WFR Plans").

2        11.    While the WFR Plans' titles suggest that the primary goal is a "workforce

3    reduction," as Ms. Whitman herself admitted, the true goal of the entire Workforce Restructuring

4    Initiative has been to restructure, recalibrate and reshape the HP Entities' workforces to make them

5    younger. Indeed, in the nearly five years since they began to implement the Initiative and the WFR

6    Plans in 2012, the HP Entities have added thousands of new employees to replace those who were

7    terminated under the WFR Plans.

8        12.    As many in the technology industry know, Hewlett-Packard is generally regarded

9    as the oldest company in Silicon Valley whose employees have a higher average age when

10   compared to companies such as Facebook or Google. When she took over in 2012, Ms. Whitman

11   perceived the age of Hewlett-Packard Company's workforce as a problem that needed solving,

12   rather than an asset to be harnessed. With this mindset, Ms. Whitman began the Initiative to make

13   Hewlett-Packard Company younger, and that Initiative has been ongoing since then.

14       13.    The Plaintiffs, along with thousands of other similarly situated former employees of

15   the HP Entities, are among those who were discarded as part of the Initiative because they were

16   considered too old.

17       14.    The Initiative violated federal laws and California state laws prohibiting age

18   discrimination in employment. The Initiative was designed and implemented to discriminate

19   intentionally against employees based on age. In addition, the WFR Plans and other employment

20   programs that were used to implement the Initiative's goals have had a substantially adverse impact

21   on employees aged 40 or older.

22       15.    For these reasons, as well as those set forth in greater detail below, Plaintiffs bring

23   this action on behalf of themselves and others similarly situated to recover damages and seek other

24   relief available under the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621, *et*

25   *seq.*, as well as under the California Fair Employment and Housing Act ("FEHA"), Government

26   Code §§ 12900-12996, and other California state laws.

27   //

28   //

1

## THE PARTIES

2      16.     Plaintiff Donna Forsyth is a resident of the State of Washington. She worked at the

3   Hewlett Packard Enterprise Company (and previously Hewlett-Packard Company) until she was

4   laid off in May 2016, when she was 62 years old.

5      17.     Plaintiff Arun Vatturi is a resident of the State of California. He worked at HP, Inc.

6   (and previously Hewlett-Packard Company) until he was laid off in January 2016, when he was 52

7   years old.

8      18.     Plaintiff Dan Weiland is a resident of the State of Texas. He worked at Hewlett-

9   Packard Company until he was laid off in July 2015, when he was 63 years old.

10     19.     Plaintiff Shafiq Rahman is a resident of the State of Texas. He worked at Hewlett

11  Packard Enterprise Company (and previously Hewlett-Packard Company) until he was laid off in

12  July 2016, when he was 65 years old.

13     20.     Plaintiff Albert R. DeVere is a resident of the State of Virginia. He worked at

14  Hewlett Packard Enterprise Company (and previously Hewlett-Packard Company) until he was laid

15  off in July 2016, when he was 52 years old.

16     21.     Plaintiff Kevin Alviso is a resident of the State of California. He worked at Hewlett

17  Packard Enterprise Company (and previously Hewlett-Packard Company) until he was laid off in

18  October 2016, when he was 53 years old.

19     22.     Defendant HP Inc. is a corporation organized under the laws of the State of

20  California with its headquarters and principal place of business located at 1501 Page Mill Road,

21  Palo Alto, California.

22     23.     Defendant Hewlett Packard Enterprise Company is a corporation organized under

23  the laws of the State of Delaware with its headquarters and principal place of business located at

24  3000 Hanover Street, Palo Alto, California.

25     24.     Non-party Hewlett-Packard Company in November 2015 split into the two

26  Defendants in this action, HPE and HPI. These new entities have expressly and/or impliedly

27  assumed liability for the wrongful acts of Hewlett-Packard Company and the wrongful acts of

28  Hewlett-Packard Company are imputed to the Defendants. Furthermore, Defendants have

THIRD AMENDED COMPLAINT

1  continued Hewlett-Packard Company's illegal age discrimination. As a matter of law, Defendants

2  are legally responsible for the age discrimination of their predecessor, Hewlett-Packard Company.

3       25.     At all times relevant, both Defendants aided and abetted, incited, compelled, coerced

4  and/or conspired with each other in connection with the acts complained of herein. Each Defendant

5  knowingly and substantially assisted and encouraged the other in the discriminatory conduct

6  alleged. Through Ms. Whitman's common leadership and control over the management of both

7  entities, Defendants agreed to continue the discriminatory policies after Hewlett-Packard Company

8  split into two companies and they have acted in furtherance of that conspiracy by pursuing virtually

9  identical discriminatory policies and practices. At all times relevant, Defendants acted as a joint or

10 single employer and/or the agents of one another while carrying out this illegal age discrimination.

11                        **JURISDICTION AND VENUE**

12      26.     This Court has subject matter jurisdiction over this action pursuant to the ADEA, 29

13 U.S.C. § 621, *et seq*.

14      27.     This Court has supplemental jurisdiction over the California state law claims alleged

15 herein pursuant to 28 U.S.C. § 1367(a).

16      28.     This Court has personal jurisdiction over the two Defendants because they are

17 headquartered and do substantial business in the State of California.

18 //

19      29.     Venue is proper in the Northern District of California, San Jose Division, pursuant

20 to 28 U.S.C. §§ 1391(b)(1) and (2) because a substantial part of the events giving rise to Plaintiffs'

21 claims arose in this District, and because both Defendants are headquartered here.

22                         **FACTUAL ALLEGATIONS**

23              ***The HP Entities' Publicly-Stated Goal to Get Younger***

24      30.     Throughout the time that the HP Entities have been carrying out the Workforce

25 Restructuring Initiative, Ms. Whitman held senior leadership positions at all three companies. She

26 was the CEO of pre-split Hewlett-Packard Company, and was the Chair of HPI's Board of Directors

27 and the CEO of HPE. Throughout this time, Ms. Whitman publicly made it known that her

28 overarching goal was to make the HP Entities younger.

31.     Ms. Whitman candidly admitted this objective when discussing the need to change Hewlett-Packard Company's "labor diamond" into a "labor pyramid" or a "quite flat triangle" with large numbers of young people at its base. Specifically, during an October 2013 Securities Analyst Meeting, Ms. Whitman said:

> [A]s we think about our overall labor pyramid at Hewlett-Packard, we need to return to a labor pyramid that really looks like a triangle where you have a lot of early career people who bring a lot of knowledge who you're training to move up through your organization, and then people fall out either from a performance perspective or whatever.
>
> And over the years, our labor pyramid doesn't look—has become not a triangle. It's become a bit more of a diamond. And *we are working very hard to recalibrate and reshape our labor pyramid so that it looks like the more classical pyramid* that you should have in any company and particularly in ES. If you don't have *a whole host of young* people who are learning how to do delivery or learning how to do these kinds of things, you will be in [for] real challenges.
> . . . .
>
> Now, that's not something that changes like that. Changing the same shape of your labor pyramid takes a couple of years, but we are on it, and *we're amping up our early career hiring, our college hiring*. And we put in place an informal rule to some extent which is, listen, when you are *replacing* someone, really think about the new style of IT skills. (emphasis added.)

