UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| DONNA J. FORSYTH, et al.,<br><br>　　　　Plaintiffs,<br><br>　　v.<br><br>HP INC., et al.,<br><br>　　　　Defendants. | Case No. 5:16-cv-04775-EJD<br><br>**ORDER GRANTING PLAINTIFFS' MOTION FOR PRELIMINARY CERTIFICATION**<br><br>Re: Dkt. No. 409 |

This is a putative collective action against Plaintiffs' former employers, HP Inc. ("HPI") and Hewlett Packard Enterprise Company ("HPE") (collectively "Defendants" or "HP"), alleging in part violations of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 621 *et. seq. See* Fourth Amended Complaint ("FAC") ¶¶ 133-44, 145-56, Dkt. No. 389. Before the Court is Plaintiffs' motion for an order preliminarily certifying two collectives under the Fair Labor Standards Act, 29 U.S.C. § 216(b), for production of contact information of potential opt-in plaintiffs, and for approval of notice to the members of the collectives. ("Mot."), Dkt. No. 409. An opposition ("Opp.") was filed by Defendants, to which Plaintiffs have replied ("Reply"). *See* Dkt. Nos. 414, 416. Pursuant to Civil Local Rule 7-1(b), the Court finds this matter appropriate for resolution without oral argument and therefore **VACATES** the hearing currently scheduled for April 15, 2021. Based on the reasoning below, the Court **GRANTS** Plaintiffs' motion for preliminary certification.

**I.   BACKGROUND**

The five named Plaintiffs allege Defendants violated the ADEA and California laws by targeting older employees and replacing them with younger employees. Plaintiffs allege that in 2012 HPI (then Hewlett-Packard Company ("HP Co.")), under the direction of Meg Whitman,

Case No.: 5:16-cv-04775-EJD
ORDER GRANTING PLAINTIFFS' MOTION FOR PRELIMINARY CERTIFICATION
1

began to implement a company-wide multiyear restructuring initiative designed to make the company younger by replacing thousands of existing, older workers with new, younger employees. FAC ¶ 3. This initiative was referred to as the "Workforce Restructuring Initiative." *Id*. When rolling out this initiative, Whitman said the goal was to "recalibrate and reshape" the workforce. *Id*. ¶ 4. In Plaintiffs' view, through this statement, Whitman made it known that she regarded the age of HP's workforce as a problem that needed solving. *Id*. ¶ 13. Indeed, in October 2013, Whitman publicly stated during a Securities Analysts meeting that the Workforce Restructuring Initiative's goal was to "recalibrate and reshape" the company's workforce by "replacing" existing workers with "a whole host of young people." *Id*. ¶¶ 3-4, 30. In order to execute the Workforce Restructuring Initiative, Whitman caused HP Co. to implement a two-pronged strategy that involved (1) pushing current, older workers out of the company, while (2) hiring large numbers of new, younger employees to replace them. *Id*. ¶ 11.

In November 2015, HP Co. split into two companies, HPI and HPE. *Id*. ¶ 5-8, 11. After the split, Whitman served as the Chair of the Board of Directors for HPI until July 26, 2017 and as the CEO for HPE until February 1, 2018 and also served on the board of HPE until February 1, 2019. *Id*. During her tenure at HPI and HPE, both companies allegedly continued to implement the age initiative in concert with one another, shedding thousands of additional employees. *Id*. ¶ 6. Hence, according to Plaintiffs, all three HP entities shared the common goal of wanting to make the entire HP organization younger. *Id*. ¶ 7. Further, all three entities shed thousands of older workers, while aggressively recruiting and hiring younger employees to replace them. *Id*.

To execute the first prong of the Workforce Restructuring Initiative, HP Co. initiated the "2012 Workforce Reduction Plan" ("WFR"), which was then adopted by both HPI and HPE and was implemented over a period of years. *Id*. ¶ 11. However, contrary to the name, the WFR was not meant to reduce the HP workforce, but was a means to restructure, recalibrate, and reshape the HP workforce to make it younger. *Id*. ¶¶ 12, 30–34. This, Plaintiffs contend, is confirmed by Whitman's public statements, in which Whitman made clear that she intended to make both HPI and HPE "younger." *Id*. ¶ 12. Whitman also admitted that HP was "amping up [its] early career

