JENNIE LEE ANDERSON (SBN 203586)
jennie@andrusanderson.com
ANDRUS ANDERSON LLP
155 Montgomery Street, Suite 900
San Francisco, CA 94104
Phone: (415) 986-1400
Fax: (415) 986-1474

DOUGLAS P. DEHLER (admitted *pro hac vice*)
doug.dehler@wilaw.com
O'NEIL, CANNON, HOLLMAN, DEJONG & LAING S.C.
111 East Wisconsin Avenue, Suite 1400
Milwaukee, WI 53202
Phone: (414) 276-5000
Fax: (414) 276-6581

*Attorneys for Plaintiffs and the Proposed Classes*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| DONNA J. FORSYTH, ARUN VATTURI, DAN WEILAND, SHAFIQ RAHMAN, AND KEVIN ALVISO for an on behalf of themselves and other persons similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>HP INC. AND HEWLETT PACKARD ENTERPRISE COMPANY,<br><br>Defendants. | Case No. 5:16-CV-04775-EJD<br><br>**PLAINTIFFS' UNOPPOSED MOTION FOR PRELIMINARY APPROVAL OF CLASS AND COLLECTIVE ACTION SETTLEMENT**<br><br>Date: October 26, 2023<br>Time: 10:00 a.m.<br>Judge: Hon. Edward J. Davila<br><br>Dept.: Courtroom 4 (5th Floor) |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## TABLE OF CONTENTS

NOTICE OF MOTION AND MOTION.................................................................................... 1

STATEMENT OF RELIEF SOUGHT……………………….…………………………...1

MEMORANDUM OF POINTS AND AUTHORITIES........................................................ 2

I.   INTRODUCTION........................................................................................................ 2

II.  PROCEDURAL HISTORY ........................................................................................ 4

III. SUMMARY OF PLAINTIFFS' FACTUAL ALLEGATIONS ............................... 6

IV. TERMS OF THE PROPOSED SETTLEMENT........................................................ 6

A. The ADEA Plaintiffs and California Classes............................................................ 6

B. The Proposed Common Fund and Allocation Plan……………………….…….....7

C. The Proposed Allocation Methodology ................................................................... 8

D. Settlement Administration and Notice.................................................................... 11

E. Release of Claims .................................................................................................... 12

F. Named Plaintiffs' Service Awards.......................................................................... 12

G. Attorneys' Fees, Costs, and Expenses.................................................................... 12

V. STANDARD OF REVIEW .......................................................................................... 12

VI. ARGUMENT ............................................................................................................... 13

A. Certification of the California Settlement Classes Is Appropriate...................... 13

1. Rule 23(a) Is Satisfied......................................................................................... 13

2. The Requirements of Rule 23(b)(3) Are Satisfied. ......................................... 15

B.  The Settlement Is Fair, Adequate and Reasonable............................................... 15

1. The Relief Proposed is Fair, Adequate, and Reasonable. ........................... 16

a. The Costs, Risks, and Delay of Continued Litigation Are Substantial ................. 16

b. The Amount of the Settlement and the Allocation Plan Are Fair..……………..…17

c. The Settlement Is the Product of Arm's Length Negotiations…...…………..….…20

d. The Parites Are Adequately Informed to Make Decisions About Settlement….…20

e. Counsel's Experience and Views Support the Settlement………..…………......…21

f. Attorneys' Fees, Costs, and Expenses Are Reasonable……..…..…………………22

g. The Requested Service Awards Are Reasonable……………...…...….…...….…23

C. The Proposed Notice and Notice Plan Are the Best Practicable Here..............................24

VII.  PROPOSED SCHEDULE FOR REMAINING PROCEDURES ...................................25

VIII. CONCLUSION...................................................................................................................25

1

## TABLE OF AUTHORITIES

**Cases**

*Abdullah v. U.S. Sec. Assocs.*,
   731 F.3d 952 (9th Cir. 2013) ................................................................................ 14

*Amchem Prods., Inc. v. Windsor*,
   521 U.S. 591 (1997) ............................................................................................ 14

*Betancourt v. Advantage Human Resourcing, Inc.*,
   2016 WL 344532 (N.D. Cal. Jan. 28, 2016) ...................................................... 16

*Chavez v. Netflix Inc.*,
   162 Cal. App. 4th 43 (2008) ............................................................................... 22

*Coleman v. Quaker Oats Co.*,
   232 F.3d 1271 (9th Cir. 2000) ........................................................................... 17

*Cotter v. Lyft, Inc.*,
   176 F. Supp. 3d 930 (N.D. Cal. 2016) .............................................................. 17

*Dallas v. Alcatel-Lucent USA, Inc.*,
   2013 WL 2197624 (E.D. Mich. May 20, 2013) ............................................... 19

*Delagarza v. Tesoro Refin. & Mktg. Co.*,
   2011 WL 4017967 (N.D. Cal. Sept. 8, 2011) ................................................... 15

*DeLeon v. Wells Fargo Bank, N.A.*,
   2015 WL 2255394 (S.D.N.Y. May 7, 2015) ..................................................... 23

*Dyer v. Wells Fargo Bank, N.A.*,
   303 F.R.D. 326 (N.D. Cal. 2014) ...................................................................... 20

*Ellis v. Costco Wholesale Corp.*,
   285 F.R.D. 492 (N.D. Cal. 2012) ...................................................................... 15

*Galeener v. Source Refrigeration & HVAC, Inc.*,
   2015 WL 12976106 (N.D. Cal. Aug. 20, 2015) ............................................... 24

*Hanlon v. Chrysler Corp.*,
   150 F.3d 1011 (9th Cir. 1998) ....................................................................Passim

*Heath v. Google LLC*,
   2019 WL 3842075 (N.D. Cal. Aug. 15, 2019) ................................................. 19

*In re Bluetooth Headset Products Liab. Litig.*,
   654 F.3d 935 (9th Cir. 2011) ....................................................................... 22, 23

*In re Hyundai & Kia Fuel Econ. Litig.*,
   926 F.3d 539 (9th Cir. 2019) ................................................................. 24

*In re Omnivision Techn., Inc.*,
   559 F. Supp. 2d 1036 (N.D. Cal. 2008) ................................................... 21

*In re Tableware Antitrust Litig.*,
   484 F. Supp. 2d 1078 (N.D. Cal. 2007) ................................................... 15

*In re Uponor, Inc., F1807 Plumbing Fittings Prod. Liab. Litig.*,
   716 F.3d 1057 (8th Cir. 2013) ................................................................. 24

*Nat'l Rural Telecomms. Coop. v. DIRECTV, Inc.*,
   221 F.R.D. 523 (C.D. Cal. 2004) ............................................................ 21

*Rabin v. PricewaterhouseCoopers LLP*,
   2021 WL 837626 (N.D. Cal. Feb. 4, 2021) ............................ 18, 19, 22, 24

*Rodriguez v. W. Publ'g Corp.*,
   563 F.3d 948 (9th Cir. 2009) ................................................................... 20

*Ross v. U.S. Bank Nat'l Ass'n*,
   2010 WL 3833922 (N.D. Cal. Sept. 29, 2010) ....................................... 24

*Shaheen v. BF Goodrich*,
   873 F.2d 105 (6th Cir. 1989) ................................................................... 17

*Shin v. Plantronics, Inc.*,
   2019 WL 2515827 (N.D. Cal. June 17, 2019) ......................................... 24

*Tierno. v. Rite Aid Corp.*,
   2006 WL 2535056 (N.D. Cal. Aug. 31, 2006) ........................................ 15

*Tijero v. Aaron Bros., Inc.*,
   301 F.R.D. 314 (N.D. Cal. 2013) ............................................................ 20

*Vizcaino v. Microsoft Corp.*,
   290 F.3d 1043 (9th Cir. 2002) ................................................................. 22

*Wal-Mart Stores, Inc. v. Dukes*,
   564 U.S. 338 (2011) ................................................................................. 14

*Whiteway v. FedEx Kinko's Office & Print Servs., Inc.*,
   2006 WL 2642528 (N.D. Cal. Sept. 14, 2006) ....................................... 14

*Williams v. MGM-Pathe Commc'ns Co.*,
   129 F.3d 1026 (9th Cir. 1997) ................................................................. 22