32.     Two years later, at another Securities Analyst Meeting held in September 2015 (just before the anticipated November 2015 split and formation of HPI and HPE), Ms. Whitman reiterated her position that the HP Entities needed to create a "labor pyramid" that was "quite flat," stating:

> We have to fundamentally recreate the labor pyramid. Many of you heard me say our labor pyramid in Enterprise Services looks like a diamond and it needs to look like a triangle and quite frankly it needs to look like a quite flat triangle to be competitive.

33.     In November 2015, more than three years after implementing the Initiative and the 2012 WFR Plan, and just as Ms. Whitman was preparing to take on senior leadership positions at both HPI and HPE, Ms. Whitman again declared publicly during an interview on CNBC that the goal was for the HP Entities to get younger:

> Interviewer:     You did announce significant job cuts about a month

6

1

2

3

4

or so ago. . . . Is that going to be it for HP?

<u>Ms. Whitman:</u> That should be it. That will allow us to right-size our Enterprise Services business . . . to make sure that we've got a labor pyramid with ***lots of young people*** coming in right out of college and graduate school and early in their careers. That's an important part of the future of the company. . . . (emphasis added).

5

6

7

8

34.     Notably, Ms. Whitman answered the CNBC interviewer's question about ***job cuts*** by saying that the HP Entities would be doing a lot of additional ***hiring*** of "young" people. This demonstrates the true purpose of the Initiative: to reduce the ***age*** of the HP Entities' workforce, not its size.

9

10

11

12

13

14

15

16

17

35.     When carrying out the Initiative, the HP Entities' senior management (acting under the direction of Ms. Whitman) provided managers throughout the country with two simultaneous orders: (1) terminate a specific number of employees, called "slates," pursuant to a WFR Plan; and (2) hire a specific number of requisitions ("reqs") to replace them, focusing on new, younger hires. The issuance of these "slates" and "reqs" followed a distinct pattern: an upper-level manager would order a subordinate manager to lay off a designated number of experienced, older, tenured "LT" (meaning "long-term" or "long-tailed") employees, while simultaneously providing that manager a similar number of new "reqs" authorizing the hiring of recent "graduate" or "early career" employees to replace those just fired.

18

19

20

21

22

23

24

25

26

36.     The HP Entities used uniform, near-verbatim paperwork when terminating Plaintiffs and other class members, who all received the same vaguely worded, boilerplate reasons for being terminated, regardless of which of the HP Entities they worked for. Those notices generically state: "Employees were selected for the reduction in force because the job they were performing will no longer continue, their skill set was not applicable to the Company's or organization's operations going forward, and/or other employees were viewed as better qualified because of past performance and competency evaluation, which may include skills, abilities, knowledge and experience." This broadly worded, proffered justification for firing these employees was merely a pretext for policies of overt age discrimination.

27

28

7

37.     Even when a terminated employee's specific job title or position was eliminated, consistent with Ms. Whitman's statements about the Initiative generally, those positions were not truly eliminated, but were simply staffed with new, younger hires.

### The HP Entities' Other Efforts to Eliminate Older Workers

38.     In addition to terminating employees under the WFR Plans, the HP Entities used other tactics to push current, older workers out—thereby further fulfilling the first prong of the Initiative. For example, in 2012 and 2014, Hewlett-Packard Company implemented early and phased retirement programs under which employees having a combined number of years in terms of age and tenure were strongly encouraged to "voluntarily" phase out their employment.

39.     In 2016, HPI initiated nearly the same phased retirement program that the former Hewlett-Packard Company had, and HPE has also implemented similar retirement policies to strongly encourage older employees to leave the company.

40.     For example, Hewlett-Packard Company proposed that Plaintiff Dan Weiland take early phased retirement in September 2014. However, Mr. Weiland declined because he was not ready to retire and wanted to continue working. Nevertheless, Mr. Weiland's supervisor tried to persuade him to participate in the program, even though it offered no significant benefits to Mr. Weiland. It was simply a way for Hewlett-Packard Company to apply pressure on Mr. Weiland to leave the company "voluntarily."

41.     The retirement programs have put older employees in a dilemma that works to the HP Entities' advantage. During meetings with older employees where the various phased retirement programs are explained and promoted by management, the elephant in the room is looming: each person is thinking, like Mr. Weiland did, "If I turn down this retirement program, am I just going to be laid off anyway?"

42.     In Mr. Weiland's case, and in thousands of others, that question was answered just how Mr. Weiland feared. Shortly after he turned down the 2014 phased retirement program, Mr. Weiland's employment was simply terminated under Hewlett-Packard Company's WFR Plan. As time went on, older employees at each of the HP Entities received the message: they were in serious jeopardy of losing their jobs.

8

43.     Hewlett-Packard Company also employed a bait-and-switch strategy with its employees regarding work-at-home policies. Specifically, just before implementing the 2012 WFR Plan, Hewlett-Packard Company adopted new employment policies that strongly encouraged employees to work remotely from home. But then, shortly after it initiated its 2012 WFR Plan, Hewlett-Packard Company (acting at Ms. Whitman's direction) reversed course and suddenly required all employees to appear regularly at physical office locations. Not only was this a complete reversal of the prior policy (which was only recently implemented), in many cases, the offices where these employees previously worked had been closed. Thus, many employees found themselves needing to make hour-plus long commutes to new offices that often did not even have room for them. This policy change disproportionately impacted older employees and amplified the ongoing hostility toward older workers.

44.     Pursuant to their Workforce Restructuring Initiative, the HP Entities also implemented bans on hiring employees who were terminated pursuant to WFR Plans implemented by any of the HP Entities. In other words, the HP Entities agreed to effectively blacklist employees who were terminated under any of the WFR Plans. This ensured that the current, older workers would not be re-hired by any of the HP Entities.

45.     This blacklisting policy was implemented even though the HP Entities claimed to have a "60 Day Preferential Rehire Period" during which those terminated under a WFR Plan were encouraged to apply for new positions within either HPE or HPI (and Hewlett-Packard Company before the split). These employees were told they would receive preferential hiring status for 60 days following their termination. However, although apparently meant to be facially neutral, in practice, the 60-day Preferential Rehire Period was a farce for older employees.