Case No.: 5:16-cv-04775-EJD
ORDER GRANTING PLAINTIFFS' MOTION FOR PRELIMINARY CERTIFICATION
2

hiring, [and] [its] college hiring." *Id*. ¶ 30. Meanwhile, according to Plaintiffs, HPI and HPE were terminating thousands of existing employees pursuant to the WFR. *Id*. ¶ 6. When replacing employees that were terminated under the WFR, Whitman acknowledged that HP had an "informal rule" requiring managers to "really think" about hiring a younger "early career" employee. *Id*. ¶ 30. Indeed, internal HP Co. documents dated July 2015 stated that anyone born between 1930 and 1946 could be considered a "Traditionalist" who moves "slow and steady" and seeks "part time work." *Id*. ¶ 59. "Baby Boomers" (born between 1946 and 1964) were considered to be "rule breakers," which implies that they were "undesirable." *Id*. "Millennials," on the other hand were highly desirable and HP Co. specifically adopted strategies for "integrat[ing] millennials into the workforce" and "educat[ing] managers and others on millennial characteristics." *Id*. Plaintiffs allege these policies were carried forth at HPI and HPE. *See infra*.

Plaintiffs assert that the Workforce Restructuring Initiative has continued for years. In September 2015, Whitman stated that HP still needed to "fundamentally recreate the labor pyramid" because the pyramid looked too much like "a diamond" and it needed to look "like a quite flat triangle to be competitive." *Id*. ¶ 31. In November 2015, just as Whitman was preparing to take on senior leadership roles at HPI and HPE, Whitman confirmed in an interview that the goal for HPI and HPE was to higher younger employees to replace laid-off employees. *Id*. ¶ 32 ("[T]o make sure that we've got a labor pyramid with lots of young people coming in right out of college and graduate school and early in their careers. That is an important part of the future of the company. . . ." (emphasis added)).

Moreover, as noted, both HPI and HPE used the same WFR process and paperwork that HP Co. used. *See id*. ¶¶ 11, 23–24, 35. HPI and HPE used uniform, near-verbatim paperwork when terminating Plaintiffs and other putative collective members, who all received the same worded reasons for being terminated, regardless of which entity they worked for. *Id*. ¶ 35. Those notices at both HPI and HPE, state: "Employees were selected for the reduction in force because the job they were performing will no longer continue, their skill set was not applicable to the Company's or organization's operations going forward, and/or other employees were viewed as

Case No.: 5:16-cv-04775-EJD
ORDER GRANTING PLAINTIFFS' MOTION FOR PRELIMINARY CERTIFICATION
3

better qualified because of past performance and competency evaluation, which may include skills, abilities, knowledge and experience." *Id.*

The two companies also worked together to coordinate efforts to implement the WFR, which Plaintiffs allege resulted in continued discriminatory employment practices. *Id.* ¶¶ 24, 34–38, 43–47, 55–56, 63–65. Plaintiffs further contend that the HP entities worked together to impose a common ban on rehiring any employees discharged pursuant to the WFR, regardless of what entity the employee was fired from. *See id.* ¶¶ 43–45 (describing the coordinated "blacklisting policy"). HPI and HPE also implemented similar early retirement policies that were meant to pressure older employees to leave "voluntarily" or risk being involuntarily fired under the WFR. *Id.* ¶¶ 37–41. Plaintiffs allege that the coordinated efforts between HPI and HPE were at Whitman's direction as part of her ongoing initiative to make all the HP entities "younger." *Id.* ¶¶ 4, 7. Both HPI and HPE followed the two-step Workforce Restructuring Initiative outlined above. *See id.* ¶¶ 34–36. According to Plaintiffs, HPI and HPE even used the same terminology as HP Co. to review employees—existing employees slated for termination under the WFR were called "slates," and the new hires that management hired to replace them were called "reqs." *Id.* ¶ 34.