*Williams v. Sprint/United Management Company*,
    2007 WL 2694029  (D. Kan. Sept. 11, 2007)........................................................................ 19

*Wren v. RGIS Inventory Specialists*,
    2011 WL 1230826 (N.D. Cal. April 1, 2011)..................................................................... 23

**Rules**
Fed. R. Civ. P. 23(a) ............................................................................................... 13, 14
Fed. R. Civ. P. 23(b) ...................................................................................................... 19
Fed. R. Civ. P. 23(c) ...................................................................................................... 24
Fed. R. Civ. P. 23(e) ................................................................................................Passim
Fed. R. Civ. P. 23(g) ...................................................................................................... 14
Fed. R. Civ. P. 54(d) ...................................................................................................... 23

**Other Authorities**
4 *Newberg and Rubenstein on Class Actions* (6th ed. 2023)............................ 12, 13, 17, 20

**NOTICE OF MOTION AND MOTION**

PLEASE TAKE NOTICE that on October 26, 2023, at 10:00 a.m., or as soon thereafter as the matter may be heard, in Courtroom 4, 5th Floor, of the San Jose Courthouse, located at 280 South 1st Street, San Jose, CA 95113, Plaintiffs Donna Forsyth (now deceased, by and through her personal representative, Chris Forsyth), Arun Vatturi, Dan Weiland, Shafiq Rahman, and Kevin Alviso ("Named Plaintiffs" or "Plaintiffs"), individually and on behalf of others similarly situated, move the Court for preliminary approval of the parties' Collective and Class Action Settlement Agreement ("Settlement" or "Settlement Agreement"). This Motion is unopposed by Defendants HP Inc. and Hewlett Packard Enterprise Company ("Defendants").[1]

**STATEMENT OF RELIEF SOUGHT**

By this Motion, Plaintiffs hereby ask that the Court:

1.      Certify, for settlement purposes only, the California Settlement Classes[2] as defined below pursuant to Federal Rule of Civil Procedure 23(b)(3);

2.      Appoint Named Plaintiff Arun Vatturi as representative of the HP Co./HP Inc. California Class as defined below and Named Plaintiff Kevin Alviso as representative of the HPE California Class as defined below;

3.      Appoint the Named Plaintiffs' attorneys as Class Counsel;

---

[1] Defendants do not oppose the instant motion for preliminary approval of the proposed settlement or the certification of the proposed California Settlement Classes for settlement purposes only and reserve the right to raise any argument with respect to the merits of the Plaintiffs' individual, class, or collective claims or the appropriateness of the certification (or decertification) of any ADEA collective or Rule 23.  *See* SA §§ 10.3.6, 11.1. In addition, Defendants' non-opposition to this motion shall not act to preclude Defendants from opposing both the merits, and the propriety of collective or class certification (and Plaintiffs agree that they will not use this settlement to support the certification of any ADEA collective or state-law equivalent class), in any subsequent action. SA § 11.1.

[2] Unless otherwise defined herein, the capitalized terms used in this Motion are intended to have the same meaning as they are given in the Settlement Agreement.

4.     Adjudge the terms of the proposed Settlement Agreement to preliminarily be fair, reasonable and adequate, direct consummation of its terms and provisions, and order that dissemination of Class Notice to the California Class Members is appropriate;

5.     Approve, as to form and content, the proposed notice plan and Class Notice to the California Class Members;

6.     Approve and appoint CPT Group, Inc. as the Settlement Administrator who will administer this settlement and carry out the duties set forth in the Settlement Agreement; and

7.      Schedule a Fairness Hearing, for a date no earlier than one hundred (100) calendar days from the date on which this Motion is filed.

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.     INTRODUCTION

The Parties have entered into a settlement agreement to resolve Plaintiffs' claims of age discrimination brought on behalf of individuals who were age 40 and older when terminated as part of workforce reductions by each Defendant. *See* Declaration of Jennie Lee Anderson in Support of Preliminary Approval of Settlement ("Anderson Decl."), Ex. A ("SA"). The proposed Settlement seeks to resolve in full the claims of the 146 plaintiffs who filed consents to join (or "opted in" to) one of the two ADEA collectives previously conditionally certified by this Court (the "ADEA Plaintiffs"), as well as the claims of the putative members of the proposed HP Co./HP Inc. California Class and HPE California Class on whose behalf Named Plaintiffs Vatturi and Alviso have asserted claims pursuant to California state law, including but not limited to the California Fair Employment and Housing Act ("FEHA") ("California Class Members").

The proposed Settlement would create a common fund with a Maximum Gross Settlement Amount of $18 million for payments to the Named Plaintiffs, the ADEA Plaintiffs, and the California Class Members, who do not exclude themselves from the Settlement ("Participating California Class Members"), requested attorneys' fees, costs, and expenses, costs of settlement administration, and requested service awards for the Named Plaintiffs.  Under the proposed Settlement, all ADEA Plaintiffs and Participating California Class Members will receive significant and meaningful compensation. Under the allocation plan proposed by Plaintiffs' counsel, every ADEA Plaintiff and

Participating California Class Member will receive at minimum of $15,000 (net of attorneys' fees, costs, and expenses) in exchange for the release of claims set forth in the Settlement Agreement. Plaintiffs' counsel and the Named Plaintiffs believe that the proposed allocation plan is fair and objective.  If approved, the average gross individual recovery (inclusive of requested attorneys' fees, costs, and expenses, requested service awards, and costs of settlement administration) for all ADEA Plaintiffs and Participating California Class Members would be $50,279.

The Parties are in a good position to evaluate the risks of continued litigation against the benefits of settlement. Plaintiffs filed this action in 2016. Since that time, the parties have exchanged written discovery and Plaintiffs have obtained oral testimony from Defendants' witnesses. In addition to formal discovery, counsel for Plaintiffs conducted an extensive investigation, communicating with hundreds of percipient witnesses and consulting with experts to develop and evaluate the case. The Parties also exchanged a substantial amount of information as a condition of engaging in mediation and continued to exchange information for months after two formal mediation sessions.

While Plaintiffs won several major motions, including resisting numerous motions to dismiss and to strike class allegations and their motion for conditional certification of two ADEA collectives, they recognize that this ongoing litigation poses significant risks. Indeed, Defendants also won significant motions in this Action, including motions to compel the claims of certain named and opt-in plaintiffs to individual arbitration and portions of their motions to dismiss, and have pledged to oppose Rule 23 certification of the alleged California state law classes, to move to decertify the ADEA collectives, to seek summary judgment, and to vigorously defend the case on the merits at trial. Moreover, even if Plaintiffs were to prevail at trial, extended appeals are likely, further delaying potential relief in a case that has been pending for seven years.

There is no indication of collusion in connection with this Settlement—quite the opposite. Settlement negotiations were not only at arms' length, but fiercely contested.  The principal financial terms were reached after the exchange of considerable information on both sides and two full-day mediation sessions under the supervision of two highly experienced mediators.  Even after the two formal mediation sessions, the Parties continued to negotiate on a weekly and sometimes daily basis regarding material terms of the Settlement for more than eight months thereafter.

As described in greater detail below, the proposed Settlement readily satisfies all requirements of Rule 23, the ADEA, Ninth Circuit case law, and this District's Procedural Guidance for Class Action Settlements (updated Aug. 4, 2022) ("Class Action Settlement Guidance"). Therefore, Plaintiffs submit that the Settlement should be preliminarily approved, and that the proposed Class Notice should be disseminated to the California Class Members in accordance with the proposed notice plan.

## II. PROCEDURAL HISTORY

On August 18, 2016, Plaintiffs filed their initial Complaint. ECF No. 1. Subsequently, on November 14, 2016, Defendants moved to partially dismiss the Complaint and to compel arbitration of a former Plaintiff's claim. *See* ECF Nos. 42, 44. On November 15, 2016, Defendants also moved to strike the proposed definition of the nationwide ADEA collective and the Rule 23 California class definition. ECF No. 46. Plaintiffs then filed their First Amended Complaint ("FAC"), and, on January 30, 2017, Defendants moved to partially dismiss the FAC and to compel arbitration for some previously named plaintiffs. ECF Nos. 60, 74, 75. On March 20, 2017, Defendants also moved to compel arbitration for 13 opt-in plaintiffs on the grounds that they had signed a Waiver and General Release Agreement ("Waiver and Release") containing a mandatory arbitration clause with class and collective action waiver when Defendants terminated them. ECF Nos. 99–108.