46.     For example, after Mr. Rahman was terminated, HPE created a new job opening for a nearly identical position in Colorado Springs, Colorado. Mr. Rahman was appropriately qualified for that position and applied for it during his 60 Day Preferential Rehire Period, but HPE refused to hire him because he was laid off under a WFR Plan. All three HP Entities engaged in this policy of blacklisting their own and each other's former employees in order to prevent them from being rehired.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

*HP's Internal Policies to Hire Young Employees*

47.     While pushing out older workers as part of the first prong of the Initiative, the HP Entities also hired (and continue to hire) thousands of new, younger workers as part of the Initiative's second prong.

48.     In other words, since the so-called workforce "reduction" efforts began in 2012, the HP Entities have continued to hire aggressively. The primary difference is that, since 2012, HP has hired a disproportionately large number of new, younger employees (under the age of 40) to replace older employees (aged 40 and older) who were terminated.

49.     Thus, the HP Entities were not actually engaging in a workforce "reduction." Rather, as Ms. Whitman admitted publicly, the Initiative has always been an effort to "recalibrate" (most modestly stated) or "fundamentally recreate" (most accurately stated) the HP Entities' workforces with a "whole host of young people." Regardless of which words are used, the HP Entities are engaging in illegal age discrimination.

50.     The discriminatory intent is also shown by internal directives provided to hiring managers by senior management and the human resources departments at the HP Entities. For example, in August 2013, the Hewlett-Packard Company's human resources department distributed written guidelines stating that its "[n]ew corporate requisition policy requires 75% of all External hire requisitions be 'Graduate' or 'Early Career'" employees. A similar policy of promoting "graduate" and "early career" hires continued at both HPE and HPI after the split.

51.     The use of the words "graduate" and "early career" in this August 2013 document (and others like it) provide additional evidence of the intent to discriminate against older workers in hiring decisions.

52.     As Hewlett-Packard Company defined the term for purposes of the August 2013 directive, a "graduate" hire was someone who either was about to graduate or had graduated within the previous 12 months. Similarly, an "early career" hire was somebody who had completed his or her degree and had ***up to*** five years of experience related to the job for which they were applying.

THIRD AMENDED COMPLAINT

53.     Furthermore, across Hewlett-Packard Company, hiring managers were advised in writing to "look for and create opportunities to enhance [their] labor structure" through "Early Career hiring."

54.     Human resources employees at Hewlett-Packard Company were also told to "[h]elp convert or repurpose" the hiring managers' "current requisitions, as appropriate, to Early Career requisitions."

55.     Hewlett-Packard Company's human resources department knew, however, that focusing on hiring younger employees might raise some concerns with its older "long term" employees. Thus, in an internal memorandum issued in 2013, management demonstrated that they knew there was a need to disguise the discriminatory hiring policies and, specifically, to "*[a]ddress [the] issue of long term employees being perceive[d] as bypassed by the next gen[eration]."* (emphasis added).

56.     Despite knowing that it was improper, the HP Entities continued to use online job openings that contained blatantly discriminatory statements such as:

- This position is for a recent college graduate. To qualify, you must have graduated with your Bachelor's or Master's degree within the last 12 months.

- In order to be considered for this role, you must have graduated within 12 months of the start date. . . [W]e can only consider graduates who have graduated between August 2014 and September 2015.

- Must have graduated within 12 months of July, 2016.

- This position is for a recent college graduate. To qualify you must have received your last degree within the past 12 months.

- The candidate must be a recent graduate.

- We are looking for recent college graduate and early career candidates. . . .

- The successful candidate must be near degree completion (Dec 2015 or prior) or have graduated within the past 12 months.

- Must be a recent graduate (2015) or graduating by January 2016.

- Must have completed degree within the past 12 months.

- We are looking for a future, or recent (within 12 months) College Graduate. . . .

- This position is for a recent university graduate.

11

- First Level University degree awarded within the past 12 months.

- Recent (graduation date between July 2014 and September 2015 only) college graduate. . . .

- We are seeking candidates who have recently graduated. . . . Only applicants who have graduated within the past year (July 2014 - August 2015) will be considered for this role, and this will be verified during the background check.

- Recent college graduates preferred.

### *The HP Entities' Age Discrimination Is Willful*

57.    The Workforce Restructuring Initiative was designed by Ms. Whitman to achieve one discriminatory goal: to make the Hewlett-Packard organization younger. The HP Entities knew that their practice of firing old and hiring young was discriminatory but pursued those practices regardless, making their age discrimination willful.

58.    At one point, in 2014, Hewlett-Packard Company even acknowledged that it "need[ed] to remove references to maximums or limits on years of experience in [its] posting[s], job titles, classifications of jobs and policies as it relates to our Early Career definition to mitigate any potential risk and litigation regarding discrimination of protected classes against our employment practices."

59.    Notably, Hewlett-Packard Company did not suggest it should rethink or reconsider its discriminatory employment practices, but decided it should simply avoid using certain words in its job postings and advertisements to "mitigate" against the potential litigation risk.

60.    As seen in cases involving other types of illegal employment discrimination (e.g., race or gender discrimination), stereotypical statements were made at Hewlett-Packard Company about large groups of employees based entirely on their age. For example, internal Hewlett-Packard Company documentation dated July 2015 stated that anyone born between 1930 and 1946 could be considered a "Traditionalist" who moves "slow and steady" and seeks "part time work." As for "Baby Boomers" (born between 1946 and 1964), they were considered to be "rule breakers," implying that they were undesirable. Conversely, when it came to "Millennials," Hewlett-Packard Company made it clear that hiring new employees from this generation was highly desirable. Indeed, Hewlett-Packard Company specifically adopted strategies for "integrat[ing] millennials

into the workforce" and "educat[ing] managers and others on millennial characteristics." These attitudes toward different age groups continued at both HPI and HPE after Hewlett-Packard Company split.

61.    Referring to entire segments of employees as "slow and steady" or "rule breakers" based on the year in which they were born is not only callous, but is at the heart of the very type of discrimination that the ADEA and similar California laws were intended to prohibit. Furthermore, promoting such stereotypes only further exacerbates unjustified bias against large parts of the HP Entities' workforce based solely on age.

62.    Plaintiff Dan Weiland observed this first-hand during a team meeting involving his then-supervisor, Mark Wade, who described a phone call with Hewlett-Packard Company's human resources team as follows:

> The theme on the EER call was, you know, college, college, college. Everything was about ***refreshing HP's golden workforce***. That was kind of the theme. I think they woke up and said, "man, ***everybody running around this place is old***." (emphasis added).

63.    As these comments demonstrate, the HP Entities were effective in communicating to their lower level managers that the Initiative was designed to "refresh" its "golden workforce" with younger employees. In these ways, the HP Entities' upper management directed its lower level managers, both directly and indirectly, to select older workers to be terminated under the WFR Plans.