Plaintiffs maintain that the slate and req process followed a "distinct pattern." *Id.* ¶ 34. At both HPI and HPE (and at HP Co. before the split), upper-level managers directed subordinate managers to slate certain numbers of older long-term or long-tailed ("LT") employees for termination under the WFR. *Id.* Simultaneously, the upper-level managers authorized subordinate managers to hire a similar number of early career employees to replace them. *Id.* During this process, HP's human resources department distributed written guidelines in August 2013 that described a "requisition policy." *Id.* ¶ 49. This policy mandated that at least 75% of people hired to replace terminated LT employees be early career hires. *Id.* ¶¶ 49-51. Managers who resisted directives to slate and replace LT employees were allegedly in danger of being terminated. For instance, Plaintiff DeVere was instructed to identify two employees from his team to slate for termination under the WFR. *Id.* ¶ 66. Plaintiff DeVere identified two employees for termination;

Case No.: 5:16-cv-04775-EJD
ORDER GRANTING PLAINTIFFS' MOTION FOR PRELIMINARY CERTIFICATION
4

he selected two younger early career hires who he believed were performing poorly. *Id*. Plaintiff DeVere's supervisor told him he should be slating LT employees rather than younger employees. *Id*. Plaintiff DeVere resisted the direction to slate LT employees and ultimately designated the two younger employees for termination. *Id*. This decision, however, was overruled by human resources and two older members of Plaintiff DeVere's team (over the age of 40) were fired under the WFR. *Id*. ¶ 67. Soon thereafter, Plaintiff DeVere, who was also over the age of 40, was fired under the WFR. *Id*. Plaintiffs argue that this, in combination with Whitman's other statements, show that older employees were terminated because of their age. *Id*. ¶¶ 34, 66–67.

Accordingly, Plaintiffs allege two nationwide ADEA collectives, one against each of the two Defendants. Plaintiffs have defined the proposed collective against HPI as follows:

> All individuals who had their employment terminated by HP, Inc. (including when HP, Inc. was named Hewlett-Packard Company) pursuant to a WFR Plan on or after December 9, 2014 for individuals terminated in deferral states; and on or after April 8, 2015 for individuals terminated in non-deferral states, and who were 40 years or older at the time of such termination.

*Id*. ¶ 105. The proposed collective against HPE is defined as follows:

> All individuals who had their employment terminated by Hewlett Packard Enterprise Company pursuant to a WFR Plan on or after November 1, 2015, and who were 40 years or older at the time of such termination.

*Id*. ¶ 106. Plaintiffs' collectives exclude individuals who signed a Waiver and General Release Agreement or an Agreement to Arbitrate Claims. *Id*. ¶ 107.

## II.   LEGAL STANDARD

Plaintiffs seek collective certification of their ADEA case pursuant to the standards set forth under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 216(b). The ADEA incorporates the collective action procedures of the FLSA, set forth in 29 U.S.C. § 216(b). *See* 29 U.S.C. § 626(b); *Lewis v. Wells Fargo & Co.*, 669 F. Supp. 2d 1124, 1126 n.1 (N.D. Cal. 2009) ("[B]ecause ADEA incorporates § 16(b) of the Fair Labor Standards Act into its enforcement scheme, the same rules govern judicial management of collective actions under both statutes.").

Case No.: 5:16-cv-04775-EJD
ORDER GRANTING PLAINTIFFS' MOTION FOR PRELIMINARY CERTIFICATION
5

Conditional certification under § 216(b) differs markedly from class certification under Federal Rule of Civil Procedure 23. Conditional certification in the FLSA context does not "produce a class with an independent legal status, or join additional parties to the action." *Genesis Healthcare Corp. v. Symczyk*, 569 U.S. 66, 75 (2013). Instead, "[t]he sole consequence" of a successful motion for conditional certification is "the sending of court-approved written notice" to workers who may wish to join the litigation as individuals. *Id.*

The "near-universal practice" that Courts use to determine whether claims under the FLSA should proceed in a collective is the two-step certification process. *See Campbell v. City of Los Angeles*, 903 F.3d 1090, 1100 (9th Cir. 2018). The first step of this process occurs when a plaintiff moves for conditional certification at some point during the pleading stage. *Id*. At this first stage, "conditional certification is by no means automatic, but Plaintiffs' burden is light." *Dudley v. TrueCoverage LLC*, No. CV 18-3760 PA (AGRX), 2018 WL 6431869, at *2 (C.D. Cal. Sept. 28, 2018). "The district court's analysis is typically focused on a review of the pleadings but may sometimes be supplemented by declarations or limited other evidence." *Campbell*, 903 F.3d at 1109. The level of consideration is "lenient" and "loosely akin to a plausibility standard." *See id*.