On September 20, 2017, the Court granted Defendants' motion to compel arbitration as to 15 named and opt-in plaintiffs, denied without prejudice Defendants' motion to partially dismiss the FAC, and stayed the action pending resolution of the individual arbitrations. ECF No. 132. On October 18, 2017, Plaintiffs filed a Motion for Reconsideration with leave of the Court to do so. ECF Nos. 135–136. The Court ordered further briefing, and Defendants filed a motion to enjoin class arbitration and a motion to stay this action pending resolutions of individual arbitrations. ECF Nos. 142–144.

On February 6, 2018, the Court continued the stay, but allowed Plaintiffs to amend the FAC to add an additional named plaintiff. ECF No. 152. Plaintiffs then filed their Second Amended Complaint ("SAC"), adding Kevin Alviso as a new Named Plaintiff. ECF No. 168. On November 6, 2018, the Court dismissed with prejudice the claims of the former named plaintiffs and 13 opt-in plaintiffs who had been compelled to individual arbitration proceedings. ECF No. 177.

While the case was stayed, counsel for Plaintiffs continued to investigate Plaintiffs' claims, evaluate documents produced in discovery, work with experts, interview former employees, consult with putative class and collective members, and file consents to join the lawsuit. Anderson Decl. ¶ 3. Between November 16, 2018, and May 2, 2019, counsel for Plaintiffs filed consents to join the alleged ADEA collective for an additional 156 individuals. ECF Nos. 179–82, 185, 190–334, 337–342. Ultimately, 145 of the opt-in plaintiffs were found to have signed a Waiver and Release, and the claims alleged by these plaintiffs were dismissed after the parties resolved their claims prior to individual arbitration. ECF Nos. 336, 361, 367–68.

On January 7, 2020, Plaintiffs filed a Third Amended Complaint ("TAC"), which expressly excluded the claims of individuals who executed a Waiver and Release. ECF No. 360. On February 6, 2020, Defendants filed a motion to dismiss Plaintiffs' TAC. ECF No. 371. The Court denied Defendants' motion with respect to Plaintiffs' ADEA and FEHA claims but granted it with respect to Plaintiffs' California Unfair Competition Law claims under the fraudulent prong of the statute (Bus. & Prof. Code §17200, *et seq.*) and Plaintiffs' prayer for injunctive relief, with leave to amend. ECF No. 381. On July 9, 2020, Plaintiffs filed their Fourth Amended Complaint ("4AC"). ECF No. 389. On August 24, 2020, Defendants filed another motion to dismiss and/or to strike the class definitions set forth in the 4AC. ECF No. 401. On October 15, 2020, the Court denied Defendants' motion, and Defendants answered the 4AC on October 29, 2020. ECF Nos. 405-07.

On December 30, 2020, Plaintiffs filed a motion for conditional certification of their collective action under the ADEA. ECF No. 409. On April 13, 2021, the Court granted Plaintiffs' motion for conditional certification of two ADEA collectives, one with respect to HP Inc. and another with respect to HPE. ECF No. 423. After protracted negotiations and seeking the Court's assistance to resolve disputes about the form and content of the notices to be sent to putative members of the conditionally certified ADEA collectives, a third-party administrator provided notice to those individuals on November 2, 2021, informing them that the deadline to opt into this action was February 15, 2022. ECF No. 488. By the close of the opt-in period, an additional 122 individuals had opted into one of the two ADEA collectives, for a total of 148 ADEA Plaintiffs (including the five Named Plaintiffs and 143 opt-in plaintiffs). *Id.* The Parties then continued to engage in discovery before deciding to explore

settlement as an option. Anderson Decl. ¶ 4. The Parties continued to exchange information in advance of settlement discussions for several months. *Id.*

The Parties participated in two (2) day-long mediation sessions with mediators Mark S. Rudy and Hon. Daniel J. Buckley (Ret.) on October 14, 2022, and November 16, 2022, and were able to reach an agreement in principle on the basic financial terms of a potential settlement during those sessions. ECF No. 498. The settlement negotiations continued into 2023, as the Parties continued to negotiate the details of the proposed Settlement, including how the settlement funds would be allocated between the various ADEA Plaintiffs and California Class Members. The parties continued these settlement negotiations, often on a weekly or even daily basis, for many months and, by June 6, 2023, had reached agreement on the final terms of a settlement term sheet documenting the primary settlement terms. ECF No. 514. Additional negotiations continued thereafter and, on September 19, 2023, the parties fully executed the Settlement Agreement that is presented here for preliminary approval. *See* SA.

### III.   SUMMARY OF PLAINTIFFS' FACTUAL ALLEGATIONS

Plaintiffs have alleged that, in 2012, under the direction of Meg Whitman, Hewlett-Packard Company ("HP Co.") implemented a companywide workforce reduction plan ("WFR Plan") that continued through at least 2020, and that each of the Defendants' intention was to utilize the alleged WFR Plan to replace thousands of existing, older workers with new, younger employees. ECF No. 391. Plaintiffs further alleged that the WFR Plan was designed and used by Defendants to restructure their workforces over this multi-year period—from approximately 2012 to 2020 —and to push older workers out of the company, while hiring large numbers of new, younger employees to replace them. *Id.* ¶¶ 1–16, 29–74. As alleged, the WFR Plan was first implemented by HP Co., and in November 2015, HP Co. was renamed HP Inc. and HPE was spun off as a separate entity. *Id.* ¶¶ 5–6, 34–35. Plaintiffs alleged that, after this November 2015 split, both HP Inc. and HPE continued to implement the discriminatory WFR Plan while acting in concert with one another. *Id.* Throughout the litigation, each Defendant has denied, and continues to deny, the allegations described above.

### IV.   TERMS OF THE PROPOSED SETTLEMENT
#### A.  The ADEA Plaintiffs and California Classes.

There are currently 146 ADEA Plaintiffs in this case. Thirty-two (32) of these 146 ADEA Plaintiffs are also California Class Members because they had their employment terminated by a Defendant in California. Also, there are an additional 212 California Class Members who are asserting only California state law claims and who did not opt into one of the ADEA collectives. Thus, in total, there are 358 unique individuals eligible to share in the proceeds of the Settlement.

The "California Settlement Classes" are defined as follows (*see* SA § 1.7):

**The HP Co./HP Inc. California Class**:
All individuals who had their employment terminated by HP Inc. (including when HP Inc. was named Hewlett-Packard Company) in California pursuant to a WFR Plan between August 18, 2012, and February 15, 2022, and who were 40 years or older at the time of such termination. As provided in the operative Fourth Amended Complaint [Dkt. No. 389] ("FAC"), excluded from the HP Co./HP Inc. California Class are: (a) individuals who signed a Waiver and General Release Agreement (as defined in the FAC, n.1); and (b) individuals who signed an Agreement to Arbitrate Claims (as defined in the FAC, n.2).[3] In addition, any individuals who previously signed agreements that waived and released the claims asserted in this action are excluded from the HP Co./HP Inc. California Class.

**The HPE California Class**:
All individuals who had their employment terminated by Hewlett Packard Enterprise Company in California pursuant to a WFR Plan between November 1, 2015, and February 15, 2022, and who were 40 years or older at the time of such termination. As provided in the operative FAC [Dkt. No. 389], excluded from the HPE California Class are: (a) individuals who signed a Waiver and General Release Agreement (as defined in the FAC, n.1); and (b) individuals who signed an Agreement to Arbitrate Claims (as defined in the FAC, n.2). In addition, any individuals who previously signed agreements that waived and released the claims asserted in this action are excluded from the HPE California Class.

### B.  The Proposed Common Fund and Allocation Plan

The proposed Settlement involves a Maximum Gross Settlement Amount of $18,000,000.  The Maximum Gross Settlement Amount represents the maximum amount that Defendants would pay if every ADEA Plaintiff participates in the settlement and receives a settlement payment, inclusive of: (1) all individual settlement payments to Participating California Class Members and ADEA Plaintiffs; (2) the Plaintiffs' attorneys' fees; (3) litigation costs and expenses incurred by the Plaintiffs' attorneys up to $200,000, including the costs of a third-party settlement administrator; and (4) and proposed

---

[3] *See also* SA § 1.7 n.1 (exclusion of individuals who disclaimed interest in participating in or intention to participate in this action).