### *Facial Neutrality of the Workforce Restructuring Initiative*

64.    As Ms. Whitman's public statements and the other allegations set forth herein demonstrate, the intent behind the Workforce Restructuring Initiative was (and still is) to discriminate willfully against older workers to make the HP Entities younger. However, to hide their discriminatory goals, the Defendants may claim that the Initiative and the policies implemented in connection with that Initiative were age-neutral.

65.    However, even if facially neutral, the HP Entities' policies had a substantial discriminatory impact on employees aged 40 and over. For instance, the mandate that 75% of all new hires be "graduate" or "early career" hires does not, on its face, mention age. Hypothetically,

1   an older worker could be a recent college graduate, or starting a new career, such that the worker

2   might meet the definitions of an "early career" or "graduate" employee. However, in practice, the

3   overwhelming majority of the HP Entities' early career and recent graduate hires under the

4   Initiative were younger workers in their 20's or 30's.

5        66.    In addition, while the HP Entities' upper management and human resources

6   departments arguably may have communicated facially neutral criteria to lower level managers

7   about who they should select to be terminated under the WFR Plans (i.e., instructions to fire more

8   tenured employees or those who work remotely), the HP Entities' upper management and human

9   resources departments made the final decisions regarding which individuals to terminate under the

10  WFR Plans. Indeed, although lower level managers would initially be asked to select individuals

11  for termination, the HP Entities' upper management and human resources departments always

12  could (and did) override those selections consistent with the discriminatory intentions of the

13  Initiative.

14       67.    For example, when Plaintiff DeVere—himself a lower level manager—was asked

15  to select two employees from his team to be terminated under the WFR Plan, he selected two who

16  he felt had the worst performance: specifically, two younger, early career or graduate recent hires.

17  But, Mr. DeVere's boss, a director named Mark Moreno, told Mr. DeVere he should not be laying

18  off recent graduates or early career hires. Nonetheless, Mr. DeVere submitted his selections to

19  HPE's human resources department, which promptly vetoed his selections.

20       68.    Instead, two older team members from Mr. DeVere's team were fired. In addition,

21  two other workers over the age of 40 were terminated at about the same time—specifically, both

22  Mr. DeVere **and** Mr. Moreno.

23                          ***Statistical Evidence Showing Discrimination***

24       69.    In implementing the Workforce Restructuring Initiative, regardless of any facially

25  neutral criteria the HP Entities allegedly used, the end result was that older workers were

26  disproportionately selected to be laid off under the WFR Plans. Indeed, based on available data

27  regarding layoffs under the WFR Plans, the HP Entities clearly conformed to Ms. Whitman's

28  publicly-stated goal of trying to make the companies younger. Older workers were statistically

---

14

1    more likely to be laid off under the WFR Plans than younger ones.

2         70.    The HP Entities provided "Attachment A" forms to terminated employees.

3    However, these forms were drafted in a manner that underrepresented the discriminatory impact of

4    the Initiative.

5         71.    The Attachment A forms did not include the job titles and ages of all employees in

6    the pertinent "decisional unit" impacted by the HP Entities' layoffs. Indeed, they did not even

7    define the employee's "decisional unit." Rather than provide the required data for the relevant

8    "decisional unit," the HP Entities regularly provided Attachment A forms that improperly focused

9    on a small group of employees that the HP Entities deceptively suggested were part of the

10   appropriate decisional unit, when in fact they were not.

11        72.    A preliminary statistical analysis of Attachment A forms provided to former

12   employees who are part of the Nationwide Class or California Class (as defined below) shows that

13   older employees were significantly more likely to be terminated than younger employees, reaching

14   a statistical confidence level of three standard deviations; in other words, the statistical level of

15   confidence in this disparity exceeds 99%.

16        73.    The disparity exists even though the Attachment A forms that the HP Entities

17   prepared and distributed to these former employees did not fully portray the negative impact of

18   their employment policies on older employees. Indeed, the HP Entities improperly crafted their

19   Attachment A forms to understate the true impact of the employment terminations on older

20   employees.

21        74.    If, instead, the Attachment A forms were accurate and properly identified all of the

22   younger employees who were hired or retained pursuant to the Initiative, as well as the additional

23   older workers who were terminated pursuant to the Initiative, then the known statistical disparity

24   between the impact on older employees in the Nationwide Class or California Class versus younger

25   employees would be even greater.

26

27

28

THIRD AMENDED COMPLAINT

1

*The Named Plaintiffs' Background*

2

Donna Forsyth

3       75.     Plaintiff Donna Forsyth was hired by Hewlett-Packard Company on or about July

4  12, 1999. Her most recent position was a Manager on the Capabilities Team in the Global Corporate

5  Services organization. When her employment was terminated, Ms. Forsyth was working for

6  Hewlett Packard Enterprise Company in Bellevue, Washington.

7       76.     Ms. Forsyth performed her job duties in a satisfactory and competent manner. She

8  always met or exceeded her employer's expectations.

9       77.     Ms. Forsyth was involved with and knowledgeable about Hewlett-Packard

10  Company's and HPE's graduate and early career hiring efforts. She has first-hand knowledge of

11  the aggressive efforts used to hire younger "millennial" employees to replace the many thousands

12  of employees terminated under the WFR Plans.

13       78.     In May 2016, HPE notified Ms. Forsyth, then 62 years old, that she was being

14  terminated pursuant to a WFR Plan. Her last day of work at HPE was May 27, 2016.

15       79.     Upon information and belief, and consistent with the HP Entities' internal policies

16  and practices as alleged in this Complaint, when Ms. Forsyth's employment was terminated, she

17  was replaced with a "graduate" or "early career" hire who is significantly under the age of 40, or

18  with someone else who is younger than her.

19       80.     Ms. Forsyth filed a charge of discrimination with the Equal Employment

20  Opportunity Commission (EEOC) that raised class-wide claims for relief on July 8, 2016. More

21  than 60 days have passed since she filed that charge. She received a Notice of Right to Sue from

22  the EEOC dated August 2, 2016. This lawsuit was filed within 90 days after receiving her Notice

23  of Right to Sue. Ms. Forsyth has exhausted her administrative remedies.

24

Arun Vatturi

25       81.     Plaintiff Arun Vatturi was hired by Hewlett-Packard Company in 2001. His most

26  recent position at the company was a Master Black Belt of PC Quality. When his employment was

27  terminated, Mr. Vatturi worked for HPI in its Palo Alto, California offices.

28

82.     Mr. Vatturi performed his job duties in a satisfactory and competent manner. He always met or exceeded his employer's expectations.

83.     Mr. Vatturi's job was essentially to work on internal systems to improve procedures and save money. In one instance alone, Mr. Vatturi saved Hewlett-Packard Company and HPI more than $70 million through the implementation of his ideas. He was one of the 0.5% of employees at Hewlett-Packard Company who received the company's top performance review rating of "significantly exceeds expectations" in its forced ranking system.

84.     Shortly before terminating Mr. Vatturi, and despite his stellar performance reviews, HPI moved him to a low-level data collection position working with two young independent contractors located in India.