The second step of the certification process is triggered when defendants move for decertification following the conclusion of discovery. *See id.* at 1109. These motions usually contend that plaintiffs have not developed a record sufficient to satisfy § 216(b)'s "similarly situated" requirement. *See id.* This second step resembles a motion for summary judgment, and "the plaintiff bears a heavier burden." *Id.* (quoting *Morgan v. Fam. Dollar Stores, Inc.*, 551 F.3d 1233, 1261 (11th Cir. 2008)).

The key inquiry during both steps of certification is whether the employees at issue are "similarly situated." *See* 29 U.S.C. § 216(b). The FLSA does not define "similarly situated," but the Ninth Circuit recently interpreted the term in *Campbell*. *See Campbell*, 903 F.3d at 1114. There, the court ruled that employees are "similarly situated" for the purposes of the FLSA "to the extent they share a similar issue of law or fact material to the disposition of their FLSA claims" or,

Case No.: 5:16-cv-04775-EJD
ORDER GRANTING PLAINTIFFS' MOTION FOR PRELIMINARY CERTIFICATION
6

1    put another way, when they are "alike in ways that matter to the disposition of their FLSA

2    claims." *See id*. "If the party plaintiffs' factual or legal similarities are material to the resolution

3    of their case, dissimilarities in other respects should not defeat collective treatment." *See id*.

4    District courts have found that the standard articulated in *Campbell* "requires a much lower

5    showing than the [ ] approach district courts previously employed." *Campanelli v. Image First*

6    *Healthcare Laundry Specialists, Inc.*, No. 15-CV-04456-PJH, 2018 WL 6727825, at *6 (N.D. Cal.

7    Dec. 21, 2018).

### III. JUDICIAL NOTICE

Defendants request for the Court to take judicial notice of fifteen different 10-K and 8K filings with the Securities and Exchange Commission ("SEC"). *See* Defendants' Request for Judicial Notice, Dkt. No. 414-10. These documents were filed with the SEC during certain years between 2005 and 2020. Federal Rule of Evidence 201(b) permits a court to take judicial notice of an adjudicative fact "not subject to reasonable dispute," that is "generally known" or "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Specifically, a court may take judicial notice of matters of public record. *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 999 (9th Cir. 2018).

In response, Plaintiffs argue that while the Court may take judicial notice of public documents, the Court may not notice the factual content of the exhibits therein. This is true. "[A] court may take 'judicial notice of matters of public record,' but 'cannot take judicial notice of disputed facts contained in such public records.'" *Baird v. BlackRock Institutional Tr. Co., N.A.*, 403 F. Supp. 3d 765, 774 (N.D. Cal. 2019) (quoting *Khoja*, 899 F.3d at 999). Where the SEC filings are "subject to varying interpretations, and there is a reasonable dispute as to what the [SEC filings] establish[]," the court should refuse to take judicial notice of the truth of any factual assertions or statements contained therein. *Baird*, 403 F. Supp. 3d at 775 (quoting *Khoja*, 899 F.3d at 1000). Hence, with respect to Exhibits A-O, while the Court takes judicial notice of the financial documents, it does not take judicial notice of any disputed facts therein.

Plaintiffs have also requested for the Court to take judicial notice of certain exhibits. *See*

Case No.: 5:16-cv-04775-EJD
ORDER GRANTING PLAINTIFFS' MOTION FOR PRELIMINARY CERTIFICATION
7

Plaintiffs' Request for Judicial Notice, Dkt. No. 416-2.  In particular, Plaintiffs request this Court take judicial notice of three public documents, including (1) a transcript of Hewlett-Packard Securities Analyst Meeting held on October 9, 2013; (2) a transcript of Hewlett-Packard Securities Analysis Meeting held on September 15, 2015; and (3) a "CNBC Transcript: Hewlett-Packard Enterprise CEO & HP Inc. Chairman Meg Whitman Speaks with CNBC's David Faber on 'Squawk of the Street' Today."  Courts may take notice of transcripts of conference earning calls.  *In Re Energy Recover Inc. Sec. Litig.*, No. 15-CV-00265-EMC, 2016 WL 324150, at *3 (N.D. Cal. Jan. 27, 2016) ("[T]ranscripts of conference earnings calls are judicially noticeable because they are matters of public record. Courts can consider securities offerings and corporate disclosure documents that are publicly available."); *Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1064 n.7 (9th Cir. 2008) (same).  Similarly, courts may take judicial notice of transcripts of television news interviews and similar documents.  *Kuehbeck v. Genesis Microchip Inc.*, No. C 02-05344 JSW, 2005 WL 1787426, at *4 (N.D. Cal. July 27, 2005) (granting request for judicial notice of press releases, earnings call transcripts, and SEC filings referenced in the complaint).