7

service awards of up to $10,000 each for the five Named Plaintiffs. The allocation of these four categories is as follows:

| | |
|---|---|
| **Maximum Gross Settlement Amount:** | **$18,000,000.00** |
| Less Plaintiffs' Counsel's Attorneys' Fees (25%): | Up to $ 4,500,000.00 |
| Less Cost and Expenses Advanced by Plaintiffs' Counsel Including Settlement Administration Costs: | Up to $200,000.00 |
| Less Service Awards to the 5 Named Plaintiffs ($10,000 each): | $50,000.00 |
| **Adjusted Settlement Amount:** | **$13,250,000.00** |

Under the proposed allocation methodology, the Revised Gross Settlement Amount would be further divided between the ADEA Collective Action Plaintiffs and Participating California Class Members as follows:

| | |
|---|---|
| **Adjusted Settlement Amount Allocated to ADEA Collective Action Plaintiffs:** | **$7,905,044.17** |
| **Adjusted Settlement Amount Allocated to Participating California Class Members:** | **$5,344,955.83** |

### C. The Proposed Allocation Methodology

The proposed allocation methodology took into consideration: (1) each individual's salary at termination; (2) the number of years each individual was employed by a Defendant before termination; and (3) the damages (specifically, lost earnings) potentially recoverable by the ADEA Plaintiffs if the case went to trial, after considering their post-termination earnings and duty to mitigate damages. Plaintiffs' counsel believes that each of these factors is objectively verifiable and tied to the allegations in the 4AC. *First*, salary at the time of termination is significant because any damages recoverable at trial would be based in part on how much each individual was earning at termination. *Second*, the number of years employed is relevant because Plaintiffs believe that former employees who worked for a Defendant for longer periods of time are in a better position to rebut that Defendant's anticipated defenses that they were terminated for reasons other than age at trial as compared to employees who worked for a Defendant for a relatively short time. *Third*, the proposed allocation methodology

recognizes that individuals who opted into one of the ADEA collectives have taken on additional risk by being named in the litigation. The ADEA Plaintiffs also worked cooperatively with Plaintiffs' counsel to provide support for the claims alleged in this case, including by providing detailed earnings and tax information necessary for Plaintiffs' counsel to calculate damages. Further, as a general matter, Plaintiffs' counsel believes that the ADEA Plaintiffs are likely in a stronger position procedurally than the California Class Members because the Court already conditionally certified the two ADEA collectives and the ADEA Plaintiffs are parties to this case. By contrast, the 212 California Class Members, including those eligible to opt into an ADEA collective but who did not do so, might never be allowed to participate in this case unless a Rule 23 motion for class certification is granted. For these reasons, the proposed allocation methodology includes an "Additional Damages Fund" that will be distributed on a pro rata basis to ADEA Plaintiffs who demonstrated to Plaintiffs' counsel, with verifiable tax information, the amount of the lost earnings they incurred (after taking post-termination earnings into account for mitigation purposes) during the first partial and first full year post-termination.

If approved, payments to ADEA Plaintiffs and Participating California Class Members would be based on an allocation methodology that works as follows[4]:

**Step One**:   Calculate "Base Payments." The proposed methodology allocates a "Base Payment" to each of the 358 individuals who have an interest in the Settlement, including the 146 ADEA Plaintiffs and 212 California Class Members. The proposed "Base Payment" is calculated as follows. First, each individual's annual "salary at termination" according to each Defendant's records is divided by 52 to determine each individual's "weekly salary at termination." Second, the number of years each individual was employed by a Defendant was calculated based on data contained in each Defendant's records. Third, the "weekly salary at termination" was multiplied by the "number of years employed at WFR termination" to calculate each individual's Base Payment. Fourth, if the Base Payment calculation resulted in a figure that was less than $15,000, the individual's Base Payment was set at $15,000. Fifth, the Base Payment for the 32 individuals who are both ADEA Plaintiffs and

---

[4] *See* SA§ 3.3.

California Class Members was enhanced by 50% in recognition that these individuals are alleged to have both federal ADEA and California state law claims. The estimated Base Payments for all of the ADEA Plaintiffs and California Class Members (358 individuals) total $9,884,556.49.

**Step Two**:   Distribution of the "Additional Damages Fund" to eligible ADEA Plaintiffs. In addition to the Base Payments described above, the proposed methodology also includes allocations from an "Additional Damages Fund" for those ADEA Plaintiffs who provided Plaintiffs' counsel with tax documentation to confirm the amount of their post-termination earnings, including documentation needed to determine any mitigation of their alleged lost earnings through post-termination employment. Payments from the Additional Damages Fund were calculated on a pro rata basis based on each ADEA Plaintiff's alleged lost earnings as set forth in the Settlement Agreement. *See* SA § 3.3.1 and 3.3.1 n.2. The proposed Additional Damages Fund is approximately $3,365,443.52.

Attached to the Anderson Declaration as Exhibit B is an anonymized spreadsheet listing the individual payments that would be made to all ADEA Plaintiffs and California Class Members, assuming all of them participate in the settlement, based on the above proposed allocation methodology should the Settlement be approved.

To the degree there are uncashed checks equal to or exceeding a total of $25,000, a second pro rata distribution will be made to all ADEA Plaintiffs and Participating California Class Members. If the total of any uncashed checks is below $25,000, or to the degree there is unclaimed money after a second distribution, that money will go to the proposed *cy pres* recipient, the AARP Foundation. The AARP Foundation is a nonprofit that advocates for economic opportunity, social connection, legal advocacy, and food security for older adults. AARP Foundation, https://www.aarp.org/aarp-foundation/ (last visited Sept. 21, 2023);  SA § 6.5.

No part of the California Class Members' allocated share of the settlement proceeds will revert to the Defendants.  At present, 144 of the 146 ADEA Collective Action Plaintiffs have approved the Settlement in writing by signing a Written Consent Authorizing Settlement ("Consent Form"). Anderson Decl. ¶ 6. Four of these 144 individuals are deceased and their representatives have obtained the authority to sign the Consent Form on their behalf the deceased ADEA Plaintiff. *Id.* Two additional ADEA Plaintiffs are deceased, and their family members have agreed to accept the Settlement, but

and they are in the process of obtaining state probate authority to sign a Consent Form accepting the Settlement. *Id.* If, however, an ADEA Plaintiff were to reject the Settlement, the Maximum Gross Settlement Amount would be reduced by that person's allocation or $50,000, whichever is higher, because that individual's claim will not be resolved as part of this lawsuit. SA § 10.1.3.

Under the terms of the Settlement Agreement, half of each individual's settlement payment will be characterized as back wages (with a Form W-2 being issued for that portion) and half will be characterized as liquidated damages (with a Form 1099 being issued). The employer's share of payroll taxes will be paid by the Defendants. Other applicable taxes will be deducted from each individual's allocated settlement share, as set forth in the Settlement Agreement. *See* SA § 6.7.

### D. Settlement Administration and Notice

The Parties have retained a mutually agreeable settlement administrator, CPT Group, Inc. (the "Settlement Administrator" or "CPT"), which will be subject to the Court's approval, appointment, and jurisdiction. The parties obtained bids from three different settlement administrators and CPT's bid was the most economical and complete. Anderson Decl. ¶ 7. As detailed in the Settlement Agreement, the duties of the Settlement Administrator will include, but are not limited to: (i) compiling and delivering by First Class U.S. Mail the proposed settlement notice to the California Class Members ("Class Notice"); (ii) attempting to confirm the accuracy of the addresses of the California Class Members through the United States Post Office's National Change of Address database before mailing; (iii) performing one skip trace on Class Notices returned as undeliverable; (iv) re-mailing Class Notices one time only by First Class U.S. Mail upon a California Class Member's request; (v) distributing Settlement proceeds and handling applicable tax reporting; (vi) establishing a Qualified Settlement Fund; (vii) sending reminder postcards to any California Class Members and ADEA Plaintiffs who have not cashed their checks thirty (30) days prior to the check expiration date; and (viii) all other duties outlined in the Settlement Agreement and/or required under this District's Procedural Guidance for Class Action Settlements ("Class Action Settlement Guidance"). *See* SA § 9. The Settlement Administrator has agreed to perform all administrative work set forth in the Settlement Agreement for a flat fee of $14,750. Anderson Decl. ¶ 7. This amounts to approximately .082% of the Maximum Gross Settlement Amount.