85.     In January 2016, HPI notified Mr. Vatturi, then 52 years old, that he was being terminated pursuant to a WFR Plan. His last day of work was January 22, 2016.

86.     Upon information and belief, and consistent with the HP Entities' internal policies and practices as alleged in this Complaint, when Mr. Vatturi's employment was terminated, he was replaced with a "graduate" or "early career" hire who is significantly under the age of 40, or with someone else who is younger than him.

87.     Mr. Vatturi filed a charge of discrimination with the EEOC on July 5, 2016. In that EEOC charge, Mr. Vatturi raised class-wide claims for relief. He received a Notice of Right to Sue dated August 2, 2016. In addition, Mr. Vatturi filed the same charge of discrimination with the California Department of Fair Employment and Housing on July 5, 2016 and received a Notice of Right to Sue from that state agency dated July 6, 2016. More than 60 days have passed since Mr. Vatturi filed his discrimination charge. This lawsuit was brought within 90 days of receiving his Notice of Right to Sue. Mr. Vatturi has exhausted his federal and state administrative remedies.

<u>Dan Weiland</u>

88.     Plaintiff Dan Weiland was hired by Hewlett-Packard Company as an independent contractor in 2010. In February 2012, he was hired by Hewlett-Packard Company as a full-time employee. His most recent position at the company was Project/Program Manager and Acting Group Chief of Staff in the Test Operations & Technologies organization. When his employment

was terminated, Mr. Weiland worked for Hewlett-Packard Corporation in its Houston, Texas offices.

89.     Mr. Weiland performed his job duties in a satisfactory and competent manner. He always met or exceeded his employer's expectations.

90.     In his last performance review before being laid off, Hewlett-Packard Company praised Mr. Weiland as a "solid contributor" who brought a "positive, 'can do' attitude" with him every day. Hewlett-Packard Company also said Mr. Weiland was "[a] pleasure to work with, well grounded, [had] outstanding dependability, and work ethic." In 2014, Mr. Weiland received the "Making a Difference" award.

91.     On or about September 9, 2014, Hewlett-Packard Company notified Mr. Weiland that he was eligible to participate in the 2014 Phased Retirement program. His then-manager, Bland Quattlebaum, had several conversations with Mr. Weiland to try to persuade him to participate in the retirement program, which Mr. Weiland declined. Mr. Weiland wanted to continue working.

92.     In July 2015, Hewlett-Packard Company notified Mr. Weiland, then 63 years old, that he was being terminated as part of a WFR Plan. His last day of work was July 24, 2015.

93.     Upon information and belief, and consistent with the HP Entities' internal policies and practices as alleged in this Complaint, when Mr. Weiland's employment was terminated, he was replaced with a "graduate" or "early career" hire who is significantly under the age of 40, or with someone else who is younger than him.

94.     Mr. Weiland filed a charge of discrimination with the EEOC on October 5, 2015, raising class-wide claims for relief against Hewlett-Packard Company. Shortly after Hewlett-Packard Company split into HPE and HPI, Mr. Weiland notified the EEOC that he was charging both HPE and HPI with discrimination. He received a Notice of Right to Sue dated August 11, 2016. More than 60 days have passed since this filing of his discrimination charge. This lawsuit was filed within 90 days of receiving his Notice of Right to Sue. Mr. Weiland has exhausted his administrative remedies.

Shafiq Rahman

95.     Plaintiff Shafiq Rahman began working at Compaq in April 1997, which was acquired by Hewlett-Packard Company in 2002. At the time of his termination, on July 29, 2016, Mr. Rahman was a Senior Engineer developing computer servers for HPE.

96.     Throughout the nearly twenty years of his employment, Mr. Rahman performed his job duties in a satisfactory and competent manner, and consistently received positive reviews. Indeed, during a mid-year review that took place shortly before his termination, Mr. Rahman was told his performance was good and he should consider himself "safe" from termination.

97.     Nevertheless, soon thereafter, on July 18, 2016, when Mr. Rahman was 65 years old, he was informed he was being terminated under a WFR Plan. His last day of work was July 29, 2016.

98.     Upon information and belief, and consistent with the HP Entities' internal policies and practices as alleged in this Complaint, when Mr. Rahman's employment was terminated, he was replaced with a "graduate" or "early career" hire who is under the age of 40, or with someone else who is younger than him.

99.     Mr. Rahman filed a charge of discrimination with the EEOC on September 29, 2016 that raised class-wide claims for relief. More than 60 days have passed since the charge was filed. He has exhausted his administrative remedies.

Albert R. DeVere

100.    Plaintiff Albert R. DeVere began working for the Hewlett-Packard Company in September 2010. When he was terminated in 2016, Mr. DeVere was a Manager of Solutions Architects for HPE.

101.    Mr. DeVere consistently performed his job duties in a satisfactory and competent manner and always met or exceeded his employer's expectations. He never received any negative performance reviews during his time at Hewlett-Packard Company and HPE.

102.    On July 1, 2016, when Mr. DeVere was 52 years old, he was terminated under a WFR Plan.

//

103.    Upon information and belief, and consistent with the HP Entities' internal policies and practices as alleged in this Complaint, when Mr. DeVere's employment was terminated, he was replaced with a "graduate" or "early career" hire who was under the age of 40, or with someone else who is younger than him.

104.    Mr. DeVere filed a charge of discrimination with the EEOC on October 5, 2016 that raised class-wide claims for relief. More than 60 days have passed since the charge was filed. Mr. DeVere has exhausted his administrative remedies.

Kevin Alviso

105.    Plaintiff Kevin Alviso began working for the Hewlett-Packard Company in June 1997. When he was terminated in October 2016, he was a Research and Development Manager for HPE.

106.    Mr. Alviso consistently performed his job duties in a satisfactory and competent manner, and always met or exceeded his employer's expectations. He never received any negative performance reviews during his time at Hewlett-Packard Company and HPE. In fact, Mr. Alviso significantly exceeded his employer's expectations, and he received top ratings in each of his last five annual reviews.

107.    On October 28, 2016, when he was 53 years old, Mr. Alviso was terminated under a WFR plan.

108.    Upon information and belief, and consistent with the HP Entities' internal policies and practices as alleged in this Complaint, when Mr. Alviso's employment was terminated, he was replaced with a "graduate" or "early career" hire who was under the age of 40, or with someone else who is younger than him.

109.    Mr. Alviso filed a charge of discrimination with the EEOC on January 18, 2017 that raised class-wide claims for relief. More than 60 days have passed since the charge was filed. On March 30, 2018, the EEOC issued Mr. Alviso a Notice of Right to Sue. Mr. Alviso has exhausted his administrative remedies.