Therefore, the Court will take judicial notice of these three exhibits with respect to their existence and what was in the public domain.  However, the Court does not take judicial notice for the truth of their contents.  *See Von Saher v. Norton Simon Museum of Art at Pasadena*, 592 F.3d 954, 960 (9th Cir. 2009) ("Courts may take judicial notice of publications introduced to indicate what was in the public realm at the time, not whether the contents of those articles were in fact true").

## IV.   DISCUSSION

### A.   Conditional Certification

The Court considers the pleadings and other evidence submitted to determine whether potential collective action members are "similarly situated" to Plaintiffs.  Per the Ninth Circuit's holding in *Campbell*, the Court specifically looks at whether the prospective collective members are "alike with regard to some material aspect of their litigation."  903 F.3d at 1114.

Based on the *Campbell test*, the Court concludes that the inquiry here is whether Plaintiffs substantially allege that their employment was terminated pursuant to the ongoing, multiyear, Workforce Restructuring Initiative, which was designed to replace existing, older workers with new, younger employees. The Ninth Circuit's analysis in *Campbell* supports this conclusion. In *Campbell*, plaintiff police officers moved for conditional certification of a collective action alleging "a pervasive, unwritten policy discouraging the reporting of overtime." *Id.* at 1099. After notice was sent to all potential collective action members and after years of discovery, the court granted defendant's motion for "decertification." *Id*. The Ninth Circuit noted that the plaintiffs would have been "similarly situated" if the record supported that "there was a tacit, Department-wide policy discouraging the reporting of earned overtime." *Id*. at 1116. The panel further stated that this would have made the officers "alike in a way material to their litigation," and that such a likeness "would have affected the ultimate findings regarding the occurrence of unpaid overtime . . ., thus collectively advancing the litigation." *Id*. In looking at this inquiry, the Court does not address in any way whether the claims alleged by Plaintiffs have any merit.

Plaintiffs here allege that the declarations from named Plaintiffs submitted with the motion demonstrate that Plaintiffs are "similarly situated" to other potential members of the proposed collective action. Mot. at 16. Plaintiffs allege that they are similarly situated because they were all employed by either HPI and HPE, were 40 years or older, received the same form documents offering the same, generic, pretextual reasons for their termination, and were terminated under the same company-wide, multiyear Workforce Restructuring Initiative. *Id*. at 14. Plaintiffs further allege that they all declined to sign Defendants' proposed release agreements, which were identical for both HPI and HPE, and never signed any other "Agreement to Arbitrate Claims" forms used by the Defendants. *Id*.

The Court first looks to the FAC. As recounted above, starting in 2012, Whitman implemented the Workforce Restructuring Initiative. *See* supra; *see also* FAC ¶¶ 30–35. Whitman was vocal about her desire to recruit and hire young people; Whitman wanted a "whole host of young people." *See* FAC ¶¶ 30–35. Moreover, Whitman's statements were not contained

Case No.: 5:16-cv-04775-EJD
ORDER GRANTING PLAINTIFFS' MOTION FOR PRELIMINARY CERTIFICATION
9

to just HP Co. To the contrary, according to Plaintiffs' FAC, these statements directly translated into discriminatory hiring and firing practices at both HPI and HPE. *See supra* Background (noting that HPI and HPE used the same WFR process and worked together to implement the WFR). Indeed, the FAC shows that both HPI and HPE used the Workforce Restructuring Initiative to terminate older employees and hire younger ones. The Workforce Restructuring Initiative and the related WFR were announced as means to reduce the HP workforce. FAC ¶ 12. Yet, the Workforce Restructuring Initiative did not result in a decreased HP workforce. Rather, Plaintiffs have alleged that "in the years since [Defendants] began to implement the Initiative and the WFR plans . . . the [Defendants] have added thousands of new [and younger] employees to replace those who were terminated under the WFR Plans." *Id*. Moreover, Plaintiffs have plead facts which show that Plaintiffs were competently performing their jobs. *See supra* Background. However, Plaintiffs allege facts that show that managers were *required* to terminate older employees because such employees were "old". *See* FAC ¶¶ 65–67; *see also* 29 U.S.C. § 623(a)(1) (requiring the allegedly discriminatory action to be "because of" the plaintiff's age). They have also shown that older employees were terminated based on antiquated stereotypes. *See* FAC ¶ 59 (stating that Defendants considered older employees to move "slow and steady" and "undesirable"). Thus, Plaintiffs allege they were all subject to the same illegal selection of older workers for termination under the WFRs and pursuant to the Workforce Restructuring Initiative.