### E.  Release of Claims

The release of claims to be given by ADEA Plaintiffs (excluding the five Named Plaintiffs) and Participating California Class Members is tailored to the age discrimination allegations asserted in the lawsuit and does not release claims for any future conduct.  SA § 13.1.  Specifically, upon final approval, California Class Members who do not timely opt out will release all legal claims they may have against the "Released Persons" relating to actual or alleged age discrimination in re-hiring, retention, termination of employment, or retaliation related to any attempt to become re-hired up to the date the Court entered an order preliminarily approving the settlement.  *Id.*

### F.  Named Plaintiffs' Service Awards

The Settlement provides that the five Named Plaintiffs will request service award payments of $10,000 each.  *Id.* at § 5. These amounts will be in addition to any other recovery they may be entitled to under the Settlement as ADEA Plaintiffs and/or California Class Members.

### G.  Attorneys' Fees, Costs, and Expenses

The Settlement Agreement provides that Plaintiffs' counsel may seek up to 25% of the Maximum Gross Settlement Amount ($4,500,000) and reimbursement of costs and expenses up to $200,000, including costs of settlement administration. *Id.* at § 4. Counsel for Plaintiffs will file a Motion for Class Counsel's Fees, Costs, and Expenses and Named Plaintiff Service Awards at least thirty-five (35) days before the California Class Members' deadline to opt out of or object to the Settlement.  *See* Class Action Settlement Guidance, Preliminary Approval, ¶ 9.

## V.  STANDARD OF REVIEW

 "[T]he court's primary objective at [preliminary approval] is to establish whether to direct notice of the proposed settlement to the class, invite the class's reaction, and schedule a final fairness hearing." 4 *Newberg and Rubenstein on Class Actions* § 13:10 (6th ed. 2023) (hereafter "*Newberg & Rubenstein*"). "Rule 23(e)(1) authorizes a court to grant preliminary approval of a proposed class action settlement—and hence send notice of it to the class—so long as the moving parties demonstrate that the court will '***likely*** be able to' grant final approval to the settlement" under Rule 23(e)(2). *Newberg & Rubenstein*, § 13:13 (citing Fed. R. Civ. P. 23(e)(1)) (emphasis added).

Final approval under Rule 23(e)(2) will require a showing that the settlement is "fair,

reasonable, and adequate," after taking into consideration four factors. *Id.* The procedural factors evaluate whether the class representatives and class counsel adequately represent the class and whether the proposed settlement was negotiated at arm's length. *Id.* (citing Fed. R. Civ. P. 23(e)(2)(A)–(B)). The substantive factors evaluate the adequacy of the relief and whether the proposed settlement treats class members equitably. *Id.* (citing Fed. R. Civ. P. 23(e)(2)(C)–(D)).

## VI.   ARGUMENT

### A.  Certification of the California Settlement Classes Is Appropriate.

A court is authorized to send notice of a proposed settlement to a class "if the parties have demonstrated that it is 'likely' the court will be able to … 'certify the class for purposes of judgment on the proposal' after a notice and objection period." *Newberg & Rubenstein*, § 13:17 (quoting Fed. R. Civ. P. 23(e)(1)). For the purposes of settlement, the parties here agreed to the certification of the two California State Law Settlement Classes set forth in Section IV.A., *supra*.[5] The proposed classes meet all of the criteria for certification under Rule 23.

### 1.  Rule 23(a) Is Satisfied

Numerosity is met because the proposed California Settlement Classes consist of hundreds of individuals who are geographically dispersed across the state such that joinder would not be practicable. Fed. R. Civ. P. 23(a)(1).

Commonality is met because "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). In examining the commonality factor, the focus is on whether there are common issues of fact among class members and whether class treatment will "generate common *answers* apt

---

[5] The two proposed California Settlement Classes are substantially the same as those asserted in the 4AC except both have an end date of February 15, 2022, whereas the 4AC asserts classes without an end date because the alleged WFR Plan was still being implemented when the 4AC was filed. SA § 1.7; ECF No. 391, ¶¶ 114–116. The cutoff date is reasonable given that, according to the class-wide data that Defendants provided to Plaintiffs' counsel ahead of mediation, the latest date that any California Class Member was terminated was prior to February 15, 2022. Anderson Decl. ¶ 8. The February 15, 2022, date is the last day that ADEA Plaintiffs were permitted to opt into the case. *Id.*

to drive the resolution of the litigation." *Abdullah v. U.S. Sec. Assocs.*, 731 F.3d 952, 957 (9th Cir. 2013) (quoting *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011)). Here, it is Plaintiffs' position that there are numerous common questions, including whether the WFR policies and practices of each Defendant discriminated against California Class Members and whether each Defendant's conduct violated FEHA, the UCL and/or California common law.

Typicality is also satisfied. Rule 23 typicality requires that the "claims or defenses of the representative parties [be] typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). Typicality "focuses on the similarity between the lead plaintiff's legal theories and those of the people he or she purports to represent." *Whiteway v. FedEx Kinko's Office & Print Servs., Inc.*, No. 05–cv–2320–SBA, 2006 WL 2642528, at *6 (N.D. Cal. Sept. 14, 2006); *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir. 1998). Here, it is Plaintiffs' position that the Named Plaintiffs' claims are typical because they challenge the same policies and practices, the same alleged workforce reduction plans, and assert the same legal theories, as California Class Members.

Adequacy is satisfied where the class representatives: (1) have common, and not antagonistic, interests with unnamed class members, and (2) vigorously prosecute the interests of the class through qualified counsel. Fed. R. Civ. P. 23(a)(4); *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625 (1997); *Hanlon*, 150 F.3d at 1020. Here, the Named Plaintiffs contend that they share common interest in holding Defendants accountable for the alleged discriminatory conduct.  Plaintiffs Alviso and Vatturi are well-suited to represent the HPE California Class and HP Co./HP Inc. California Class, respectively, because they were terminated as part of workforce reductions by their respective employers, which they allege discriminated against older workers.  All Named Plaintiffs have dedicated themselves for years to prosecuting these claims on behalf of themselves and others they allege to be similarly situated.

Finally, Plaintiffs are also adequately represented. Adequacy of class counsel depends on (1) work performed on the matter, (2) experience, (3) knowledge of the law, and (4) the resources that counsel can commit.  Fed. R. Civ. P. 23(g)(1)(A).  As described further in counsel's declarations, Plaintiffs' counsel are experienced litigators, recognized experts in representing employees in complex employment cases, and have committed significant resources and time to the prosecution of the claims

1    asserted here.   Anderson Decl. ¶¶ 15–18, Ex. E; Declaration of Douglas Dehler in Support of

2    Unopposed Motion for Preliminary Approval of Settlement ("Dehler Decl."), ¶¶ 2–5, Ex. A.

3                    **2.   The Requirements of Rule 23(b)(3) Are Satisfied.**

4            Rule 23(b)(3) is satisfied because common questions "predominate over any questions

5    affecting only individual members, and [] a class action is superior to other available methods for

6    fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

7            Common questions can predominate "even though certain class members' circumstances

8    var[y] and some of the defendant's practices would have to be proven by anecdotal testimony."

9    *Delagarza v. Tesoro Refin. & Mktg. Co*., No. 09-cv-5803 EMC, 2011 WL 4017967, at *12 (N.D. Cal.

10   Sept. 8, 2011).  Here, Plaintiffs contend that common issues predominate because the Named Plaintiffs

11   and the California Class Members have alleged that they were all terminated under the same WFR

12   Plan when they were over 40 years old, which Plaintiffs allege was discriminatory and implemented

13   from the top down. *See, e.g.,* ECF No. 391, ¶¶ 29, 32, 34–35; *see also Ellis v. Costco Wholesale Corp*.,

14   285 F.R.D. 492, 538 (N.D. Cal. 2012) (citing evidence of a common nationwide promotion system in

15   support of a finding of predominance); *Tierno. v. Rite Aid Corp.*, Case No. 05-02520 TEH, 2006 WL

16   2535056, at *10 (N.D. Cal. Aug. 31, 2006) (holding that centralized policies and control support a

17   finding of predominance).