<strong><em>Class Allegations</em></strong>

110.    Plaintiffs are representatives of the following class for purposes of the ADEA:

20

THIRD AMENDED COMPLAINT

The "Nationwide Class"

All individuals aged 40 and older who have not signed a Waiver and General Release Agreement[2], and who had their employment terminated by an HP Entity pursuant to a WFR Plan on or after December 9, 2014 for individuals terminated in deferral states; and on or after April 8, 2015 for individuals terminated in non-deferral states.

111.    Plaintiffs and the members of the Nationwide Class were all: (a) aged 40 years or more at the time of termination, (b) terminated pursuant to Defendants' Workforce Restructuring Initiative and common WFR Plans without signing a Waiver and General Release Agreement, and (c) terminated because of their age pursuant to common discriminatory employment policies, practices and procedures.

112.    The HP Entities' discriminatory practices and policies are centralized. As explained above, the HP Entities instituted company-wide policies of firing older employees (who were aged 40 years or older) and hiring a disproportionately large number of significantly younger employees (who were under the age of 40). This policy was carried out through the HP Entities' upper management and human resources departments, as alleged in greater detail above. The HP Entities' highest levels of management implemented the discriminatory policies and practices described herein, and they were uniformly carried out through all levels of the HP Entities.

113.    Common questions of law and fact among Plaintiffs and the members of the Nationwide Class include, but are not limited to:

(a) whether the HP Entities unlawfully terminated members of the Nationwide Class in violation of the ADEA;

(b) whether the HP Entities engaged in a pattern and practice of age discrimination when selecting members of the Nationwide Class for termination pursuant to the WFR Plans;

(c) whether the HP Entities through their WFR Plans willfully and intentionally discriminated against members of the Nationwide Class because of their age;

---

[2] Individuals who were terminated pursuant to a WFR Plan were offered certain severance and other benefits in exchange for signing a general release agreement that released claims relating to their employment and termination ("Waiver and General Release Agreement"). The Waiver and General Release Agreements included an arbitration clause and a class action waiver.  Individuals who signed a Waiver and General Release Agreement are excluded from the Nationwide Class and the California Class.

THIRD AMENDED COMPLAINT

(d) whether the HP Entities' common employment policies and practices adversely

impacted members of the Nationwide Class; and

(e) whether the HP Entities' purported reasons for laying off members of the

Nationwide Class pursuant to the WFR Plans have been pretextual.

114.    Counts for violations of the ADEA may be brought and maintained as an "opt-in" collective action pursuant to 29 U.S.C. § 216(b), for all claims asserted by Plaintiffs, because their claims are similar to the claims of the members of the Nationwide Class.

115.    Plaintiffs and the members of the Nationwide Class are similarly situated because, among other things, (a) they all worked for the HP Entities and are all aged 40 and older, (b) they are all residents of the United States, (c) they were all subjected to the same company-wide policy of age discrimination, (d) they were all subjected to the same company-wide policies that adversely impacted them because of their age, (e) they were all terminated pursuant to the Initiative and the WFR Plans because of their age, (f) they were all given the same boilerplate reason for having their employment terminated; and (g) they all declined to sign the Waiver and General Release Agreements.

116.    Individual variations among Plaintiffs and members of the Nationwide Class, such as location, education, or job responsibilities, do not undermine the common issues at stake here. Plaintiffs allege a single scheme of age discrimination initiated at the very top of the HP Entities and carried out through the entire structure of the companies. Regardless of where an individual worked in the United States or to which manager the individual reported, each member of the Nationwide Class faced the same discrimination and discriminatory policies.

117.    Plaintiff Arun Vatturi also seeks to represent the following class for purposes of his California state law claims pursuant to Rule 23 of the Federal Rules of Civil Procedure:

The "California Class"

All individuals aged 40 and older who have not signed a Waiver and General Release Agreement and who had their employment terminated by an HP Entity in California pursuant to a WFR Plan on or after August 18, 2012.

118.   The California Class consists of hundreds, if not thousands, of former employees who were notified of their termination when they were aged 40 and older, making joinder of all members of the class impracticable.

119.   The common questions of law and fact among Plaintiffs Vatturi, Alviso, and the California Class members and the members of the California Class include, but are not limited to:

> (a) whether the HP Entities' conduct violated the California Fair Employment and Housing Act;

> (b) whether the HP Entities' conduct was unlawful, unfair or fraudulent in violation of California's Unfair Competition Law;

> (c) whether the HP Entities' conduct constitutes an unlawful employment practice in violation of public policy;

> (d) whether the HP Entities engaged in a pattern and practice of age discrimination when selecting individuals for termination pursuant to the Initiative and the WFR Plans;

> (e) whether the HP Entities based their processes for selecting employees for termination on reasonable factors other than age that were a business necessity;

> (f) whether the HP Entities through the WFR Plans willfully and intentionally discriminated against the California Class because of their age;

> (g) whether the HP Entities' discrimination had a disparate impact on members of the California Class; and

> (h) whether the HP Entities' purported reasons for laying off members of the California Class pursuant to the WFR Plans have been pretextual.

120.   Plaintiffs Vatturi's and Alviso's claims and the relief sought for their claims are typical of the claims and relief sought for the California Class. Like the members of the California Class, Vatturi and Alviso are aged 40 or older and worked for one or more of the HP Entities in California until they were terminated pursuant to the WFR Plans and did not sign a Waiver and General Release Agreement. Vatturi and Alviso were, therefore, subjected to the same discriminatory policies and practices as the other members of the California Class. The relief

necessary to remedy Vatturi's and Alviso's claims is the same relief necessary to remedy the claims of the members of the California Class in this case.

121.    Plaintiffs Vatturi and Alviso will adequately represent the interests of the members of the California Class. Vatturi's and Alviso's interests are co-extensive with those of the California Class. They seek to remedy the HP Entities' discriminatory employment policies, procedures and practices and will fairly and vigorously pursue claims on behalf of the California Class. Vatturi and Alviso are willing and able to represent the California Class fairly and vigorously as they pursue their individual claims in this action.

122.    Plaintiffs Vatturi and Alviso have retained counsel who are qualified, experienced, and able to conduct this litigation and to meet the time and fiscal demands required to litigate an employment discrimination class action of this size and complexity. The combined interests, experience, and resources of Vatturi's and Alviso's counsel to litigate completely the individual and class claims at issue in this case satisfy the adequacy of representation requirement.

123.    The HP Entities have acted or refused to act on grounds that apply generally to all members of the California Class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the California Class as a whole pursuant to Rule 23(b)(2).

124.    The HP Entities have failed to create adequate incentives for their managerial and supervisory personnel to comply with laws regarding the employment policies, practices, and procedures described herein.

125.    The HP Entities have acted on grounds generally applicable to Plaintiffs Vatturi and Alviso and the California Class by adopting and implementing systemic policies, practices, and procedures that are discriminatory. Disparate impact and systemic age discrimination have been the HP Entities' standard operating procedures rather than sporadic occurrences.