        Four of the named Plaintiffs also submitted declarations with the motion. Although the declarations are similar, the representative sample documents attached to the declarations show that Plaintiffs received a substantially similar set of documents when they were terminated under the Restructuring Initiative in different years. *See* Plaintiffs' Declarations, Dkt. Nos. 409-1 to 5, Exs. A-D. Among the documents employees received when they were terminated as part of the Workforce Restructuring Initiative were (1) a form letter notifying the employee of termination, (2) a summary plan description of benefits, (3) a frequently asked questions document, and (4) a notice under the Older Workers Benefit Protection Act ("OWBPA"). Mot. at 4-10; Plaintiffs' Declarations, Dkt. Nos. 409-1 to 5, Exs. A-D. The "Notification and Severance Materials" forms

Case No.: 5:16-cv-04775-EJD
ORDER GRANTING PLAINTIFFS' MOTION FOR PRELIMINARY CERTIFICATION
10

received by Plaintiffs all referred to the "U.S. Workforce Reduction Program" and an associated website. *See* Declaration of Dan Weiland ("Weiland Decl.") ¶ 3, Ex. A at 1; Declaration of Arun Vatturi ("Vatturi Decl.") ¶ 3, Ex. A at 1; *see also* Declaration of Donna Forsyth ("Forsyth Decl.") ¶ 3, Ex. A at 1; Declaration of Kevin Alviso ("Alviso Decl.") ¶ 3, Ex. A at 1.

Plaintiffs' declarations also describe how the respective "Workforce Reduction Plan Summary Plan Descriptions" all have language describing a single plan and confirm they were used as part of the same Workforce Restructuring Initiative involving the same group of terminated employees identified in Plaintiffs' proposed collective actions. *See* Weiland Decl. ¶ 4, Ex. B at 1-3; Vatturi Decl. ¶4, Ex. B at 1-3; *see also* Forsyth Decl. ¶ 4, Ex. B at 1. Further, the nearly identical "Workforce Reduction (WFR) Frequently Asked Questions (FAQs)" documents presented in Plaintiffs' separate declarations all explain that the employment terminations occurred for the same reasons and were implemented by both HPI and HPE using the same WFR processes. *See* Weiland Decl. ¶ 5, Ex. C at 2; Vatturi Decl. ¶ 5, Ex. C at 2; *see also* Forsyth Decl. ¶ 5, Ex. C at 2. The Court finds that these declarations, combined with the detailed factual allegations in the complaint, are sufficient to show that the proposed collectives are "alike in ways that matter to the disposition of their [ADEA] claims." *Campbell*, 903 F.3d at 1117; *see also Knight v. Concentrix Corp.*, No. 4:18-CV-07101-KAW, 2019 WL 3503052, at *3 (N.D. Cal. Aug. 1, 2019) (finding that three declarations were sufficient at the conditional certification stage). Indeed, the implementation of the Workforce Restructuring Initiative across both HPI and HPE is a "shared issue of fact" that is "material" to the claims. *See Campbell*, 903 F.3d at 1114 (finding that if supported by an adequate record, plaintiffs' allegations that the police department had a tacit policy of discouraging overtime would have been sufficient to show that they were similarly situated).

Defendants' attempt to rebut Plaintiffs' showing with competing declarations is unavailing at this preliminary certification stage. Defendants argue that Plaintiffs theory in support of their age discrimination claims ignores the financial and business circumstances that HP Co. and Whitman were facing. *See* Opp. at 4-5. According to Defendants, employee WFRs were only one

Case No.: 5:16-cv-04775-EJD
ORDER GRANTING PLAINTIFFS' MOTION FOR PRELIMINARY CERTIFICATION
11

1    cost-cutting measure that HP. Co. took to restructure its businesses, reduce long-term debt, and
2    better align its costs structure with incoming revenues.  *Id.* at 5.  Defendants support this
3    contention with declarations from different employees and supervisors and Defendants' financial
4    documents to argue that Plaintiffs are not similarly situated and were ultimately terminated for
5    independent reasons that did not have to do with their age.  Plaintiffs argue that these declarations
6    go to the merits of their claims and should not be considered until the decertification stage.  The
7    Court agrees.