18           Plaintiffs believe that a class action is also superior to other available methods for adjudicating

19   California Class Members' claims here. Litigating hundreds of individual age discrimination lawsuits,

20   where Plaintiffs alleged that the terminations at issue related to the same alleged WFR Plan and alleged

21   policies, would be wasteful and inefficient, and the class mechanism achieves significant economies

22   of scale without wasting judicial resources.

23                    **B.  The Settlement is Fair, Adequate and Reasonable.**

24           Once the Court has determined that Rule 23 class certification is proper for the purposes of

25   settlement, the next step is to determine whether the settlement is "fundamentally fair, adequate, and

26   reasonable" and whether the settlement suffers from any obvious deficiencies.  *Hanlon*, 150 F.3d at

27   1026; *See also In re Tableware Antitrust Litig*., 484 F. Supp. 2d 1078, 1079–80 (N.D. Cal. 2007). Rule

28   23(e) instructs the Court to assess the adequacy of the relief proposed, whether the proposed settlement

treats class members equitably, whether the proposed settlement was negotiated at arm's length, and whether the class representatives and class counsel adequately represent the class. Fed. R. Civ. P. 23(e)(2)(A)–(D).  Similarly, the Ninth Circuit has long considered the following factors, some of which overlap with Rule 23(e)(2)(A)–(D) and may warrant greater attention at final approval: (1) "the strength of the plaintiffs' case," "the risk, expense, complexity, and likely duration of further litigation," and "the risk of maintaining class action status throughout the trial," (2) "the amount offered in settlement," (3) "the extent of discovery completed and the stage of the proceedings," and (4) "the experience and views of counsel."  *Hanlon*, 150 F.3d at 1026.[6]

### 1.    The Relief Proposed Is Fair, Adequate, and Reasonable.

When evaluating the adequacy of the relief proposed pursuant to Rule 23(e)(2)(C), courts should take into account the following factors: (i) the cost, risks, and delay of trial and appeal; (ii) the effectiveness of any proposed methods of distributing relief to the class, including the method of processing class-member claims; (iii) the terms of any proposed award of attorneys' fees, including time of payment; (iv) any agreement required to be identified under Rule 23(e)(3); and (v) whether the proposal treats class members equitably relative to each other.  Fed. R. Civ. P. 23(e)(2)(C).

### a.   The Cost, Risks, and Delay of Continued Litigation Is Substantial.

"Approval of a class settlement is appropriate when 'there are significant barriers plaintiffs must overcome in making their case.'"  *Betancourt v. Advantage Human Resourcing, Inc.*, No. 14–cv–01788–JST, 2016 WL 344532, at *4 (N.D. Cal. Jan. 28, 2016).

Plaintiffs face substantial obstacles to full recovery, and this factor weighs in favor of settlement here. First, even if Plaintiffs are able to prove statistically significant disparities regarding termination of older workers as part of an alleged WFR Plan, Defendants are expected to argue that terminations were based on factors other than age and that age was not a significant factor in the

---

[6] In addition, courts review "the presence of a governmental participant," and "the reaction of the class members to the proposed settlement." *Id.* Here, there are no governmental participants and the California Class Members have not yet weighed in, although the Settlement appears to have achieved unanimous approval from the ADEA Plaintiffs. Anderson Decl. ¶ 6.

decision-making process or the "but for" cause of the decisions at issue. *See Coleman v. Quaker Oats Co.*, 232 F.3d 1271, 1282 (9th Cir. 2000) (noting that a reductions-in-force initiatives can be a nondiscriminatory reason for laying off an employee in age discrimination case). Defendants are also expected to argue that the California Settlement Classes should not be certified and that the ADEA collectives should be decertified because, *inter alia*, the Plaintiffs worked in different geographical locations, had different job titles, reported to different local managers, were selected for termination in a highly decentralized manner based on varying selection criteria, and the lack of any common workforce reduction plan. *See, e.g.,* ECF No. 414 (Defendants' Opposition to Plaintiffs' Motion for Conditional Certification).

Finally, trial always presents substantial risks for both parties and, even if Plaintiffs ultimately prevail at trial, appeals are likely to further delay relief and resolution.  The delay factor is particularly acute here in an age discrimination case already pending for nearly seven years.  Indeed, six ADEA Plaintiffs have already passed away, and the chances are that the same is true for some California Class Members. Anderson Decl. ¶ 6.

### b.  The Amount of the Settlement and the Allocation Plan Are Fair.

"[P]erhaps the most important factor" courts consider for preliminary approval is "plaintiffs' expected recovery balanced against the value of the settlement offer." *Cotter v. Lyft, Inc.*, 176 F. Supp. 3d 930, 935 (N.D. Cal. 2016).

One way to assess the fairness of the amount is to compare the settlement amount to the maximum damages expected to be awarded at trial should plaintiffs prevail, taking into consideration the risk factors continued litigation poses. Class Action Settlement Guidance, Preliminary Approval, § 1.c. If this case was successfully litigated to trial, counsel for Plaintiffs estimate that the wage loss recovery for the 212 California Class Members and 146 ADEA Plaintiffs would be in the range of $36,591,982 to $73,183,964.[7] Anderson Decl. ¶ 10.  These figures are Plaintiffs' counsel's estimated

---

[7] These estimates are exclusive of any liquidated damages, punitive damages, interest, noneconomic damages, and/or attorneys' fees that could be awarded because such damages are difficult to estimate at this stage.

equivalent of one and two years of lost wages, respectively, before consideration of the mitigation efforts of California Class Members and ADEA Plaintiffs. Any estimate of the potential class and collective recovery must take into account the duty to mitigate lost earnings by making reasonable efforts to obtain a new job. For example, when taking mitigation data collected from ADEA Plaintiffs into consideration and extrapolating those percentages across the California Settlement Classes, the total projected *mitigated* wage losses during the first full year after termination for both the ADEA Plaintiffs and the California Class are estimated to be $22,321,209, or 61% of *unmitigated* wage loss damages (based on the $36,591,982 estimate noted above). Anderson Decl. ¶ 10.  Based on data from the Bureau of Labor Statistics ("BLS"), as well as detailed mitigation information that Plaintiffs' counsel obtained from the ADEA Plaintiffs, many plaintiffs either will have been reemployed to some extent or have withdrawn from the workforce after two years. According to BLS, 68.9% of long-term workers in business and professional services who were terminated between January 2013 and December 2015 were reemployed by January 2016, while another 20.2% of those workers had left the workforce altogether.[8] Similarly, based on information that counsel has collected from the ADEA Collective Action Plaintiffs, approximately 65.5% of the ADEA Plaintiffs were reemployed by the end of their first full year after their termination. Anderson Decl. ¶ 11. While variables certainly exist, in light of the foregoing, Plaintiffs' counsel believes that using the full one- and two-year salary ranges for each and every California Class Member and ADEA Plaintiff provides a reasonable estimate of the damages that might be awarded at trial.

The next step is to adjust these exposure figures by the probability of Plaintiffs' prevailing at each stage of litigation. In *Rabin*, an age discrimination case in this District where the settlement received final approval on February 4, 2021, it was estimated that plaintiffs had a 12.5% chance of recovering the maximum damages.  *Rabin v. PricewaterhouseCoopers LLP*, No. 16-cv-02276-JST,

---

[8] *See* Bureau of Labor Statistics, U.S. Department of Labor, *Two-thirds of workers displaced from 2013 to 2015 were reemployed in January 2016,* The Economics Daily (Aug. 31, 2016) https://www.bls.gov/opub/ted/2016/two-thirds-of-workers-displaced-from-2013-to-2015-were-reemployed-in-january-2016.htm.