126.    In addition, the HP Entities have, in a discriminatory way, refused to act on grounds generally applicable to the California Class by terminating class members pursuant to a WFR Plan based on their age.

127.    The HP Entities' systemic discriminatory acts and refusals to act make it appropriate to grant the requested final injunctive and declaratory relief with respect to the California Class.

128.    All requirements of Rule 23(b)(3) are satisfied here.

129.    The common issues of fact and law affecting the claims of Plaintiffs Vatturi and Alviso, and the members of the California Class predominate over any issues affecting only individual claims. The answers to the common questions listed above will be the same for Plaintiffs Vatturi and Alviso, and all members of the California Class and will resolve all core issues in the case, once, on common evidence and on a class-wide basis.

130.    Prosecution of these claims on a class-wide basis is the most efficient and economical means of resolving the questions of law and fact common to the claims of Plaintiffs Vatturi and Alviso, and the members of the California Class.

131.    Plaintiffs Vatturi and Alviso, and the members of the California Class were injured by the same discriminatory policies and practices, and these injuries are redressable through systemic relief and class-wide remedies.

132.    In order to achieve such class-wide relief, Plaintiffs Vatturi and Alviso will establish the existence of systemic age discrimination as the premise for the relief they seek. Without class certification, the same evidence and issues would be subject to re-litigation in a multitude of individual lawsuits with an attendant risk of inconsistent adjudications and conflicting obligations. Certification of the California Class is the most efficient and judicious means of presenting the evidence and arguments necessary to resolve such questions for Plaintiffs Vatturi and Alviso, the California Class, and the HP Entities.

133.    The cost of proving the disparate treatment and impact of the HP Entities' policies, procedures and practices makes it impracticable for Plaintiffs Vatturi and Alviso, and members of the California Class to prosecute their claims individually.

134.    Class-wide liability and the relief sought herein present common issues capable of class-wide resolution, which would advance the interests of the parties in an efficient manner such that the requirements of Rule 23(c)(4) are also satisfied here.

## COUNT 1 –AGE DISCRIMINATION UNDER THE ADEA
### (On behalf of all Plaintiffs and the Nationwide Class)

135.    Plaintiffs hereby incorporate each paragraph above as though fully set forth here.

136.    This is a representative action under 29 U.S.C. §§ 626(b) and (c) and 29 U.S.C. § 216(b) filed by the above-named Plaintiffs individually and on behalf of similarly situated persons who opt into this action by filing an appropriate notice.

137.    As more fully set forth elsewhere in this Complaint, the HP Entities engaged in an unlawful pattern or practice of age discrimination that adversely affected Plaintiffs and the members of the Nationwide Class in violation of 29 U.S.C. § 621, *et seq*.

138.    Plaintiffs and the members of the Nationwide Class were 40 years of age or older at the time of they were terminated.

139.    The HP Entities terminated Plaintiffs and the members of the Nationwide Class because of their age, and would not have terminated Plaintiffs or the members of the Nationwide Class but for their age.

140.    The unlawful pattern or practice of age discrimination by the HP Entities alleged herein constitutes a willful violation of the ADEA. Plaintiffs' charges of discrimination filed with the EEOC asserted claims on behalf of both the Plaintiffs themselves and others similarly situated, and adequately placed the HP Entities on notice that a collective action was forthcoming.

141.    Plaintiffs and others similarly situated were adversely affected by the pattern or practice of unlawful, willful age discrimination by the HP Entities as elsewhere described herein. Plaintiffs and all similarly situated individuals have suffered actual damages in an amount to be determined at trial.

142.    This is also a representative action under 29 U.S.C. §§ 626(b) and (c) and 29 U.S.C. § 216(b) filed by the above-named Plaintiffs individually and on behalf of similarly situated persons who opt into this action by filing an appropriate notice, and an individual action under the ADEA.

143.    The HP Entities used WFR Plans that had a significantly adverse or disproportionate impact on Plaintiffs and the members of the Nationwide Class and caused Plaintiffs and the members of the Nationwide Class to be terminated. The HP Entities' policies and practices have had a disparate impact on Plaintiffs and the members of the Nationwide Class and were not based upon a reasonable factor other than age.

144.    As set forth more fully above, the HP Entities have utilized practices, policies and procedures that have disparately impacted former employees of the HP Entities, resulting in an unlawful pattern or practice of age discrimination in violation of the ADEA, 29 U.S.C. § 621 *et seq*. There was no legitimate, non-discriminatory reason for its action, and any reasons the HP Entities may advance are pretextual. The HP entities at all times relevant acted as a joint or single employer and/or the agent of the other.

145.    The above-named Plaintiffs and others similarly situated were disparately impacted by the HP Entities' practices, policies and procedures, in violation of the ADEA.

146.    As a direct and proximate result of the aforesaid age discrimination by the HP Entities, each of the Plaintiffs and all others similarly situated have suffered damages in an amount to be determined at trial.

## COUNT 2 – AGE DISCRIMINATION UNDER THE FEHA
**(On behalf of Plaintiff Arun Vatturi, Kevin Alviso, and the California Class only)**

147.    Plaintiffs hereby incorporate each paragraph above as though fully set forth here.

148.    This is a representative action under the California Fair Employment and Housing Act, Cal. Gov't Code § 12900, *et seq*. ("FEHA"). The FEHA prohibits employers from discriminating on the basis of age. Cal. Gov. Code § 12940(a). Plaintiff Vatturi brings his FEHA claim on behalf of himself and a class of similarly situated individuals.

149.    The HP Entities have engaged in a pattern and practice of discriminating against individuals aged 40 and older by knowingly and intentionally firing a disproportionately large number of workers aged 40 and older while simultaneously hiring a disproportionately large number of workers under the age of 40.

150.    As a direct and proximate result of the HP Entities' intentional discrimination, Plaintiffs Vatturi, Alviso, and a class of similarly situated individuals have had their employment terminated.

151.    The HP Entities have used employment policies and practices related to hiring and firing that have had a disparate impact on the basis of age (discriminating against workers who are aged 40 and older) that are not job-related for the positions at issue, not consistent with business

1    necessity, and are not necessitated by a reasonable factor other than age.

2        152.    The HP Entities' conduct has been intentional, deliberate, willful, malicious,

3    reckless, and conducted in callous disregard of the rights of Plaintiffs Vatturi, Alviso, and the

4    California Class members, entitling them to punitive damages.

5        153.    The HP Entities' policies, procedures, and practices have produced a disparate

6    impact on Plaintiffs Vatturi, Alviso, and the California Class members with respect to the terms

7    and conditions of their employment.

8        154.    The HP Entities' actions constitute unlawful discrimination in violation of the

9    FEHA.

10       155.    HPI and HPE at all times relevant aided and abetted, incited, compelled, coerced

11   and/or conspired with each other to carry out the discriminatory Workforce Restructuring Initiative.