8          As discussed above, during this first stage of conditional certification, the scope of review
9    is loosely akin to a plausibility standard.  *See Campbell*, 903 F.3d at 1109.  The question at this
10   point "is not whose evidence regarding commonality is more believable, but simply whether
11   plaintiffs have made an adequate threshold showing." *Flores v. Velocity Exp., Inc.*, No. 12CV-
12   05790-JST, 2013 WL 2468362, at *7 (N.D. Cal. June 7, 2013).  Courts rarely reject conditional
13   certification during this first stage based on a defendant's declarations.  *See, e.g., Dashiell v. Cty.*
14   *of Riverside*, No. EDCV15211JGBSPX, 2015 WL 13764448, at *5 (C.D. Cal. Sept. 18, 2015)
15   (finding that declarations submitted by employees "averring that they were not subject to the
16   violations alleged in Plaintiff's complaint do not preclude conditional certification"); *Ellerd v. Cty.*
17   *of Los Angeles*, No. CV 08-4289 CAS FFMX, 2009 WL 3462179, at *4 (C.D. Cal. Oct. 22, 2009)
18   (granting conditional certification even though "defendant has made its own substantial allegations
19   (supported by affidavits and depositions) which contradict many of the facts that the plaintiffs
20   seek to prove").  Accordingly, the Court finds that Plaintiffs have met their burden in showing that
21   employees of HPI and HPE who were 40 years or older when they were terminated are similarly
22   situated for the purposes of § 216(b).

23       **B.**    **Proposed Notice**

24         Once a collective class has been conditionally certified, potential FLSA collective
25   members are entitled to "accurate and timely notice concerning the pendency of the collective
26   action, so that they can make informed decisions as to whether to participate." *Hoffmann–La*
27   *Roche Inc. v. Sperling*, 493 U.S. 165, 170 (1989).  The Court has authority and discretion to
28   Case No.: 5:16-cv-04775-EJD
     ORDER GRANTING PLAINTIFFS' MOTION FOR PRELIMINARY CERTIFICATION

monitor the preparation and distribution of the notice, to "ensure that it is timely, accurate, and informative." *Id*. at 172.

In their motion, Plaintiffs request that the Court direct Defendants to provide Plaintiffs' counsel the names of former employees who come within the definitions of the HPI Nationwide Collective and the HPE Nationwide Collective, as well as the basic data necessary to confirm they belong within a collective—specifically, their date of birth, which entity employed them, the state where they lived and worked when their employment was terminated by Defendants, their position or title when terminated, and the effective date of their termination. Plaintiffs also request that Defendants provide the last known permanent addresses, email addresses, and telephone numbers for all members of the proposed collectives so that notice can be provided to each of them. Defendants do not oppose.

Courts routinely allow the production of employees' mail and email addresses and telephone numbers. *Knight*, 2019 WL 3503052, at *5 (quoting *Benedict v. Hewlett-Packard Co.*, No. 13-CV-00119-LHK, 2014 WL 587135, at *14 (N.D. Cal. Feb. 13, 2014) ("Courts routinely approve the production of email addresses and telephone numbers with other contact information to ensure that notice is effectuated. . . .")). Courts have also granted unopposed requests by plaintiffs that seek personal information such as birthdates or social security numbers. *See Wong v. HSBC Mortg. Corp. (USA)*, No. C-07-2446 MMC, 2008 WL 753889, at *4 (N.D. Cal. Mar. 19, 2008) (granting the plaintiffs' unopposed request for last four digits of employees' social security number). In this case, production of employees' birthdates are necessary. Accordingly, the Court grants Plaintiffs' request to direct Defendants to provide their counsel with names, date of birth, which entity employed them, the state where they lived and worked when their employment was terminated by Defendants, their position or title when terminated, the effective date of their termination, and last known mailing and email addresses and phone numbers of the "similarly situated" individuals.