2021 WL 837626, at *5 (N.D. Cal. Feb. 4, 2021). In that case, the aggregated 12.5% chance of recovering maximum wage loss damages at trial was calculated based on the assumption that plaintiffs had a 50% chance at prevailing at each of the following stages: (1) class certification (and decertification), (2) summary judgment, and (3) trial. Anderson Decl., ¶ 12; Ex. C.  And this figure does not take into account the additional risk of losing on appeal. Applying the same risk factors here, the estimated range of $36,591,982 to $73,183,964 is reduced to $4,573,998 to $9,147,996, rendering the settlement amount here of $18,000,0000 reasonable. *See also Heath v. Google LLC*, Case No. 15-cv-01824-BLF, 2019 WL 3842075, at *5 (N.D. Cal. Aug. 15, 2019) (assessing settlement compared to actual wage loss and noting that courts in the Ninth Circuit have found FLSA settlements in the range of 25% to 35% of total possible recovery reasonable).[9]

Another way to assess the fairness of the Settlement is to look at the per-person recovery.  Here the $18,000,000 settlement results in an average gross recovery of $50,279 for each of the 358 individuals participating in the Settlement. Compared to other ADEA settlements, counsel for Plaintiffs believe the average recovery here exceeds results achieved in many other age discrimination cases. *See, e.g., Rabin*, 2021 WL 837626, at *5 ($11.625 million settlement yielding an average award of $2,054, with class members receiving awards ranging from $200 to $6,054); *Heath*, 2019 WL 3842075, at *5 ($11,000,000 settlement for 227 plaintiffs yielding an average gross award of $48,458 per plaintiff); *Williams v. Sprint/United Management Company*, No. 03-2200-JWL, 2007 WL 2694029  (D. Kan. Sept. 11, 2007) ($57,000,000 for 1,697 plaintiffs yielding an average of $33,589 per plaintiff); *Dallas v. Alcatel-Lucent USA, Inc*., Case No. 09-14596, 2013 WL 2197624 (E.D. Mich. May 20, 2013) ($1,400,000 settlement was shared by 194 plaintiffs yielding an average of $7,216 per plaintiff); *see also* Anderson Decl. Ex. D.

As described in Section IV.C., *supra*, the proposed allocation plan is based on objective factors including salary at termination, time employed at each Defendant, and a separate lost wages fund for plaintiffs who opted into one of the two ADEA collectives and provided objectively verifiable

---

[9] This settlement amount would constitute 49% to 25% of the estimated total wage loss of $36,591,982 to $73,183,964, respectively, without accounting for risk factors or mitigation.

evidence of mitigated wage losses. The proposed allocation plan also takes into consideration individuals who have opted into one of the ADEA collectives and individuals who have asserted claims under both the ADEA and California state law, while providing significant relief to every class or collective member without requiring a cumbersome claims process.

### c.   The Settlement Is the Product of Arm's Length Negotiations.

"The primary procedural factor courts have considered at preliminary approval is whether the agreement arose out of arms-length, non-collusive negotiations." *Newberg & Rubenstein*, § 13:14; *see also Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948, 965 (9th Cir. 2009) (citing *Hanlon* at 1027). "[T]he involvement of a neutral or court-affiliated mediator or facilitator in those negotiations may bear on whether they were conducted in a manner that would protect and further the class interests." Advisory Committee Notes, Fed. R. Civ. P. 23(e)(2) (2018). *See also Tijero v. Aaron Bros., Inc.*, 301 F.R.D. 314, 325 (N.D. Cal. 2013) (participation in private mediation "support[s] the conclusion that the settlement process was not collusive").

Here, the Parties engaged in two full-day mediations with one of the most prominent employment discrimination mediators in the country, Mark S. Rudy, and a retired California state court chief judge with significant complex litigation experience, Hon. Daniel J. Buckley (Ret.), and continued to consult with the mediators in connection with ongoing settlement negotiations. Anderson Decl. ¶ 14. Thereafter, the parties continued to vigorously negotiate the terms of the proposed Settlement on a weekly, and sometimes daily, basis for eight more months, including terms relating to allocation of the settlement proceeds, the scope of the release, the data security guarantees of the Settlement Administrator, walk-away provisions, attorneys' fees, costs, and expenses, and confidentiality provisions, in addition to Plaintiffs' counsel conducting significant independent investigations to verify the employment data used to create the proposed allocation methodology. *Id.*

### d.   The Parties Are Adequately Informed to Make Decisions About Settlement.

"In the context of class action settlements, 'formal discovery is not a necessary ticket to the bargaining table' where the parties have sufficient information to make an informed decision about settlement," including formal and informal discovery. *Dyer v. Wells Fargo Bank, N.A.* 303 F.R.D.

326, 332 (N.D. Cal. 2014) (concluding that the parties were sufficiently informed to judge the adequacy of the settlement where counsel had propounded and reviewed discovery, taken depositions, interviewed defendant's employees and prepared for a multi-day mediation); *see also In re Omnivision Techn., Inc.,* 559 F. Supp. 2d 1036, 1042 (N.D. Cal. 2008) (finding the parties were sufficiently informed about the case prior to settling the action where they propounded and reviewed discovery, took depositions, briefed motions, and engaged in mediation). "[T]he nature and amount of discovery in this or other cases, or the actual outcomes of other cases, may indicate whether counsel negotiating on behalf of the class had an adequate information base. The pendency of other litigation about the same general subject on behalf of class members may also be pertinent." Advisory Committee Notes, Fed. R. Civ. P. 23(e)(2) (2018).

Here, the Parties have sufficient information to evaluate the sufficiency of the proposed Settlement. The parties have exchanged written discovery and Plaintiffs have taken corporate depositions. Class Counsel conducted significant independent investigation, including interviewing and gathering information from percipient witnesses, and working on regression analyses and theories with expert consultants. Counsel for Plaintiffs also prosecuted the claims of the individual plaintiffs whose claims were compelled to arbitration, which provided significant insight regarding the Defendants' policies, practices, and defenses. Finally, the parties have continued to exchange a large volume of information and data over the course of many months informally in connection with particular issues that arose during settlement negotiations. Anderson Decl. ¶ 15.

**e. Counsel's Experience and Views Support the Settlement.**

"Great weight is accorded to the recommendation of counsel, who are most closely acquainted with the facts of the underlying litigation." *Nat'l Rural Telecomms. Coop. v. DIRECTV, Inc*., 221 F.R.D. 523, 528 (C.D. Cal. 2004) (internal quotations omitted).

As noted in Section VI.A.1, above, counsel for Plaintiffs are experienced and highly regarded employment class attorneys, who have been litigating claims on behalf of the ADEA Plaintiffs and California Class Members in this case, as well as other individuals compelled to individual arbitration, for more than seven years. Anderson Decl. ¶ 15; Dehler Decl. ¶ 2. Plaintiffs' counsel also worked closely with consultants to analyze the strength of their statistical analysis. Anderson Decl. ¶ 15. Thus,

the proposed Settlement results from Plaintiffs' counsel's informed judgment about the strengths and weaknesses of the claims. Based on their experience and knowledge of the law, and their knowledge of the Defendants' policies, practices, and defenses, the rigorous manner in which Defendants are expected to defend themselves against the claims and class and/or collective certification, the legal standards that will need to be met at trial, and the significant monetary relief that Plaintiffs' counsel believe the Settlement guarantees, Plaintiffs' counsel believe the Settlement is not only fair, but an excellent result for the California Class Members and ADEA Plaintiffs. Anderson Decl. ¶ 16; Dehler Decl. ¶ 3.

### f. Attorneys' Fees, Costs, and Expenses Are Reasonable.

The proposed Settlement allows Plaintiffs' counsel to request a fee of up to 25% of the Maximum Gross Settlement Amount.  Twenty-five percent is the well-established "benchmark for an attorneys' fee award in a successful class action" in this Circuit. *Williams v. MGM-Pathe Commc'ns Co.*, 129 F.3d 1026, 1027 (9th Cir. 1997); *see also In re Bluetooth Headset Products Liab. Litig.*, 654 F.3d 935, 942 (9th Cir. 2011) ( "[C]ourts typically calculate 25% of the fund as the 'benchmark' for a reasonable fee award"). Indeed, courts in this Circuit frequently approve fee awards in excess of 25%. *Chavez v. Netflix Inc.*, 162 Cal. App. 4th 43, 66 n.11 (2008) (noting that fee awards in class actions average around one-third of the recovery); *Rabin*, 2021 WL 837626, at *8 (approving attorneys' fees of 35% of the common fund). Counsel's anticipated fee request is also reasonable when conducting a lodestar crosscheck.  "Calculation of the lodestar, which measures the lawyers' investment of time in the litigation, provides a check on the reasonableness of the percentage award." *Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1050 (9th Cir. 2002).