12   At all times relevant, each Defendant knew that the other was engaging in unlawful discrimination

13   and provided substantial assistance or encouragement to the other in the discriminatory acts

14   described herein. The Initiative was designed to reduce the number of older workers drastically

15   between 2012 and 2017 to make the HP Entities younger. After Hewlett-Packard Company split

16   into HPI and HPE, Defendants agreed to continue to implement the Initiative and took overt acts

17   to continue the Initiative in furtherance of the discriminatory policies.

18       156.    Pursuant to California Civil Code Section 12940(i), it is unlawful "for any person

19   to aid, abet, incite, compel or coerce" discrimination forbidden by the act.

20       157.    As a direct and proximate result of the aforesaid age discrimination by the HP

21   Entities, Plaintiffs Vatturi, Alviso, and all similarly situated individuals have suffered damages in

22   an amount to be determined at trial.

23       **COUNT 3 – AGE DISCRIMINATION IN VIOLATION OF PUBLIC POLICY**
         **(On behalf of Plaintiffs Arun Vatturi,**
24       **Kevin Alviso, and the California Class only)**

25       158.    Plaintiffs Vatturi and Alviso hereby incorporate each paragraph above as though

26   fully set forth here.

27       159.    The HP Entities discriminated against Plaintiffs Vatturi and Alviso, and the

28   California Class members by terminating their employment on the basis of their age.

160.   The HP Entities' discrimination constitutes an unlawful employment practice in violation of California public policy.

161.   As a proximate result of the HP Entities' discriminatory conduct, Plaintiffs Vatturi, Alviso, and the California Class members have been injured in their health, strength, and activity, all of which have caused and continue to cause them to suffer mentally and emotionally.

162.   As a further proximate result of the conduct alleged herein, Plaintiffs Vatturi, Alviso, and the California Class members have lost earnings, lost employment opportunities, and will lose job benefits in an amount yet to be ascertained.

163.   The HP Entities discriminated on the basis of age with fraud, oppression, and malice. Plaintiffs Vatturi, Alviso, and the California Class members are therefore entitled to exemplary and punitive damages in an amount to be determined at trial.

## COUNT 4 – UNFAIR COMPETITION
## CALIFORNIA BUSINESS AND PROFESSIONS CODE § 17200, *ET SEQ.*
### (On behalf of Plaintiffs Arun Vatturi,
### Kevin Alviso, and the California Class only)

164.   Plaintiffs Vatturi and Alviso hereby incorporate each paragraph above as though fully set forth here.

165.   Each of the Defendants is a "person" as defined under California Business & Professions Code section 17021.

166.   The HP Entities' discrimination against its older employees, as alleged herein, constitutes unlawful and/or unfair and/or fraudulent activity prohibited by the California Business & Professions Code § 17200. As a result of their unlawful and/or unfair and/or fraudulent acts, the HP Entities reaped and continue to reap unfair benefits at the expense of Plaintiffs Vatturi, Alviso, and the California Class members. The HP Entities should be enjoined from these activities.

167.   Accordingly, Plaintiffs Vatturi and Alviso, and the California Class members are entitled to restitution with interest and other equitable relief.

## JURY DEMAND

168.   Plaintiffs hereby demand a trial by jury.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs request that the Court make orders and enter judgment in their favor and against Defendants as follows:

1.     Making such orders as are necessary and appropriate to certify this case for treatment as a collective action under the ADEA;

2.     Making such orders as are necessary and appropriate to certify the California claims for class relief;

3.     Designating the above-named Plaintiffs as representatives of the Nationwide Class;

4.     Designating Plaintiffs Arun Vatturi and Kevin Alviso as representatives of the California Class;

5.     Designating the undersigned as class counsel;

6.     Granting injunctive relief ordering Defendants to stop discriminating against their older workers based on age;

7.     Awarding each of the Plaintiffs and all members of the Nationwide Class and California Class damages in an amount to be determined at trial, including but not limited to back pay and benefits, together with interest thereon;

8.     Restoring each of the Plaintiffs and all members of the Nationwide Class and California Class to positions comparable to those from which they were terminated or, in lieu of reinstatement, awarding each Plaintiff and all members of the Nationwide Class and California Class front pay and benefits for the period remaining until that person's expected retirement age;

9.     Awarding each Plaintiff and all members of the Nationwide Class liquidated damages pursuant to the ADEA in an amount equal to that person's back pay and benefits award, together with interest thereon;

10.     Awarding Plaintiffs Arun Vatturi, Kevin Alviso and all members of the California Class compensatory damages, restitution, and punitive damages pursuant to their state law claims;

11.     Awarding Plaintiffs and all members of the Nationwide Class and the California Class their attorneys' fees and costs pursuant to the ADEA and California state law;

12.     Awarding prejudgment interest, costs and disbursements; and

THIRD AMENDED COMPLAINT

1    13.    Awarding such other and further relief, including but not limited to declaratory or

2 injunctive relief, as the Court and/or jury deems equitable, appropriate, and just.

3

4    DATE: January 7, 2020.                    O'NEIL, CANNON, HOLLMAN,
                                               DEJONG & LAING S.C.
5
                                                _/s/ Douglas P. Dehler_
6                                              Douglas P. Dehler, *pro hac vice*
                                               doug.dehler@wilaw.com
7                                              Paul W. Zimmer, *pro hac vice*
                                               paul.zimmer@wilaw.com
8                                              111 East Wisconsin Avenue, Suite 1400
                                               Milwaukee, WI 53202
9                                              Phone:    (414) 276-5000
                                               Fax:      (414) 276-6581
10

11                                             Jennie Lee Anderson (SBN 203586)
12                                             ANDRUS ANDERSON LLP
                                               jennie@andrusanderson.com
13                                             Leland H. Belew (SBN 293096)
                                               leland.belew@andrusanderson.com
14                                             ANDRUS ANDERSON LLP
                                               155 Montgomery Street, Suite 900
15                                             San Francisco, CA 94104
                                               Phone:    (415) 986-1400
16                                             Fax:      (415) 986-1474

17                                             Bruse Loyd
                                               bruse@jgl-law.com
18                                             JONES, GILLASPIA & LOYD LLP
                                               4400 Post Oak Parkway, Suite 2360
19                                             Houston, TX 77027
                                               Phone:    (713) 225-9000
20                                             Fax:      (713) 225-6126

21                                             Brian H. Mahany
                                               brian@mahanylaw.com
22                                             MAHANY LAW
                                               8112 W. Bluemound Road, Suite 101
23                                             Milwaukee, WI 53213
                                               Phone:    (414) 258-2375
24                                             Fax:      (414) 258-2521

25                                             *Attorneys for Plaintiffs and the Proposed
                                               Classes*
26

27

28

31