### C. Form of Notice to Potential Opt-in Plaintiffs

Because preliminary certification is warranted, notice to the putative collectives is proper.

Case No.: 5:16-cv-04775-EJD
ORDER GRANTING PLAINTIFFS' MOTION FOR PRELIMINARY CERTIFICATION
13

1   The Parties have not yet met and conferred on how notice should be effectuated.  Plaintiffs have,

2   however, provided the Court with a proposed notice.  Defendants oppose the proposed notice

3   because it does not inform potential opt-in plaintiffs of their right to obtain their own counsel or

4   that by joining the action they may be asked to: (1) appear for a deposition, (2) respond to written

5   discovery, and (3) appear at trial.  Defendants also argue that the proposed notice fails to inform

6   potential opt-in plaintiffs of their data and document preservation obligations.  Opp. at 23.

7   Defendants further argue that notice should be done by a third-party administrator and for a period

8   of no more than 60 days.  *Id.* at 23-24.  The Court orders as follows:

9       1. Notice shall be sent by a third-party administrator.  While Plaintiffs do not agree to
10          this, the Court finds it would be more appropriate for a third-party to distribute the
11          notice.  Plaintiffs' counsel has not explained why it would be preferable for them to
12          oversee distribution of notice.  *See Lewis*, 669 F. Supp. 2d at 1128; *see also Prentice v.*
13          *Fund for Pub. Int. Rsch, Inc.*, No. C-06-7776 SC, 2007 WL 2729187, at *6 (N.D. Cal.
14          Sept. 18, 2007) ("The Court agrees that using a third party is the best way to ensure the
15          neutrality and integrity of the opt-in process.").  Because Defendants seek the third-
16          party administrator, the Court finds it fair for the Parties to split the costs associated
17          with notice.

18       2. The Parties shall meet and confer with the third-party administrator to determine the
19          best means to effect notice.  Direct mail shall be one form of notice, but the
20          administrator should consider other additional means of notice, including via cell
21          phone (*e.g.* text), through an application (*e.g.*, WhatsApp), and through email.

22       3. Plaintiffs seek five months to distribute notice to putative collective members.
23          Defendants argue that only two months are necessary. On balance and based on the
24          record in the case, the Court finds that a 105-day notice period is appropriate.

25       4. The notice need not contain detailed language informing a member about his or her
26          obligations as a litigant (*e.g.*, to be subject to a deposition); however, the notice should
27          contain some language notifying a member that he or she does have an obligation to

28   Case No.: 5:16-cv-04775-EJD
ORDER GRANTING PLAINTIFFS' MOTION FOR PRELIMINARY CERTIFICATION
14

participate in the case and provide relevant information. Plaintiffs' notice as currently written, informs the putative members of their obligation to "cooperate, provide relevant information, and participate in certain aspects of the lawsuit." Mot. at 25, Ex. A. Thus, the notice properly informs potential opt-in plaintiffs of their possible obligations.

5. Defendants assert that the notice should inform potential plaintiffs of their right to choose their own counsel. Defendant cites to a case with a notice that describes an option for potential plaintiffs to select their own counsel, but no cases that describe that option as a right. *See Anjum v. J.C. Penney Co.*, No. 13 CV 460 RJD RER, 2015 WL 3603973, at *13-14 (E.D.N.Y. June 15, 2015). Plaintiffs, however, correctly point out that there is a good reason why Defendants' proposed language should not be included. "Suggesting that a plaintiff may opt in and bring her own lawyer along would lead to confusion, inefficiency, and cumbersome proceedings." *Adams v. Inter-Con Sec. Sys., Inc.*, 242 F.R.D. 530, 541 (N.D. Cal. 2007). Thus, the Court will not require that the notice include an option for potential opt-in plaintiffs to choose their own counsel.

6. The notice shall contain some language regarding data and document preservation.

## V.   CONCLUSION

For the foregoing reasons, Defendants' motion for preliminary certification is **GRANTED.** The Parties shall meet and confer as required above and shall submit a joint proposed notice by May 10, 2021. If the Parties are unable to agree on any specific issue and/or language, then, in a joint submission, the Parties shall identify what the dispute is and then each party shall provide its position on the issue and/or proposed language.

**IT IS SO ORDERED.**

Dated: April 13, 2021

_____
EDWARD J. DAVILA
United States District Judge