Plaintiffs' counsel have performed substantial work in this case such that the requested fee is justified. Over the past several years of this litigation, Plaintiffs' counsel has (a) conducted extensive research and pre- and post-filing investigation; (b) worked with expert consultants; (c) filed three subsequent amended complaints; (d) defeated, in part, multiple rounds of motions to dismiss and related motion practice; (e) negotiated multiple discovery disputes; (f) engaged in both written and deposition discovery; (g) communicated with hundreds of percipient witnesses; (h) successfully moved for conditional certification of the ADEA collectives; (i) vigorously represented Plaintiffs in

1   two full-day mediations and engaged in months of intense post-mediation settlement discussions; and

2   (j) otherwise skillfully pursued the claims in this case and achieved what they believe to be an excellent

3   result for California Class Members with this proposed Settlement.

4   The anticipated fee application also passes muster when cross checked with Plaintiffs'

5   counsel's lodestar. Plaintiffs' counsel's lodestar is already over 5,487,582, such that the requested fee

6   of $4,500,000 constitutes a 0.82 multiplier, with more work to be performed to secure preliminary

7   approval, oversee notice to California Class Members, respond to putative class member inquiries

8   during the notice period, and brief and argue final approval. Anderson Decl. ¶ 17; Dehler Decl. ¶ 4.

9   Moreover, Plaintiffs' counsel has agreed to cap the costs they seek to recover from the Maximum

10  Gross Settlement Amount at $200,000, including costs of settlement administration, even though their

11  actual costs exceed this amount. Anderson Decl. ¶ 17. As such, the requested award would not "yield

12  windfall profits for class counsel in light of the hours spent on the case" and will likely be approved.

13  *In re Bluetooth*, 654 F.3d at 942.

14  Plaintiffs' counsel will submit their request for attorneys' fees, costs, and expenses at least 35

15  days before the objection and opt-out deadline.  SA § 4.1.

16  **g.  The Requested Service Awards Are Reasonable.**

17  Service awards "are discretionary ... and are intended to compensate class representatives for

18  work done on behalf of the class, to make up for financial or reputational risk undertaken in bringing

19  the action, and, sometimes, to recognize their willingness to act as a private attorney general." *Wren*

20  *v. RGIS Inventory Specialists*, Case No. C-06-05778 JCS, 2011 WL 1230826, at *31 (N.D. Cal. April

21  1, 2011).

22  Here, the Named Plaintiffs cooperated with discovery, worked with Plaintiffs' counsel on their

23  investigation, and diligently represented the interests of the classes and collectives for as many as

24  seven years. *See also DeLeon v. Wells Fargo Bank, N.A.*, Case No. 12-cv-4494 (RLE), 2015 WL

25  2255394, at *7 (S.D.N.Y. May 7, 2015) (approving $15,000 service award, noting that doing so

26  "recognizes the risks that the named-Plaintiff faced by participating in a lawsuit against her former

27  employer"). The Named Plaintiffs also risked the potential of being liable for costs. *See, e.g.,* Fed. R.

28  Civ. P. 54(d)(1).

Plaintiffs believe that the requested $10,000 service awards here are reasonable and in keeping with service awards granted in similar cases in this District. *See,* e.g., *Rabin,* 2021 WL 837626, at *9 –10 ($20,000 service award to each named plaintiff); *Galeener v. Source Refrigeration & HVAC, Inc*., No. 13-CV-04960-VC, 2015 WL 12976106, at *3 (N.D. Cal. Aug. 20, 2015) ($27,000 and $25,000 to two class representatives); *Ross v. U.S. Bank Nat'l Ass'n*, No. 07 Civ. 2951, 2010 WL 3833922, at *4 (N.D. Cal. Sept. 29, 2010) ($20,000 service award for each of four class representatives). Plaintiffs' counsel will submit their request for service awards 35 days before the objection and opt-out deadline. SA § 5.1.

### C.  The Proposed Notice and Notice Plan Are the Best Practicable Here.

The proposed Notice is reasonable and constitutes the "best notice that is practicable under the circumstances." Fed. R. Civ. P. 23(c)(2)(B); 23(e)(1). To satisfy Rule 23(e)(1), settlement notices must "present information about a proposed settlement neutrally, simply, and understandably." *In re Hyundai & Kia Fuel Econ. Litig*., 926 F.3d 539, 567 (9th Cir. 2019).

The proposed Notice is easy to understand, explains all options available to the California Class Members, and refers California Class Members to links where they may access more detailed descriptions and the Settlement Agreement itself should they so choose.

Importantly, the Notice explains the scope of the released claims in plain language, referring the reader to the more detailed language accessible on the website. Courts have found that including the full release language can be confusing to lay people and is discouraged. *See Shin v. Plantronics, Inc*., No. 18-CV-05626-NC, 2019 WL 2515827, at *7 (N.D. Cal. June 17, 2019) (rejecting notice that "merely copies and pastes the full release language" and "is heavy on legalese and difficult to parse"); *see also In re Uponor, Inc., F1807 Plumbing Fittings Prod. Liab. Litig.,* 716 F.3d 1057, 1065 (8th Cir. 2013) (notice may refer the reader to a more detailed description or text of the release at a settlement website). "Notice is satisfactory if it 'generally describes the terms of the settlement in sufficient detail to alert those with adverse viewpoints to investigate and to come forward and be heard.'" *In re Hyundai & Kia Fuel Econ. Litig*., 926 F.3d at 567.

The Notice includes: (1) contact information for Class Counsel to answer questions; (2) the address for a website, maintained by the Settlement Administrator, that will link to the notice, the

Settlement Agreement, motions for approval and for attorneys' fees, costs, and expenses, and any other important documents in the case; and (3) instructions on how to access the case docket via PACER or in person at any of the Court's locations. The Notice will also state the date of the final approval hearing and clearly states that the date may change without further notice to the class. The Notice further advises California Class Members that they should check the settlement website or the Court's PACER site to confirm that the date has not been changed.  Finally, the Notice explains that California Class Members have 60 days to object or opt out, and provides information on how to do so.  SA Ex. B.

## VII.    PROPOSED SCHEDULE FOR REMAINING PROCEDURES

After consulting with Defendants, Plaintiffs proposed the following schedule:

| Event | Date/Days |
|---|---|
| Preliminary Approval Hearing | October 26, 2023 |
| Court Enters Preliminary Approval Order | To Be Determined by Court |
| Defendants provide list of California Class Members to CPT | Within five (5) business days of date of entry of order granting preliminary approval |
| CPT disseminates Notice to the California Class Members | Within fifteen (15) business days of receipt from Defendants of list of California Class Members |
| Plaintiffs file Motion for Attorneys' Fees, Costs, and Expenses and Motion for Named Plaintiff Service Awards | Thirty-Five (35) calendar days prior to deadline for California Class Members to opt out or object |
| Deadline for California Class Members to Opt-Out or Object to the Settlement | Sixty (60) calendar days after the date on which CPT mails Notice to California Class Members |
| Plaintiffs File Motion for Final Approval | To Be Determined by Court |
| Final Approval Hearing | Date No Earlier Than 100 Days After Preliminary Approval Motion Is Filed |

## VIII.    CONCLUSION

For the reasons set forth above, Plaintiffs' counsel request that the Court grant Plaintiffs' Motion, preliminarily approving the Settlement and, among other things set forth in this Motion, certifying the California Settlement Classes for settlement purposes only, directing that Notice be disseminated to the California Class Members, and setting a date for the Final Approval Hearing.

DATE: September 21, 2023

ANDRUS ANDERSON LLP

By: /s/ Jennie Lee Anderson
    Jennie Lee Anderson

Jennie Lee Anderson (SBN 203586)
jennie@andrusanderson.com
155 Montgomery Street, Suite 900
San Francisco, CA 94104
Phone:    (415) 986-1400
Fax:    (415) 986-1474

Douglas P. Dehler (admitted *pro hac vice*)
doug.dehler@wilaw.com
O'NEIL, CANNON, HOLLMAN,
DEJONG & LAING S.C.
111 East Wisconsin Avenue, Suite 1400
Milwaukee, WI 53202
Phone:    (414) 276-5000
Fax:    (414) 276-6581

*Attorneys for Plaintiffs and the Proposed Classes*